# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA



FILED by ___ D.C.
INTAKE

JAN 3 1 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

### CASE NO. 04-20658-CIV-JORDAN/BROWN

DARBY MARITIME LIMITED, and
GREGORY A. BRADY

      **Plaintiffs,**

vs.

HOLLAND & KNIGHT, LLP,
~~MICHAEL T. MOORE, DANIELLE~~
GRUCCI BUTLER, KOCH,
NEWTON & PARTNERS, L.C., and
JOHN ROBERT NEWTON III, a/k/a
ROB NEWTON,

      **Defendants.**
_____/

## JOINT MOTION OF PLAINTIFFS DARBY MARITIME LIMITED, AND GREGORY A. BRADY, DEFENDANTS HOLLAND & KNIGHT LLP, MICHAEL T. MOORE AND DANIELLE J. BUTLER, AND KOCH, NEWTON & PARTNERS, L.C. AND JOHN ROBERT NEWTON, III TO STAY PROCEEDINGS FOR SIXTY DAYS, WITH SUPPORTING MEMORANDUM

Plaintiffs Darby Maritime Limited and Gregory A. Brady (collectively "Darby"),

Defendants Holland & Knight LLP, Michael T. Moore and Danielle J. Butler (collectively

"H&K"), and Koch, Newton & Partners, L.C. and John Robert Newton, III (collectively

"Koch Newton"), hereby move to stay all proceedings in this case for sixty days for the

reasons and authorities set forth below.

In this Memorandum the parties address the question raised by this Honorable Court in its Order dated December 8, 2004, namely whether this action is now ripe. The parties submit that while the litigation malpractice claim has accrued and the transactional malpractice claim apparently has not, this Court should not resolve the accrual question, but should instead stay this matter for sixty days. A sixty day stay would be in the interest of justice for two reasons: First, several events pre-requisite to the completion of the purchase of the Vessel – including the delivery of the Vessel – are scheduled to take place within that time. Second, the parties have scheduled a mediation for March 24 and 25, 2005. While the parties do not know if this action will be successfully resolved, we can unequivocally state that we are working to ensure that the mediation is as productive as possible.

## A. Background

On March 19, 2004, Plaintiffs Darby Maritime Ltd. and Gregory A. Brady (collectively "Darby") brought this action against Yacht Broker Koch Newton for, *inter alia*, breach of fiduciary duty, and its former counsel H&K for legal malpractice in representing Darby in a transaction for the construction and purchase of a luxury motor yacht (the "Vessel") from Sensation Yachts Limited, a New Zealand shipyard ("the Shipyard"). *See* Complaint ¶¶ 1, 8, 9, 12. The nature of the alleged malpractice is two-fold.

First, Darby alleges transactional malpractice - in summary that H&K committed negligence in the drafting and the execution of a Vessel Construction Agreement ("the

VCA").[1]   *See* Complaint ¶¶ 18, 19.  According to Darby, the alleged legal malpractice committed by H&K resulted, *inter alia*, in an arbitration proceeding in the United Kingdom between Darby and the Shipyard.

Second, Darby alleges litigation malpractice in connection with the arbitration - in summary that H&K improperly failed to seek rectification, and improperly advised Darby to withdraw claims of fraud, misrepresentation, illegality and mistake.  *See* Complaint ¶¶ 21, 22.  Plaintiffs allege that H&K's conduct was the proximate cause of substantial economic loss and damage.  *See* Complaint ¶ 23.  On June 14, 2004, H&K filed an agreed motion to stay proceedings on the basis that the alleged claim has not accrued because the arbitration was still ongoing, the Vessel has not been fully paid for or delivered, and Darby and the Shipyard continued to have disputes between one another.

On July 12, 2004, this Honorable Court granted the Motion to Stay Proceedings and ordered that the parties file status reports every sixty days beginning August 1, 2004 to apprise the Court of the progress of the related arbitration proceedings between Darby and the Shipyard, or any other activity that could or should cause the stay to be lifted and this case reactivated.  The order also stated that "[i]f the related arbitration proceedings are still pending by the end of the year, I will ask the parties to brief whether or not this action is ripe." [D.E. 17 at 2.]

---

[1]A copy of the VCA is attached hereto as Exhibit "A".

Case No. 04-20658-Civ-Jordan/Brown

The parties then duly filed their status reports [*see* D.E. 18, 19, 21, 22, 23 and 24], and

on December 8, 2004, this Court issued an Order stating that if the matter is not resolved by

January 30, 2005, the parties are to brief the Court by that day on the issue of whether or not

this action is ripe. [D.E. 29].  This Memorandum responds to that Order.

### B.   While The Litigation Malpractice Claim Has Accrued, The Transactional Malpractice Claim Has Not.

As described below, while the litigation malpractice claim has accrued, the

transactional malpractice claim apparently has not.  On September 16, 2004, Darby and the

Shipyard executed an Amendment to the VCA ("the Amendment") that provides for payment

and delivery of the Vessel. A copy of the Amendment is attached hereto as Exhibit "B." The

Amendment also appears to terminate the arbitration proceedings, as it provides that the

parties to the Amendment will not take any further action with respect to any decision from

the arbitration proceedings that prompted the litigation malpractice claim, and puts in place

a different dispute resolution mechanism.  Amendment at ¶¶ 9 and 13.[2]  Accordingly,

inasmuch as the litigation malpractice claim stemmed from the arbitration proceedings that

have been terminated pursuant to the Amendment, that claim has accrued.  *See Silverstone

v. Edell*, 721 So.2d 1173 (Fla. 1978) (statute of limitations does not commence in litigation

malpractice action until final judgment becomes final).

---

[2]The Amendment provides for a dispute resolution process to address problems between the Shipyard and Plaintiffs that includes a non-binding facilitator to be followed by binding arbitration. *See* Amendment ¶ 9.

- 4 -

In contrast, the transactional malpractice claim appears not to have accrued.  A transactional malpractice claim does not accrue until "the client incurs damages at the conclusion of the related or underlying judicial proceedings or, if there are no related or underlying judicial proceedings, when the client's right to sue in the related and underlying judicial proceeding expires." *Blumberg v. USAA Casualty Ins. Co.*, 790 So.2d 1061, 1065 (Fla. 2001). *See also Perez-Abreu v. Taricido*, 790 So.2d 1051, 1054 (Fla. 2001) (same).

Here, the transaction in question – the purchase and delivery of the Vessel – has not been completed.  Instead, the Vessel has not yet been delivered despite provisions in the Amendment that called for its delivery in November of 2004.[3]  Accordingly,  the time for underlying judicial proceedings – particularly in connection with delivery – has not run and the claim has apparently not accrued.  Further, the claim has not accrued for another related reason: given the failure of the Shipyard to deliver the Vessel, and the potential remedies for default available under the VCA,[4] the Plaintiffs cannot show a key component of a malpractice claim namely, "redressable harm."  *See Peat Marwick Mitchell & Co. v. Lane*, 565 So.2d 1323, 1325 (Fla. 1990) (stating in context of alleged accounting malpractice claim that "[g]enerally, a cause of action for negligence does not accrue until the existence of a redressable harm or injury has been established...").

---

[3]The Amendment provides that the Plaintiffs were to make a payment and deposit within three business days of the execution of the September 16, 2004 Amendment, and the Shipyard was to deliver the Vessel within 60 days after those payments, presumably in November of 2004. *See* Amendment at ¶¶ 1 and 5.

[4]*See* VCA at ¶ 19.

That said, the parties submit that this Court should not reach the question of accrual, but should instead stay these proceedings for sixty days. We respectfully make this request for two reasons. First, if the Vessel is delivered in February, the Plaintiffs may be in a position to affirm that they will not be undertaking proceedings against the Shipyard with respect to the transaction, and thus the transactional malpractice claim may have accrued by that time.[5]

Second, as noted above, the parties have scheduled a mediation for late March 2005, and engaged in substantial pre-mediation discovery. To date, H&K has produced approximately 3,325 documents in anticipation of that mediation, and Koch Newton has produced nearly 300. While it is impossible to know whether the mediation will resolve this case, the parties are preparing for it in a thorough and vigorous manner.

Accordingly, entering a sixty day stay would be in the interest of justice and judicial economy because it would allow the parties to determine whether the Vessel will in fact be delivered, and to complete the scheduled mediation. *See Landis v. No. American Co. v. American Water Works & Electrical Co.*, 299 US 248, 254, 57 S.Ct. 163, 81 L.Ed.2d 153 (1936) (district court has inherent power "to control the disposition of the causes on its

---

[5]Counsel for the Plaintiffs has indicated that there may be certain delay claims against the Shipyard, but anticipates that they will be readily calculable and resolvable once the Vessel has actually been delivered. *See* Amendment at ¶6. (Penalty for late delivery set at $4,500.00 per day; provision triggered immediately upon late delivery). Notably, under the VCA, the penalty for late delivery was $3,000.00 rather than $4,500 and, unlike the provision in the Amendment, was not triggered until thirty days after the alleged late delivery. VCA at ¶ 15.

Case No. 04-20658-Civ-Jordan/Brown

docket with economy of time and effort for itself, for counsel, and for litigants."); *Republic of Venezuela v. Phillip Morris Co.,* 1999 WL 339116677 *1 (S.D. Fla. April 28, 1999) (granting stay pending disposition of motion to transfer pending before Judicial Panel on Multidistrict Litigation).

The parties are keenly aware of the importance of closely monitoring – and limiting – a stayed proceeding. Accordingly, the proposed Order, attached as Exhibit "C", instructs the parties to file a status report on April 1, 2005 to apprise the Court of the status of this case and the result of the mediation proceedings. The parties would add only that they are most grateful for the patience this Court has afforded the litigants in this case.

**C.    Conclusion**

For the foregoing reasons and authorities, and based on the agreement of all parties, we respectfully request entry of the proposed Order attached as Exhibit "C."

Date:  January 31, 2005                     Respectfully submitted,
         Miami, Florida

*George C. W. LaMarca / leave of permission*
George A. LaMarca
LaMARCA & LANDRY, P.C.
1820 N.W. 118th Street, Suite 200
Des Monies, Iowa 50325
Telephone:  (515) 225-2600
**Attorneys for Plaintiffs Darby Maritime Limited and Gregory A. Brady**

_____
Richard H. Critchlow (Fla. Bar # 15522)
E-mail: rcritchlow@knsacs.com
Pamela I. Perry (Fla. Bar # 455271)
E-mail: pperry@knsacs.com
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard, Suite 1100
Miami, Florida 33131-4327
Telephone:  (305) 373-1000
Facsimile:  (305) 372-1861
**Attorneys for Defendants Holland & Knight LLP, Michael T. Moore and Danielle J. Butler**

Case No. 04-20658-Civ-Jordan/Brown

Gregory G. Olsen, Esq.
MORGAN, OLSEN & OLSEN, LLP
315 Northeast 3rd Avenue, Suite 200
Fort Lauderdale, Florida 33301-1149
Telephone:   (954) 524-3111
**Attorneys for Defendants Koch, Newton & Partners, L.c. and John Robert Newton III**

## Certificate of Service

**I hereby certify** that a true and correct copy of the foregoing was served by United States mail on January 31, 2005 on all other counsel of record on the attached Service List.

Pamela I. Perry

207725.6

- 8 -

# SERVICE LIST
## Darby Maritime, etc., et al.
## vs. Holland & Knight, etc., et al.
## Case No. 04-20658-Civ-Jordan/Brown

George A. LaMarca, Esq.
LAMARCA & LANDRY, P.C.
1820 119th Street, Suite 200
Des Moines, Iowa 50325
Telephone:   (515) 225-2600
Facsimile:   (515) 225-8581
**Attorneys for Plaintiffs Darby
Maritime Limited and Gregory A.
Brady**

Richard H. Critchlow, Esq.
Pamela I. Perry, Esq.
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida  33131-4327
Telephone:   (305) 373-1000
Facsimile:   (305) 372-1861
**Attorneys for Defendants Holland &
Knight LLP, Michael T. Moore and
Danielle J. Butler**

Gregory G. Olsen, Esq.
MORGAN, OLSEN & OLSEN, LLP
315 Northeast 3rd Avenue, Suite 200
Fort Lauderdale, Florida 33301-1149
Telephone:   (954) 524-3111
Facsimile:   (954) 463-3570
**Attorneys for Defendants Koch,
Newton & Partners, L.C. and
John Robert Newton III**

- 9 -

## SERVICE LIST

**Darby Maritime, etc., et al.**
**vs. Holland & Knight, etc., et al.**
**Case No. 04-20658-Civ-Jordan/Brown**

George A. LaMarca, Esq.
LAMARCA & LANDRY, P.C.
1820 119th Street, Suite 200
Des Moines, Iowa 50325
Telephone:   (515) 225-2600
Facsimile:   (515) 225-8581
**Attorneys for Plaintiffs Darby**
**Maritime Limited and Gregory A.**
**Brady**

Richard H. Critchlow, Esq.
Pamela I. Perry, Esq.
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida  33131-4327
Telephone:   (305) 373-1000
Facsimile:   (305) 372-1861
**Attorneys for Defendants Holland &**
**Knight LLP, Michael T. Moore and**
**Danielle J. Butler**

Gregory G. Olsen, Esq.
MORGAN, OLSEN & OLSEN, LLP
315 Northeast 3rd Avenue, Suite 200
Fort Lauderdale, Florida 33301-1149
Telephone:   (954) 524-3111
Facsimile:   (954) 463-3570
**Attorneys for Defendants Koch,**
**Newton & Partners, L.C. and**
**John Robert Newton III**



EXHIBIT A

# VESSEL CONSTRUCTION AGREEMENT

### BETWEEN

## DARBY MARITIME LIMITED & SENSATION YACHTS LIMITED

### FOR THE CONSTRUCTION OF A

### 174' SENSATION YACHT



Produced by
Danielle J. Butler, Esq.
Michael T. Moore, Esq.
701 Brickell Avenue
Suite 3000
Miami, FL  33131
305-374-8500 tel
305-789-7799 fax

H&K 000009

# TABLE OF CONTENTS

ARTICLE 1. PURPOSE ........................................................................... 1

ARTICLE 2. DEFINITIONS ..................................................................... 2

ARTICLE 3. SCOPE OF THE WORKS ..................................................... 3

ARTICLE 4. PURCHASER'S REPRESENTATIVE, INSPECTION AND
MODIFICATION ................................................................................... 3

      Section 4.01    PURCHASER'S REPRESENTATIVE ...................................... 3

      Section 4.02    INSPECTION AND APPLICATION ......................................... 4

ARTICLE 5. PROJECT CO-ORDINATOR ................................................. 4

ARTICLE 6. CLASSIFICATION AND STANDARDS ................................. 5

ARTICLE 7. CONSTRUCTION ............................................................... 6

      Section 7.01    LOCATION .......................................................................... 6

      Section 7.02    SUBCONTRACTORS ............................................................ 6

      Section 7.03    CONTROL OF CONSTRUCTION .......................................... 6

      Section 7.04    UNSATISFACTORY WORKS AND MATERIALS ................... 7

ARTICLE 8. APPROVAL OF PLAN AND MATERIAL ............................... 8

ARTICLE 9. CONTRACT PRICE ............................................................. 9

ARTICLE 10. VARIATIONS .................................................................... 9

ARTICLE 11. CONDITIONS AND TERMS OF PAYMENT ...................... 10

ARTICLE 12. COMMENCEMENT AND DELAY ...................................... 11

      Section 12.01   COMMENCEMENT ............................................................ 11

      Section 12.02   TIME FOR COMPLETION .................................................. 11

ARTICLE 13. LAUNCHING ................................................................... 12

ARTICLE 14. SEA TRIALS AND ACCEPTANCE .................................... 12

ARTICLE 15. DELIVERY ...................................................................... 14

ARTICLE 16. LEGAL TITLE ................................................................. 16

ARTICLE 17. WARRANTIES ................................................................. 17

i

H&K 000010

ARTICLE 18.  DEFAULT ON THE PART OF THE PURCHASER .................……......20

ARTICLE 19.  DEFAULT ON THE PART OF THE BUILDER .................................21

ARTICLE 20.  INSURANCE .................................................................................21

ARTICLE 21.  GOODS/SERVICE TAX AND CONTRACT EXPENSES ...................22

ARTICLE 22.  NOTICE AND COMMUNICATION ................................................23

ARTICLE 23.  CONTRACT DOCUMENTS ...........................................................23

ARTICLE 24.  ASSIGNMENT ..............................................................................23

ARTICLE 25.  SETTLEMENT OF DISPUTE .........................................................24

ARTICLE 26.  INVALIDITY .................................................................................25

ARTICLE 27.  CONFIDENTIALITY ......................................................................25

ARTICLE 28.  EFFECTIVE DATE ........................................................................26

ARTICLE 29.  GENERAL ....................................................................................26

EXHIBIT A: SPECIFICATIONS

EXHIBIT B: GENERAL ARRANGEMENTS AND PROFILE

EXHIBIT C: REQUEST FOR CHANGE REQUEST

EXHIBIT D: PROTOCOL OF DELIVERY AND ACCEPTANCE

EXHIBIT E: INTERIOR DESIGNER'S GENERAL ARRANGEMENTS & PROFILE

EXHIBIT F: ABS CLASSIFICATION STANDARDS

EXHIBIT G: MCA COMPLIANCE STANDARDS

EXHIBIT H: UNITED STATES COAST GUARD COMPLIANCE STANDARDS

EXHIBIT I: ISM COMPLIANCE STANDARDS

EXHIBIT J: SURVEYOR'S REPORT FROM BURNESS, CORLETT & PARTNER, LTD.

EXHIBIT K: DARBY MARINE LIMITED CHANGE ORDERS

H&K 000011

## VESSEL CONSTRUCTION AGREEMENT

This Agreement is made this ___ day of _____, 2002, in two counterparts in English.

**By and Between:**

DARBY MARITIME LIMITED, having its principal office at Georgetown, Cayman Islands, represented and Guaranteed by GREG BRADY. Hereinafter referred to as the "Purchaser" of the first part.

**And:**

SENSATION YACHTS LIMITED, a Company duly registered and existing under the laws of New Zealand and having is registered office in Auckland represented by I.V.J. Erceg. Hereinafter referred to as the "Builder" of the second part.

### WITNESSETH:

### RECITALS

Whereas, the Purchaser wishes to purchase a 174 foot Sensation SY18 Motor Yacht (the "Vessel").

Whereas, the Builder submitted a proposal to the Purchaser in respect of building and selling the Vessel to the Purchaser.

Whereas, after several discussions and negotiations in respect of the Builder's proposal, the Purchaser accepts to buy the Vessel from the Builder, as per the Builder's design; Engineering, Architectural and Yard standards as described in the attached specifications. The Builder agrees to construct the Vessel at its Auckland, New Zealand shipyard substantially in accordance with the specifications and plans attached as Exhibit A (Specifications) and Exhibit B (General Arrangements and Profiles) of which are incorporated herein and made part of this Agreement along with the rules promulgated by ABS Standards (Exhibit F), MCA Compliance Standard (Exhibit G), United States Coast Guard Compliance Standards (Exhibit H), to assist in obtaining ISM Compliance (Exhibit I) and with ABS Classification Standard (Exhibit J).

### ARTICLE 1.    PURPOSE

This Agreement sets out the terms and conditions on which the Builder will construct and deliver the Vessel to the Purchaser and the conditions on which the Purchaser will take possession of the Vessel.

1

**H&K 000012**

## ARTICLE 2.   DEFINITIONS

In this Agreement, the following terms shall have the following meanings unless the context otherwise requires:

**Acceptance,** means acceptance of the Vessel by the Purchaser in accordance with Article 14.

**Agreement,** means this Vessel Construction Agreement, as amended from time to time.

**Builder's Bank,** means ANZ Banking Group Ltd. of Auckland, New Zealand.

**Builder's Certificate,** means the certificate to be delivered by the Builder to the Purchaser on delivery of the Vessel to the Purchaser.

**Business Day,** means a calendar day other than any Saturday, Sunday or public holiday in Auckland, New Zealand.

**Broker of Record,** KOCH, NEWTON & PARTNERS, 1700 E. Las Olas Blvd, Suite 100, Fort Lauderdale, FL 33301.

**Purchaser's Representative,** means the person appointed pursuant to Article 4 Section 4.01(a).

**Purchaser Supplied Equipment,** means equipment not included in the Specification that is purchased by the Purchaser for inclusion in the Vessel.

**Classification Society,** means MCA Society, ABS Classification Society, United States Coast Guard Standards, and to assist in obtaining ISM Compliance.

**Classification Surveyor,** means a surveyor appointed by the Classification Society.

**Construction Schedule,** means the time schedule for the construction of the Vessel set out in the Specifications.

**Default Rate,** means the Index lending rate as published by the ANZ Banking Group (New Zealand) Limited from time to time plus two and a half percent (2.5%).

**Delivery Date,** means October 31, 2002 adjusted as provided for in this agreement or such other date as the parties may agree in writing.

**Equipment,** means all equipment, machinery, parts and materials used or intended to be used in the construction of the Vessel, but excluding Purchaser Supplied Equipment.

H&K 000013

**Interior Designer**, means Francois Zuretti or such other interior designer as designated by the Purchaser and approved by the Builder and paid for by the Builder.

**Navel Architect**, means Jon Overing and the Builder or such other Navel Architect or Engineers designated by the Builder and approved by the Purchaser and paid for by the Builder.

**Invoice**, means a Builder supplied document requesting payment.

**Specification**, means the specifications, plans, and drawings signed by the Purchaser and the Builder and attached hereto as Exhibit A, the plans and drawings provided by the Interior Designer, Naval Architects and Engineers, and any amendments or further specifications, plans and drawings as may be agreed from time to time between the Purchaser and the Builder, all of which form an integral part of this Agreement.

## ARTICLE 3.   SCOPE OF THE WORKS

a)   The works consist of the building and delivery of the Vessel to the Classification Society certification as specified in Article 6 in accordance with the Specification, the General Arrangements and Plans.

## ARTICLE 4.   PURCHASER'S REPRESENTATIVE, INSPECTION AND MODIFICATION

### Section 4.01   PURCHASER'S REPRESENTATIVE

a)   Within seven days of signature of this Agreement the Purchaser shall notify to the Builder in writing the name of the Purchaser's Representative.  The Purchaser shall similarly notify the Builder of any replacement of the Purchaser's Representative.

b)   If the Purchaser's Representative (or any replacement appointed pursuant to this Section) is unable or unwilling to act or shall be removed from this position by the Purchaser at any time, the Purchaser shall as soon as reasonably practicable notify the Builder of the name of the person appointed by the Purchaser to act in his place.

c)   The Purchaser's Representative shall carry out the duties set forth herein, and may exercise the authority specified in or necessarily to be implied from, this Agreement.

d)   Except as expressly stated in the Agreement, the Purchaser's Representative shall have no authority to amend the Agreement or to agree to any single

3

H&K 000014

Variation costing more than US $2,500.00 or total Variations costing more than US $250,000.00 in aggregate.

e)   The Builder shall provide, at it's expense and cost suitable office space and office facilities at the shipyard for the Purchaser's Representative as may be reasonably necessary to enable him effectively to carry out his work. This includes the supply of computer equipment and telephone which charges from shall be charged to the Purchasers account.

f)   The Purchaser's Representative will not directly communicate with or give instructions to any Subcontractor, agent or employee of the Builder except the Project Co-ordinator.

g)   All legal permissions and acceptances required for the Purchaser's Representative's stay or visits in Auckland, New Zealand as well as all insurances required (e.g.: third party, accident & health...) during work on or off the Builder's premises shall be the Purchaser's responsibility.

h)   The Purchaser's Representative will be the direct and permanent contact of the Project Co-ordinator for performance of this Agreement.

## Section 4.02   INSPECTION AND APPLICATION

a)   The Purchaser shall have the right to have the Vessel and all engines, machinery, outfit and equipment intended therefore inspected during the construction by the Purchaser's Representative to whom the Builder shall grant free access and reasonable facilities, including office accommodation and telephone and telefax facilities, for such purposes during working hours to the Vessel and to the Builder's Yard and workshops. Expenses for these inspections shall be paid for by the Purchaser.

b)   If the Purchaser's Representative discovers any material or workmanship which they consider does not conform to the requirements of this Agreement and/or the Specifications during any inspection, they shall give the Builder notice in writing that such alleged non-conformity exists. Upon receipt of such notice from the Purchaser or its Purchaser's Representative, the Builder shall either refer the matter for determination under Article 25 or correct any such non-conformity that is found to exist.

## ARTICLE 5.   PROJECT CO-ORDINATOR

a)   Within seven days of signature of the Agreement the Builder shall notify in writing to the Purchaser the name of the Project Co-ordinator. The Builder shall similarly notify the Purchaser of any replacement of the Project Co-ordinator.

4

H&K 000015

b)     The Project Co-ordinator will be responsible for overseeing the construction of the Vessel within the conditions of this Agreement.

c)     Except as expressly stated in the Agreement, the Project Co-ordinator shall have no authority to amend the Agreement, however he will be charged with presenting necessary changes to the proper authority for approval when asked by the Purchasers Representative.

d)     The Project Co-ordinator will be the direct and permanent contact of the Purchaser's Representative for performance of this Agreement.

e)     The Project Co-ordinator shall receive on behalf of the Builder all consents, approvals, orders, instructions and information given by the Purchaser's Representative.

## ARTICLE 6.    CLASSIFICATION AND STANDARDS

a)     The Builder is to be responsible for constructing the Vessel to MCA Compliant Standards as per Exhibit G, ABS Classification Society Standards as per Exhibit F, United States Coast Guard Standards as per Exhibit H, ISM Standards as per Exhibit I (referred to collectively as "the Standards") despite anything to the contrary in this Agreement and the Specification, except for a Variation approved in accordance with Article 10, it shall be the duty of the Builder to construct, complete and deliver the Vessel in compliance with these Standards.

b)     The Builder is to be responsible for the design, construction, launching, completion, testing and delivery of the Vessel.

c)     The Builder alone is to be responsible for the construction and quality of workmanship. The fact that drawings have been shown to the Purchaser or approved on behalf of the Purchaser by the Purchaser's representative, will not relieve the Builder in any way from Article 6(a). Anything not mentioned in the Vessel Specification, Exhibit A, but which is required by the Classification Society and/or the Registration Authority for the sea operation of the Vessel is to be supplied and installed at the Builder's expense.

d)     At the Builder's request, the Classification Society shall nominate a Representative (the "Classification Surveyor") to inspect the Vessel during construction.

e)     The Builder shall pay all fees and charges incidental to the classification and compliance with the Classification Society's rules (other than ISM which costs shall be born by the Purchaser), regulations and requirements and the Standards in relation to the construction of the Vessel, including fees and charges for the certification and plan approval or any related costs.

5

H&K 000016

f) The Builder shall arrange that all materials used and to be used in the construction of the Vessel and all construction work shall be available for inspection and testing by the Classification Society and the Builder shall make all necessary facilities available so that those inspections and tests can be carried out by the Classification Society safely and conveniently.

g) The Builder shall pay for testing and materials consumed during testing mentioned in Article 14.

h) If after the Effective Date of this Agreement any requirements or any rules, regulations, requirements and recommendations of the Classification Society to which the construction of the Vessel is required to conform, are altered or changed by the Classification Society, then the Builder upon receiving notice shall present to the Purchaser's Representative a Variation as per Article 10.

## ARTICLE 7.   CONSTRUCTION

### Section 7.01   LOCATION

a) The Builder shall construct the Vessel at its Shipyard at Auckland, New Zealand, and before launching will not permit the Vessel to be removed from that shipyard except:

- with the prior consent of the Purchaser, or

- in case of "force majeure", or

- in the event of the valid termination of this agreement.

### Section 7.02   SUBCONTRACTORS

a) The Builder may appoint subcontractors as it feels fit for certain specialised work.

b) The Builder, however, remains responsible for any work performed by its subcontractors to the same extent as if the Builder had performed the work itself.

### Section 7.03   CONTROL OF CONSTRUCTION

a) The Purchaser's Representative shall at all reasonable times, until acceptance of the Vessel by the Purchaser, have the right to inspect the Vessel and all Equipment used and to be used in connection with the construction of the Vessel and all construction work wherever that equipment is stored or that work is being done for the purpose of determining that the Vessel is being constructed in accordance with the terms of this Agreement.

6

H&K 000017

b)    With their prior consent, the Purchaser's Representative shall have access to the premises of the subcontractors of the Builder who are doing work in connection with the construction of the Vessel.

c)    The Purchaser's Representative shall not, whilst carrying out his inspections under this Agreement, obstruct the Builder or its subcontractors in the construction of the Vessel.

d)    The Purchaser's Representative may exercise his functions only during the normal business hours of the Builder.

e)    Furthermore, the Purchaser's Representative agrees to abide by the company rules and regulations when he is present in the premises of the Builder and/or his subcontractors.

f)    The Purchaser's Representative may consult with the Project Co-ordinator in all matters relating to the construction of the Vessel as the Purchaser's Representative considers necessary.

## Section 7.04    UNSATISFACTORY WORKS AND MATERIALS

a)    The Purchaser's Representative after consultation with the Classification Surveyor shall during the construction of the Vessel have power to instruct in writing:

  • the removal from the construction site, within such time or times specified in the instruction, of any materials which in his opinion do not comply with the Agreement;

  • the replacement of such materials with others that in the opinion of the Purchaser's Representative do so comply; and

  • the removal and proper replacement of any work which in respect of materials or workmanship or design by the Builder or for which the Builder is responsible does not in the opinion of the Purchaser's Representative comply with the Agreement.

b)    Such instruction given by the Purchaser's Representative has to clearly state the basis for such removal, including the relevant provision of this Agreement.

c)    On receipt of such instruction, the Project Co-ordinator shall either:

  • obey the instruction and remedy the work and/or the material; or

7

H&K 000018

- • contest the instruction received from the Purchaser's Representative by sending a written notice to the Purchaser's Representative explaining the reasons for his disagreement with the instruction.

d)   If the Project Co-ordinator contests the instruction received from the Purchaser's Representative, the Purchaser's Representative and the Project Co-ordinator shall promptly hold an official meeting to solve the problem.

e)   If during the meeting the Purchaser's Representative and the Project Co-ordinator agree on the matter, they will record the agreement in the minutes of the meeting signed by both, and the Project Co-ordinator will promptly implement the agreement.

f)   If during the meeting the Purchaser's Representative and the Project Co-ordinator are unable to agree on the matter it will be referred to Article 25 for resolution.

## ARTICLE 8.   APPROVAL OF PLAN AND MATERIAL

a)   The Project Co-ordinator shall submit to the Purchaser's Representative for approval all plans and drawings necessary for the construction of the Vessel.

b)   The Purchaser's Representative shall provide his approval or comments on the plans and drawings within ten (10) days of receipt.

c)   If the copy of the plans and drawings are returned to the Project Co-ordinator with comments by the Purchaser's Representative justified under the terms of the Agreement and if those comments do not constitute a Variation, then the Project Co-ordinator shall resubmit the plans and drawings after modification. In such case, the Purchaser's Representative shall provide his approval within five (5) days of receipt.

d)   The Specifications may designate any Equipment as 'equal' or 'similar' to a specific brand with the Purchaser's Representatives approval.

e)   The Project Co-ordinator shall submit details of all Equipment to the Purchaser's Representative for approval.

f)   The Equipment has to be that noted in the Specification or 'equal' or 'similar' Equipment where permitted by the Specification or the Purchaser's Representative.

g)   The Purchaser's Representative shall provide his approval or comments on the Equipment within five (5) days of receipt.

8

H&K 000019

## ARTICLE 9.   CONTRACT PRICE

a)   The Purchaser shall pay the Contract Price of US $22,600,000.00.   The interior work is not included in the Contract Price.  However, it is expressly understood and agreed that the cost of the Interior Designer is included in the Contract Price.

## ARTICLE 10.  VARIATIONS

a)   The initial Contract Price is the fixed price of US $22,600,000.00.   The Contract Price is subject to adjustment for Variations as provided for in this Agreement.   The final Contract price shall be the initial Contract Price plus or minus the net price adjustment for all Variations under Article 10 Variations.

b)   The Purchaser and the Purchaser's Representative, subject to the limitations set forth in Article 4, Sections 4.01 and 4.02, may after consultation with the Project Co-ordinator vary the Specifications (a "Variation").

c)   Each Variation may include additions and/or omissions to the Specifications provided that any additions must remain within the Scope of the Works and may be ordered at any time up to the delivery of the Vessel.

d)   Any Variations made and agreed upon by the Purchaser and Builder shall be paid for by the Purchaser, insofar as the Variation would cause an increase in the Contract Price, at the payment date immediately following completion of the works contemplated under the Variation. If a Variation represents a saving in cost, such adjustment shall be credited by the Builder to the Purchaser against the succeeding payment(s) by the Purchaser until such credit is extinguished.

e)   Each Variation shall be documented in writing signed by both parties.  It is hereby stipulated and agreed to by both parties that all Variations shall be implemented through submission of a Request for Variation Orders Form, which is attached hereto as Exhibit C.

f)   The Purchaser or the Purchaser's Representative shall not order any Variation when:

- The Variation may have consequences on or impair the safety or performance of the Vessel,

- The Variation may impede the classification of the Vessel by the Classification Society, or

9

H&K 000020

- The Variation has consequences on parts of the Vessel already built and impossible to modify.

g) As soon as possible following consultation with the Purchaser's Representative or when requested by the Purchaser's Representative or at the latest within ten (10) working days after receipt of the Variation order from the Purchaser's Representative in accordance with this Article the Project Co-ordinator shall submit to the Purchaser's Representative:

- his quotation for any extra or substituted works necessitated by the Variation (which may be negative). In pricing any Variation, the Project Co-ordinator shall charge for labor at NZ $55.00 per hour and for materials at the Builder's cost plus 12.5% and applicable freight,

- his estimate of any delay occasioned thereby and

- his estimate of the cost of any such delay.

h) Within seven days of receiving the Project Co-ordinator's submission pursuant to Article 10 f), the Purchaser's Representative shall:

- accept the same, or

- negotiate with the Project Co-ordinator.

i) Upon reaching agreement with the Project Co-ordinator, the Contract Price and the time for completion shall be amended accordingly.

j) In the absence of a mutually satisfactory agreement then the dispute shall be referred for resolution in accordance with Article 25.

k) In the event of any dispute in respect of a request for a Variation the Builder shall be entitled to continue construction in accordance with the then existing Specifications until such time as the dispute is resolved.

## ARTICLE 11.   CONDITIONS AND TERMS OF PAYMENT

a) The Purchaser shall pay the Contract Price of US $22,600,000.00 in the following manner:

i) US $15,820,000.00 in cash upon signing this agreement.

If the Purchaser fails to pay this amount to the Builder by 19 March 2002 the Purchaser will thereafter pay to the Builder liquidated damages of US$2,000.00 per day from 19 March 2002 until the date payment is received in full, provided the delay is considered Purchaser's fault.

10                    H&K 000021

MAR 25 2002 10:16AM   I2 TECHNOLOGIES                     4693576700            P.2
03/25/02  11:30 FAX 9545257085           KOCH NEWTON & PARTNERS                      @002
23/03 02  SAT 15:29 FAX 0091 4 2213468      SHERATON DUBAI                           @003

ii) US $4,520,000.00 in cash on 1 September 2002, plus or minus the net effect of any variations under Article 10.

iii) US $2,280,000.00 in cash, plus or minus the net effect of any variations under Article 10, due upon delivery of the Vessel.

11    I  ll     l  f  Builder is default due in the Builder l bankruptcy, insolvency or goes into liquidation, at Purchaser's option, Purchaser shall have the right to legal title and possession of the Vessel for the price the Purchaser has paid to the Builder to date.

## ARTICLE 12.  COMMENCEMENT AND DELAY

### Section 12.01  COMMENCEMENT

a)   The Purchaser shall promptly procure the fulfilment of all the following and the Builder's obligations shall commence on such fulfilment:

   ▪   the Agreement has become effective as per Article 28.

b)   The Commencement Date shall be the Effective Date as set forth in Article 12, Section 12.01(a).

### Section 12.02  TIME FOR COMPLETION

a)   The date by which The Builder ~~must~~ shall complete the Vessel ~~shall be October 31, 2002.~~ by the Delivery Date

b)   If the Builder considers that the Delivery Date will not be met for any reason, including but not limited to:

   ▪   any cause of delay referred to in this Agreement,

   ▪   exceptional adverse weather conditions,

   ▪   any special circumstances of any kind whatsoever which may occur,

   ▪   any force majeure,

   ▪   any delay, impediment, or prevention of the Purchaser,

   ▪   any delay by the Interior Designer in providing the Builder with the designs and complete drawings,

H&K 000022

MAR 25 2002 09:23                          9545257095          PAGE.02

- the late supply by the Purchaser of any materials, services or work, or

- any strike, lock-out or industrial action,

the Builder shall deliver to the Purchaser's Representative, within fifteen days of occurrence of the relevant event, full and detailed particulars in justification of a request for an extension of the Delivery Date.

c) The Purchaser's Representative shall approve or comment on this request within eight days.

d) If the extension of time is approved, the Delivery Date shall be extended accordingly.

e) If the Purchaser's Representative and the Project Co-ordinator cannot agree on an extension of time within fifteen days after the submittal of the request by the Project Co-ordinator to the Purchaser Representative, the dispute will be referred for resolution in accordance with Article 25.

f) In the event of any dispute in respect of such extension of time, the Builder shall continue the construction of the Vessel and no liquidated damages can be applied until such time as the dispute is resolved.

## ARTICLE 13.  LAUNCHING

a) The Builder shall give reasonable notice to the Purchaser's Representative of the location and date of launching the Vessel.

## ARTICLE 14.  SEA TRIALS AND ACCEPTANCE

a) A Sea Trial Committee shall be established by the Purchaser and the Builder. The Sea Trial Committee will at least consist of:

- The Purchaser's Representative,

- The Classification Surveyor and

- The Project Co-ordinator.

b) The Sea Trial Committee shall attend the sea trials of the Vessel on board to witness the performance of the Vessel and assess the conformity of the Vessel with this Agreement.

c) The Sea Trials shall be conducted in the manner stated in the Specification by the Builder and the Builder shall provide at its own cost the necessary crew, consumables and equipment for the safe navigation of the Vessel.

12

H&K 000023

d)   The Builder shall give the Purchaser and the Sea Trial Committee at least twenty one days written notice of the date and place of the Sea Trials of the Vessel.

e)   In the event of failure of all or any of the Sea Trial Committee to be present at the Sea Trials of the Vessel after due notice to the Purchaser has been given, the Purchaser shall be deemed to have waived his rights to have any committee member so named (as the case may be) of the Sea Trial Committee on board the Vessel at the Sea Trials and the Builder may conduct the Sea Trials without any missing committee (as the case may be) of the Sea Trial Committee being present unless if for special reasons or 'force majeure' participants were prevented to attend in which case the Builder shall co-operate in the best possible way to make their participation possible.

f)   If none of the members of the Sea Trial Committee attends the Sea Trials the Purchaser shall be under a duty to accept the Vessel on the basis of a certificate by the Builder and the Classification Surveyor that the Vessel on the Sea Trials (subject to any minor alterations and corrections as provided in this Agreement) is found to conform with this Agreement and is satisfactory in all respects.

g)   After receiving from the Builder the final report of the sea trials stating the performance of the Vessel during the sea trial, the eventual corrections made and therefore the full conformity of the Vessel with this Agreement, the Purchaser's Representative shall provide his approval or comments within five days after the submittal of the report by the Builder or within such further time as the Sea Trials Committee may reasonably require for this purpose but in any case not more than ten business days.

h)   If the Purchaser's Representative comments on the report are justified, in accordance with this Agreement, the Builder shall make the necessary corrections and perform a new sea trial as stated above.

i)   If the Project Co-ordinator finds the comments of the Purchaser's Representative on the sea trial report are unjustified, in accordance with this Agreement, the dispute shall be referred for resolution in accordance with Article 25.

j)   Upon satisfactory conclusion of the sea trials, as acknowledged by the Purchaser's Representative or confirmed in accordance with Article 14g or pursuant to Article 25, the Purchaser's Representative will execute and deliver to the Builder the Acceptance Certificate stating that the Builder has fulfilled all his obligations with regard to the construction of the Vessel and that the delivery can proceed.

H&K 000024

## ARTICLE 15.  DELIVERY

a)   The Vessel shall be delivered to the Purchaser by the Builder at a site berth, safely afloat, at the town of Auckland, New Zealand.

b)   In the event that delivery of the Vessel does not occur by the Delivery Date, a penalty of US$3,000.00 per day shall be assessed after 30 days from the Delivery Date for each day of delay.

i)

c)   On or before delivery, the Builder shall supply the Purchaser with:

- the Bills of Sale ready for execution by the Builder,

- the Builder's Certificate in executable form,

- an interim certificate or equivalent normally provided by the Classification Society (other than ISM for which the Builder will provide all necessary documentation) documenting that the Classification Society has acknowledged that the Vessel has met all Classification Society's requirements for Classification,

- a report on the Sea Trials of the Vessel,

- inventories of equipment of the Vessel including spare parts as stated in the Specification and as built,

- inventories of stores, together with copies of the original invoices covering the purchase of those stores,

- the drawings and plans of the Vessel necessary for the proper operation of the Vessel,

- all other documents that the Specifications requires the Builder to provide to the Purchaser upon delivery of the Vessel, including but not limited to complete instruction manuals for the operation of the Vessel and its machinery (in the English language) and an electrical wiring plan of the Vessel,

- all certificate and approvals required to be provided on delivery of the Vessel pursuant to this Agreement and the Specification,

- a declaration of warranty of the Builder that the Vessel is delivered to the Purchaser free and clear of any claims, mortgages and other encumbrances upon the Purchasers title to the Vessel, and, in particular, that the Vessel is absolutely free of all liabilities of the

14

H&K 000025

Builder to its subcontractors, employees and crew, and of all liabilities arising from the operation of the Vessel in the Sea Trials or otherwise prior to delivery to the Purchaser,

- assignments of warranties granted by manufacturers of the equipment installed in the Vessel,

- the Export Documents, and

- proof of payment by the Builder to the Purchaser of the amount of all liquidated damages, if any.

d)  On the date of Acceptance, and after receipt of the documents described in Article 15(c) above and before taking over the Vessel, the Purchaser will execute and deliver to the Builder the Delivery Certificate Exhibit D, The Protocol of Delivery and Acceptance, which will declare:

- the Purchaser has taken possession of the Vessel in full conformity with this Agreement,

- Builder may request that Purchaser take possession after Delivery and Acceptance, even though minor items remain to be finished or corrected which, if not finished or corrected, would technically prevent the Builder from tendering the Vessel for Delivery and Acceptance. In this event, Builder will request the Purchaser take possession after Delivery and Acceptance provided a schedule of when, where and how these items will be dealt with. If requested, then Purchaser's consent to accept possession after Delivery and Acceptance shall not be unreasonably withheld.

- the Builder has no farther duties and responsibilities for the Vessel (except the duties imposed under the Builder's warranties of title, quality, and performance), and

- the Purchaser is taking full possession and responsibility of the Vessel.

e)  The Purchaser shall also give the proof of payment by the Purchaser to the Builder of the Variations, if any, payable upon completion of the Vessel. The Purchaser shall then take possession of the Vessel.

f)  The Purchaser irrevocably undertakes to remove the Vessel, from New Zealand waters within sixty days of delivery of, or with such extended time as authorised by the appropriate New Zealand authorities.

g)  If as a result of the Purchaser's failure to remove the Vessel from New Zealand waters, within the nominated time limit, the Builder becomes liable

15

H&K 000026

to pay Goods and Service Tax in respect of the Vessel then the Purchaser will immediately reimburse the Builder for all such tax, together with any interest, penalties, and other costs payable by the Builder in connection therewith.

## ARTICLE 16.   LEGAL TITLE

a)   The Vessel as it is constructed (whether wholly or partly finished or unfinished) and all Equipment appropriated, or intended to be appropriated, to the Vessel whether in the Builder's shipyard or elsewhere in the control of the Builder shall upon the effective date of this Agreement become and remain the absolute property of the Builder (and be at the risk of the Builder) until the Vessel is delivered to the Purchaser (subject only to the Purchaser's Lien for amounts paid under the Agreement). Builder agrees to assist Purchaser in recording a lien, superior to all other recorded liens, against Vessel up to the extent of Purchaser's investment and payments under this Agreement.

b)   During construction, risk in the Vessel shall remain with the Builder. Upon delivery of the Vessel to the Purchaser, risk of loss of or damage to the Vessel shall be transferred to the Purchaser, and thereafter all responsibilities on the part of the Builder shall cease with the exception of the warranty obligations provided for in Article 17 hereof.

c)   The Builder shall place or cause to be placed on it the Vessel number of the Vessel and shall place that number at the bow, or other appropriate place as required by the registration authority official, of the Vessel and shall take all reasonable steps to cause all Equipment to be numbered in that manner by itself or its subcontractors.

d)   Ownership of the Vessel and Equipment to be contracted and/or supplied pursuant to this Agreement shall progressively pass to the Purchaser free of any liens, to the extent only of the value of the stage of construction of the Vessel and equipment as invoiced by the Builder paid in full by the Purchaser to the Builder in cleared funds, provided however that the Purchaser will not be entitled to take possession of the Vessel whether completed or not until the Purchaser has paid in full all amounts to which the Builder is entitled to claim based on the value of the stage of construction work pursuant to this Agreement.

e)   The Builder is entitled to a possessory lien over the Vessel (whether wholly or partially completed) and the Equipment (whether wholly or partially installed) for any moneys unpaid from time to time in respect of this Agreement, which lien shall entitle the Builder, in the event of default by the Purchaser, to do any of the following:

16

H&K 000027

    i)    to retain the Vessel and the equipment until all sums due to the Builder under this Agreement have been paid in full or until any default in the performance of this Agreement by the Purchaser has been remedied, and/or

    ii)    to perform such further work on the Vessel or to install such further equipment into or upon the Vessel as the Builder in its absolute discretion deems fit.

## ARTICLE 17.  WARRANTIES

a)    The Builder, for a period of twelve (12) months following delivery of the Vessel, warrants the Vessel and all the Equipment against all defects due to defective material and/or improper workmanship.

b)    The Builder's Warranty shall extend for a further period of twelve months, as to the Vessel and Equipment generally, on all remedied defects. Further, the Builder's Warranty period shall not include (or alternatively, the warranty period shall be deemed extended) by the number of days the Vessel is in the yard or unusable due to the need for warranty repairs. It is understood and agreed that this provision does not effect the term of the warranties extended by component manufacturers where those manufacturers have extended to the Purchaser a separate warranty. A list of and copies of all warranties on all components will be provided to Purchaser no later than Delivery and Acceptance.

c)    The Purchaser or its duly authorised Representative shall notify the Builder as soon as possible and in any event by timely notice after the discovery of any defect for which a claim is made under this Article and the Purchaser's written notice shall describe the defect in detail.

d)    If the Purchaser fails to notify the Builder in accordance with Article 17 (c), the Builder shall have no liability in respect to the defect, which should have been notified.

e)    The Builder shall not be liable for defects or damages to the Vessel or the Equipment after delivery of the Vessel except those specified in this Article, and the Builder shall not be liable for any defects in the Vessel or the Equipment caused by fire or accident at sea or elsewhere (except to the extent the fire or accident is itself caused by a defect covered by the Builder's warranty) or caused by fair wear and tear, the mismanagement, negligence or wilful neglect on the part of the Purchaser, its employees or agents or any other person including the Vessel's officers, crew or passengers.

f)    In the event that the period of a warranty by the manufacturers of equipment which was requested by the Purchaser for installation in the Vessel exceeds

H&K 000028

that of the Builder's warranty then the Builder shall make available and assign to the Purchaser those extended warranty rights. The Builder shall use its best effort in insure that the manufacturer(s) of the Vessel's engines and generators provide standard manufacture extended warranties, and the Builder shall request the manufacturers of all other equipment to provide the most complete and extensive warranties they regularly offer. The Builder shall pay, as part of the Contract Price, any commercially reasonable charge imposed by any manufacturer for providing its regularly offered extended warranty.

g)  The Builder shall remedy promptly at the Builder's shipyard and, at its expense, any defect of the Vessel or any part of the Equipment which is warranted under this Article; however, if it is impractical to bring the Vessel to the Builder's shipyard then the Purchaser shall cause the necessary repairs or replacements to be made at any shipyard (agreed between the Builder and the Purchaser), provided, however that the Purchaser shall give the Builder reasonable notice of the time and place where those repairs are proposed to be made. The Builder will bare all expenses if it is necessary to bring the Vessel to the Builder's shipyard in Auckland, New Zealand for warranty repairs.

h)  The Builder shall have the right to send its own representatives, at its expense and risk to the Vessel to inspect and report on the nature and extent of defects complained of and, if thought fit, to remedy them and the Purchaser shall provide and procure access to the Vessel for this purpose.

i)  The Builder shall promptly advise the Purchaser after examination has been completed of its acceptance or rejection of defects as being within the warranty under this Article and any dispute shall be referred for resolution in accordance with Article 25.

j)  When the Builder agrees that the defects are within the terms of this Article (or when the defects are determined in accordance with Article 25 to be within the terms of this Article) the Builder shall at its option make the necessary repairs or promptly pay either the shipyard or the Purchaser the actual cost of repairs of replacements, including all reasonable cost incidental to the repairs or replacements incurred by the shipyard for which the Purchaser is liable.

k)  Delivery of the Vessel, within a reasonable distance from the place where repairs are to be carried out, shall be at the Purchaser's cost and responsibility, unless the necessary repairs require the Vessel to be returned to the Builder's yard in Auckland, New Zealand. All costs and expenses (other than crew costs) incurred in moving the Vessel to the Builder's yard shall be at the Builder's cost and for Builder's account. If the Vessel cannot be moved

H&K 000029

by its own power, as a result of a defect covered by Builder's or manufacturer's warranty, the Vessel shall be moved, at Builder's cost (other than crew costs) and responsibility, to the place where repairs are to be carried out.

l) At the Purchaser's option, the Builder agrees, at the Purchaser's cost and expense, to train the Purchaser's engineer and one crew member in the three month period prior to delivery for familiarisation purposes with the Vessel and its systems and to provide one of the Builder's engineers to serve aboard the Vessel during the one month period following its delivery.

m) The Vessel's characteristics may change as a result of Variations authorised under Article 10. The extent of any change in the Vessel's characteristics, however, must be specified in the document evidencing the Variation at the time the document is signed; otherwise, the Variation shall be deemed not to affect the Vessel's characteristics.

    i) The Vessel's actual draft (the "Draft"), (Vessel fully outfitted and tanks at 50% capacity of fuel and fresh water) must not exceed 9'-6" App., and

    ii) The Vessel's speed (the "Speed"), at (Vessel fully outfitted and tanks at 50% capacity of fuel and fresh water) and with engines running at maximum continuous r.p.m.'s (as certified by the manufacturer), shall be at least:

    Design and warranted Speed at Max Cruise (Half Load)   15 knots

    Design and warranted Speed at Max (Half Load)      17 knots

n) The warranties contained in this Article do not extend to, and the Builder shall in any event not be liable for:

    i) any consequential loss or damage caused by any defect or for any time in operating and/or repairing caused by any defect, and

    ii) any defect in Purchaser supplied equipment other than the installation work carried out by the Builder.

o) The Vessel's characteristics may change as a result of Variations authorised under Article 10. The extent of any change in the Vessel's characteristics, however, must be specified in the document evidencing the Variation at the time the document is signed; otherwise, the Variation shall be deemed not to affect the Vessel's characteristics.

H&K 000030

## ARTICLE 18.  DEFAULT ON THE PART OF THE PURCHASER

a)      The Purchaser shall be deemed to be in default if:

- The Purchaser shall fail to pay the Builder any amount due under this Agreement within 30 Days of the due date.

- The Purchaser shall, when the Vessel is duly tendered for delivery after Sea Trials in accordance with the terms of this Agreement, fail to make any payment required at delivery or to accept and take delivery of the Vessel without valid grounds for rejection pursuant to the term of this Agreement,

- The Purchaser shall become bankrupt or go into liquidation (other than for the purpose of amalgamation or reconstruction) or have a receiver appointed and the assignee, liquidator or receiver as the case may be fails within twenty-one Business Days to make arrangements satisfactory to the Builder for continued payment of amounts due under this Agreement,

- The Purchaser abandons this Agreement,

- The Purchaser persistently, flagrantly or wilfully neglects to carry out its obligations under this Agreement, or

- The Purchaser becomes unable to pay its debts as they fall due  and

The Purchaser's default has not been remedied within twenty working days of receiving written notice of such default from the Builder, then the Builder may terminate this Agreement by serving upon the Purchaser written notice of termination and upon receipt of that written notice of termination by the Purchaser, this Agreement shall forthwith terminate, and any interest that the Purchaser has in or to the Vessel and to any Equipment shall forthwith revert to the Builder and the Builder shall have full right and power to deal with or dispose of the Vessel and the Equipment in any manner as the Builder may consider appropriate at its sole discretion, including, without limitations to complete and then sell the Vessel.

b)      If the Purchaser defaults in payment of any amount due under this agreement, then in such event the Purchaser shall pay interest on the unpaid amount at the Default rate from the due date of payment until payment is made by the Purchaser to the Builder.

c)      If following termination of this Agreement the Vessel is then sold by the Builder, the Builder shall retain from the sale proceeds all costs and expenses

20

H&K 000031

incurred by reason of the default and all amounts in arrears, and interest at the Default Rate on any amounts in arrears, and all additional costs reasonably incurred in the sale of the Vessel not previously or otherwise recovered. The balance (if any) of any proceeds after deduction of these reasonably incurred costs and expenses shall be paid to the Purchaser.

d)   In the event of such termination, in addition to any rights that the Builder has under this Agreement and/or other rights which may be conferred upon the Builder at law or in equity, the Builder may sue the Purchaser for damages.

## ARTICLE 19.   DEFAULT ON THE PART OF THE BUILDER

a)   Builder shall be deemed to be in default if:

- The Builder fails to complete the Vessel within 120 days from the Delivery Date, or

- The Builder shall become insolvent, bankrupt or go into liquidation (other than for the purpose of amalgamation or reconstruction) or have a receiver appointed and the assignee, liquidator or receiver as the case may be fails within 20 Business Days to make arrangements satisfactory to the Purchaser for continued performance of the Builder's obligations under this Agreement,

and if the Builder's default has not been remedied within twenty working days of receiving written notice of such default from the Purchaser, then the Purchaser may terminate this Agreement by serving upon the Builder written notice of termination and upon receipt of that written notice of termination by the Builder, this Agreement shall forthwith terminate.

    i)   On termination, the Purchaser may take possession of the Vessel and remove the Vessel from the shipyard after paying to the Builder all moneys owed, as of the time of the default, to the Builder under this Agreement;

b)   The Purchaser may exercise any other remedy available to the Purchaser under applicable law.

## ARTICLE 20.   INSURANCE

a)   As of the Effective Date as per Article 28 and until the delivery the Builder shall cause the Vessel, the Equipment, and the Purchaser Supplied Equipment to be insured with First Class Underwriters in the name of the Builder and the Purchaser, as their interests may appear.

21

H&K 000032

b)   Any claims under the insurance policies shall be payable to the Builder (except as to loss of, or damage to, Purchaser Supplied Equipment, which shall be paid to the Purchaser).

c)   All premiums for insurance shall be payable by the Builder.

d)   In the event that the Vessel shall be damaged by any cause whatsoever prior to Delivery and that damage shall not constitute an actual or constructive total loss of the Vessel, the Builder shall repair the damage in accordance with this Agreement and the Specification and to the satisfaction of the Classification Society and the Purchaser's Representative.

e)   If the repairs to the Vessel can reasonably be expected to extend the completion of the Vessel beyond the Delivery Date then the Builder shall consult with the Purchaser to agree an extension of the Delivery Date but if they are unable to agree on the extension of the Delivery Date the dispute shall be referred to Article 25 for resolution.

f)   Nothing in this Article shall be construed as discharging the Builder from any of its duties and liabilities to construct the Vessel strictly in accordance with the requirements of this Agreement and the Specifications.

g)   In the event that the Vessel becomes an actual or constructive or actual total loss, the Builder shall refund to the Purchaser all monies paid by the Purchaser to the Builder under the Contract and all monies received under the insurance claim in respect of attorney costs and reasonable travel expenses and damage to Purchaser Supplied Equipment; the Builder shall retain the balance of the proceeds; and thereafter this Agreement shall terminate.

## ARTICLE 21.   GOODS/SERVICE TAX AND CONTRACT EXPENSES

a)   The parties acknowledge that the Contract Price for the supply of the Vessel is zero rated for goods/services and tax.  The parties agree to use their best endeavours to obtain such zero-rating.  The Builder shall complete all necessary customs and related documentation.  The Purchaser shall provide the Builder with written statement that the Vessel is not intended for use within New Zealand and that the Vessel will be exported from New Zealand. In addition, the Purchaser will provide the Builder with a written statement that the Vessel will not be hired, given away, offered for sale, or otherwise disposed of while it is in New Zealand.  The Vessel will be exported by the Purchaser within such period as the New Zealand Commissioner of Inland Revenue will allow without disentitling the Builder to zero rate the supplies made under this Agreement.

H&K 000033

b)   All taxes, duties, stamps and fees levied by any legal and/or revenue authorities in connection with the design and construction of the Vessel are to be borne by the Builder. Any taxes, duties, stamps and fees levied by any legal and/or revenue authorities in connection with the Vessel otherwise than as aforesaid (including, for the avoidance of doubt and without limitation, sales and value added taxes) are to be borne by the Purchaser.

## ARTICLE 22.   NOTICE AND COMMUNICATION

a)   Any notice to be given to the Builder under the terms of the Agreement shall be served in writing (by fax confirmed by letter, by registered mail or delivered against receipt) at the following address:

Sensation Yachts Limited
Attn: Ivan Erceg
11 Selwood Road, Henderson, Auckland 8, New Zealand
PO Box 79-020 Auckland 8, New Zealand
Ph: 64-9-8372210 / Fax: 64-9-8361775

unless otherwise notified in writing by the Builder.

b)   Any notice to be given to the Purchaser under the terms of the Agreement shall be served in writing (by fax confirmed by letter by registered mail or delivered against receipt) at the following address:

Darby Maritime Limited
PO Box 833489
Richardson, TX  75083-3489
Ph: 972-644-3167 / Fax: 972-644-3273

unless otherwise notified in writing by the Purchaser.

## ARTICLE 23.   CONTRACT DOCUMENTS

a)   In the event of any inconsistencies between the Vessel Construction Agreement, the Specification(s) and Exhibits, the Specification(s) and Exhibits shall prevail.  In the event of any inconsistency between the Specification(s) and Exhibits, the provisions of the Exhibits shall prevail. Article 23 has been effective through the life of this Agreement unless otherwise noted in writing.

## ARTICLE 24.   ASSIGNMENT

a)   Neither the Purchaser nor the Builder shall assign the Agreement or any part thereof or any benefit or interest therein or thereunder without the prior

H&K 000034

written consent of the other party which consent shall not unreasonably be withheld. –

## ARTICLE 25.  SETTLEMENT OF DISPUTE

a)   Any dispute between the Builder and the Purchaser arising from this Agreement shall be resolved in accordance with this Article 25.

b)   If any question or difference shall arise between the parties as to the meaning of, or the rights or obligations of the parties in relation to any technical requirements or technical provisions of this Agreement, the same shall be referred to the senior surveyor of the ABS Classification Society in London, England for his interpretation and decision, and his decision shall be binding.

c)   In the event the parties cannot agree whether a particular question or difference is of a technical nature suitable for decision under Article 25(b) above, then the dispute shall be referred to arbitration pursuant to Article 25(d).

d)   Any question or difference between the parties in which the amount concerned is less than US $10,000 shall be resolved by an independent expert in London, England in accordance with the rules of the United States Federal Arbitration Act and United States Maritime Law; provided, however, that the arbitration proceedings shall be conducted in English and the parties shall be entitled to be represented in the arbitration by counsel of their choosing.

e)   Any question or difference between the parties in which the amount concerned is more than US $10,000 shall be resolved by one or more arbitrators appointed in accordance with the said Rules under English Law, with the venue in London, England.

f)   The arbitration proceedings shall be held in London, English and subject to English Law.

g)   Either party may initiate arbitration under Article 25 (d) or (e) by sending written notice to the other of election of the right of arbitration and specifying the dispute to be arbitrated.

h)   No party shall be considered in default hereunder during the pending of arbitration proceedings relating to a disputed default, and if found in default by the arbitration panel, shall be given ten days from receipt of the arbitration award to cure such default.   The pending of arbitration proceedings shall not justify extension of the Delivery Date unless: (i) the Builder prevails, and (ii) the arbitration panel, at the Builder's request, finds

H&K 000035

that an extension is justified and then only for the number of days the arbitration panel so determines.

i)    A notice requiring arbitration shall be in writing and shall be given by the Purchaser or the Builder to the other.

ii)   The dispute shall be referred to a sole arbitrator if the Purchaser and Builder agree upon one within fifteen (15) Working Days after receipt of the notice of dispute.  If a sole arbitrator is not so appointed, then within five (5) Working Days, two (2) arbitrators shall be appointed (by hand delivered notice), one to be appointed by the Purchaser and one to be appointed by the Builder and such arbitrators shall jointly appoint an umpire.

iii)  If one party fails to appoint an arbitrator within the period of five (5) Working Days, the arbitrator appointed by the other party shall be deemed to have been agreed upon as the sole arbitrator.  If neither party appoints an arbitrator within the five (5) Working Days, then the notice shall be deemed to have lapsed. References in this clause to "the arbitrator" shall include, where appropriate, two arbitrators and the umpire.

iv)   The arbitrator shall have full power to open up, review and revise any decision, opinion, instruction, direction, certificate or valuation of the Purchaser's Representative or the Independent Expert and to award upon all questions referred to him.

v)    The award in the arbitration shall be final and binding on the parties.

vi)   Any arbitration shall be conducted in London, England pursuant to the English Law.

vii)  Attorney fees may be awarded in the sole discretion of the arbitration panel.

## ARTICLE 26.  INVALIDITY

a)   If any term or terms contained in this Agreement shall be void, illegal or unenforceable in any respect under the applicable law, the remaining terms shall remain valid, legal and enforceable and shall not in any way be affected or limited by that invalidity.

## ARTICLE 27.  CONFIDENTIALITY

a)   The Builder and the Purchaser shall keep the terms and conditions of this Agreement, including, without limitation, the Contract Price, in strict

25

H&K 000036

confidence and therefore shall disclose no information concerning this Agreement to any outside party save as required by law.

b)   Further, each shall cause any employee or agent involved with this transaction to agree to do the same.

c)   The foregoing restrictions, however, shall not apply to disclosures made: (a) to employees or professionals requiring such information to assist the transaction, to maintain books and records, or to prepare tax returns, or (b) to comply with subpoenas or discovery requests issued within any legal proceedings.

d)   If the Builder or the Purchaser breaches the requirements of this Article, it shall be liable to the non-disclosing party or parties for any resulting loss, damage, or other consequences of its actions.

e)   In addition, the non-disclosing party or parties shall be entitled to injunction or other equitable relief to mitigate the damage caused and/or prevent further prohibited disclosures.

## ARTICLE 28.   EFFECTIVE DATE

a)   This Agreement becomes effective when it is signed by the Purchaser and the Builder.

## ARTICLE 29.   GENERAL

a)   Demonstration: The Purchaser shall permit the Builder, on the giving of reasonable prior notice, to show the Vessel at two boat shows in Florida and to other prospective purchasers.   The Builder shall co-ordinate with the Purchaser to ensure that the Builder's access to the Vessel does not interfere with the Purchaser's use and enjoyment of the Vessel. The Builder shall pay all costs incurred by the Purchaser in making the Vessel available to the boat show in Florida and show to other prospective purchasers.

b)   Governing Law: This Agreement shall be governed by and construed in accordance with the English Law.

c)   Submission to Jurisdiction: Any action, suit, demand or proceeding instituted which is to be litigated shall be instituted and litigated within the jurisdiction of the courts of London, England and each of the parties by the execution of this Agreement hereby consents and submits to the non-exclusive jurisdiction of the courts of London, England.  Neither party shall raise as a defence to any action, suit, demand or proceedings which is initiated in any forum as provided above the lack or jurisdiction of the courts of such forum over the personal property of such party.

H&K 000037

d) <u>Lien</u>: The Builder shall have a possessory lien on the Vessel and property owned by the Purchaser in the Builder's possession, custody or control, for the whole or part as the case may be, of any and all amounts due and owing to the Builder and outstanding at any time from the Purchaser under or in connection with this Agreement up to and including the date the Protocol of Delivery and Acceptance is signed.

e) <u>Limitation of Liability</u>: In no event, whether based upon contract, tort, warranty, or otherwise, shall Purchaser or Builder be liable for or obligated in any manner to pay special, consequential, punitive, incidental, indirect or similar damages for any reason in connection with this Agreement and the transactions contemplated hereby except as otherwise set forth in this Agreement. Both the Builder's and the Purchaser's obligations hereunder shall be limited to those expressly set out and assumed by Purchaser and Builder, respectively, under this Agreement.

f) <u>Broker Indemnity and Hold Harmless</u>: The Builder shall be responsible for payment of any commission due to Robert Newton in respect of this transaction and the Builder agrees to indemnify and hold Purchaser harmless from any and all claims made by any broker regarding commissions or other fees or costs due on the construction of the Vessel. The Purchaser confirms that it was not represented by a broker in relation to this transaction, that no broker was the effective cause of this transaction and that neither it nor its representatives have agreed that any broker should be entitled to a commission in respect hereof.

g) <u>Further Assurances</u>: Each party shall sign all such documents and do all such things as may be necessary or desirable to give full effect to this Agreement.

h) <u>Entire Agreement</u>: This agreement shall constitute the entire agreement between the parties and shall supersede all previous negotiations and all other writings on the subject of the work covered hereby (except as to the Plans and Specifications) and shall not be affected or modified by any oral agreement.

i) <u>Modifications</u>: No modification, variation or amendment of this Agreement shall be of any force or effect unless the same is in writing and signed by all parties and otherwise is effected in accordance with the provisions of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be signed, personally or by their duly authorised representatives with due authority, and their seals are hereto affixed as of the day and year first above written.

EXECUTED as an agreement:

27

H&K 000038

03/23/02  11:27 FAX 9545257095          KOCH NEWTON & PARTNERS        ☒004
03/23/02  16:29 FAX 0091  8 2213488     SHERATON DUBAI
03/22/0           3545257    UVB       AULA NEWTON & PARIS             ☒002
MAR 22 2002 2:08PM    I2 TECHNOLOGIES         4693576700               P.2

For the Builder:

_____          23 / 3 / 02
Sensation Yachts Limited                       Date
Ivan Ercug
11 Selwood Road, Henderson, Auckland 8, New Zealand
PO Box 79-020 Auckland 8, New Zealand
Ph: 64-9-8372210 / Fax: 64-9-8361775

Witness:


_____          _____
                                               Date

For the Purchaser/Guarantor:

_____          3/22/02
Darby Maritime Limited / Greg Brady            Date
PO Box 833489
Richardson, TX 75083-3489
Ph: 972-644-3167 / Fax: 972-644-3273

Witness:

_____          3/22/02
                                               Date

28

**H&K 000039**

A

H&K 000040

# Exhibit A:
## Specifications

### TABLE OF CONTENTS

#### SECTION 1 – GENERAL

| | |
|---|---|
| 1.1 | Intent |
| 1.2 | Definitions |
| 1.3 | Materials & Workmanship |
| 1.4 | Cleaning & Care |
| 1.5 | Test & Trials |
| 1.6 | Weight Control |
| 1.7 | Manuals |
| 1.8 | Plans |
| 1.9 | Change Orders |
| 1.10 | Insurance |
| 1.11 | Inspection & Access |
| 1.12 | Progress Reports |
| 1.13 | Hull Characteristics |
| 1.14 | Classification Society & Survey |
| 1.15 | Marking & Labeling. |

#### SECTION 2 – VESSEL CONSTRUCTION

| | |
|---|---|
| 2.1 | Bulkheads |
| 2.2 | Tanks |
| 2.3 | Main Engines Beds |
| 2.4 | Rub Rails |
| 2.5 | Superstructure |

#### SECTION 3 – OUTFITTING

| | |
|---|---|
| 3.1 | Shaft Logs |
| 3.2 | Shaft Struts |
| 3.3 | Rudder Posts |
| 3.4 | Stairways & Ladders |
| 3.5 | Bulwarks |
| 3.6 | Freeing Ports & Scuppers |
| 3.7 | Engine Room |
| 3.8 | Engine Control Room |
| 3.9 | Tender Garage |
| 3.10 | Docking Plugs |

H&K 000041

## SECTION 4 – MACHINERY & EQUIPMENT

| | |
|---|---|
| 4.1 | Main Engines |
| 4.2 | Reduction Gears |
| 4.3 | Generators |
| 4.4 | Shafting |
| 4.5 | Propellers |
| 4.6 | Rudders |
| 4.7 | Vibration Dampers |
| 4.8 | Exhaust System |
| 4.9 | Fire Extinguishing System |
| 4.10 | Engine Controls |
| 4.11 | Hydraulic Steering |
| 4.12 | Bow Thruster |
| 4.13 | Windlasses & Ground Tackle |
| 4.14 | Air Conditioning System |
| 4.15 | Stabilizers |
| 4.16 | Manual Gauges |
| 4.17 | Ventilation System |
| 4.18 | Tank Gauging System |

## SECTION 5 – PIPING SYSTEMS

| | |
|---|---|
| 5.1 | General |
| 5.2 | Sea Chests |
| 5.3 | Sea Water System |
| 5.4 | Bilge & Fire Fighting System |
| 5.5 | Black & Grey Water System |
| 5.6 | Fuel Oil System |
| 5.7 | Lube Oil & Dirty Oil System |
| 5.8 | Chilled Water System |
| 5.9 | Potable Water System |
| 5.10 | Compressed Air System |
| 5.11 | Deck Drains |

## SECTION 6 – THERMAL & ACOUSTIC INSULATION

## SECTION 7 – ELECTRICAL SYSTEM

| | |
|---|---|
| 7.1 | General |
| 7.2 | Marking & Labels |
| 7.3 | Shore Power Inlets and Cords |
| 7.4 | Main Switchboard |
| 7.5 | Auxiliary & Emergency Generators |
| 7.6 | Ships Lighting |
| 7.7 | Low Voltage System |
| 7.8 | Navigation Lights |
| 7.9 | Corrosion Monitor |

H&K 000042

7.10   Monitoring System
7.11   Security System


## SECTION 8 – EXTERIOR OUTFITTING

8.1    Foredeck
8.2    Main Deck & Boarding Platform
8.3    Upper Deck
8.4    Flybridge
8.5    Exterior Teak
8.6    Windows
8.7    Portlights
8.8    Weathertight Doors
8.9    Watertight Doors
8.10   Zinc Anodes
8.11   Air Horn
8.12   Searchlights
8.13   Fenders
8.14   Dock Lines
8.15   Boarding Ladder
8.16   Hawse Eye Cleats & Fairleads
8.17   Ensign, Burgee & Signal Staffs
8.18   Fresh Water Washdowns
8.19   Water Pressure Inlet
8.20   Safety Equipment


## SECTION 9 – INTERIOR OUTFITTING

9.1    Hardware
9.2    Telephone
9.3    Mirrors
9.4    Aft Main Deck
9.5    Main Salon, Dining, Breakfast Room & Foyer
9.6    Skylounge & Office
9.7    Powder Rooms
9.8    Owners Stateroom / Study
9.9    Owners Bathroom
9.10   Four (4) V.I.P. Staterooms
9.11   Four (4) V.I.P. Bathrooms
9.12   One (1) Guest Stateroom
9.13   One (1) Guest Bathroom
9.14   Main Galley
9.15   Crew Galley & Mess
9.16   Laundry
9.17   Dry Provisions Storage & Bonded Storage
9.18   Upper Deck Service Pantry
9.19   Captain's Stateroom
9.20   Captain's Bathroom
9.21   Crews Staterooms

H&K 000043

9.22   Crews Bathrooms
9.23   Pilothouse


## SECTION 11 – ELECTRONICS

11.1   Communications
11.2   Telephone / Intercom Systems
11.3   Radars
11.4   Navigation
11.5   Computer & Navigation Programs
11.6   Autopilot & Steering
11.7   CCTV Systems
11.8   TV Antenna Systems

H&K 000044

# Section 1 - General

## 1.1    Intent

It is the intent of these Specifications and the contract plans that the Builder shall construct, equip and furnish a vessel complete and fitted out in accordance with the best marine practice and these specifications and ready for service as a private-use, luxury ocean going, privately owned and operated Motor Yacht.

## 1.2    Definitions

The following definitions shall apply for the purpose of these specifications:

**"ABS"** shall mean The American Bureau of Shipping, Guide for building and classing motor pleasure yachts and other rules invoked therein.

**"Builder"** shall mean the firm or individual that contracts to build the yacht.

**"Construction Contract"** shall mean the contract executed by the Owner and the Builder which sets out the terms and conditions as well as the technical requirements for the yacht.

**"Contract Drawings"** shall mean the drawings and engineering details which are made a part of the Construction Contract and those Construction Details which are developed by the Designer(s) for building the yacht as set out in the Construction Contract.

**"Contract Specification"** shall mean this Specification included in "Plans and Specification" attached to the Contract as Addendum 'A'.

**"Designer"** shall mean Overing Yacht Designs.

**"Equal"** The terms Equal, Approved Equal, or Equal To as used herein all mean the item(s) shall be approved in writing by the Owner or Owner's Representative as being equal.

**"General Arrangement"** shall mean the General Arrangement included in "Plans and Specification" attached to the contract as Addendum 'A'.

**"Owner"** shall mean the individual or firm that contracts to have the yacht built.

**"Owner's Representative"** shall mean the individual appointed by the Buyer to be the Contract Manager, to administer the Construction Contract. This person shall have full authority to make decisions and to bind the Buyer in all matters of technical decisions, price, terms, conditions and scheduling as set out in the Construction Contract. The Owner's Representative shall be designated in writing by the Owner.

**"MCA"** shall mean Maritime and Coastguard Agency

"**Shop Drawings**" shall mean all drawings, plans and/or sketches prepared by the Owner, Builder or any vendor.

"**Vendor Drawings**" refers to all manufacturers drawings, installation instruction and/or details provided by the vendor that relates to the installation, operation or maintenance of vendor's equipment, scope of work or supply.

"**Yacht**" means "the vessel" which Owner contracts to purchase and Builder contracts to construct.

### 1.3    Materials and Workmanship

All materials used for the building of the vessel shall be of marine yacht quality, and all light alloy materials used shall be of sea water resistant quality, in accordance with acceptable marine practice. All brass used shall be ASTM B-43, no brass shall be used on exterior of vessel. All bronze used shall be ASTM B-62.

All stainless steel used in the building of the vessel shall be type 316 or 316L as appropriate, unless otherwise specified herein or expressly agreed to by the Owner in writing.

All plastic pipe used shall be CPVC, schedule 80. Cement used to make connections shall be certified by the supplier.

All articles and materials furnished by the Builder shall be new, acceptable for marine use, and suitable for the purpose intended. Trade names and names of specific manufacturers mentioned in the specifications are describing preferred equipment. This shall not exclude any other makes not so named of comparable quality. Prior to any substitution or deviation, the Builder shall submit a Change Request to the Owner and Designer.

Close proximity of dissimilar materials to each other shall be avoided. Where unavoidable they shall be suitably insulated and or isolated from each other.

The Builder's experience and proven procedures shall be used to assure that workmanship in all particulars and in all departments shall be first-class in all respects and suitable for the purpose intended.

Welding shall be to American Bureau of Shipping standards, using the Builder's latest techniques and practices. Special care shall be taken to prevent distortion, buckling and warping of structure. The Builder, Owner, Owner's Representative or Designer may authorise x-ray tests or other tests as are deemed necessary, to insure highest quality. All equipment will be installed to manufacturer's instructions, unless otherwise directed in writing by the Owner. All measurements to be imperial.

### 1.4    Cleaning and Care

All parts of the craft including, but not limited to, structural, paint work, machinery, auxiliaries, appliances and apparatus shall be maintained in a satisfactory condition during the entire period of construction. Measures shall be taken to keep to a minimum, wear and damage incident throughout vessel construction and to prevent corrosion and

H&K 000046

other deterioration, especially to unpainted, polished and moving parts. All water piping shall be kept drained until system activation.

The Builder shall be responsible for the care of all machinery and equipment whether furnished by the Builder or the Owner. Electrical, electronic, and interior communication equipment shall be adequately protected against dust, moisture, or other foreign matter.

All unpainted machinery parts, both interior and exterior, shall be protected against corrosion and deterioration during the interval between delivery to and placing in service on board the vessel.

All parts, especially those having working surfaces, passages or piping for lubricating oil, shall be kept clean and protected during manufacture, storage, assembly, and after installation. Voids shall be cleaned before being closed, tanks shall be thoroughly cleaned prior to tank tops being welded into place. Rubbish shall be removed from places that are to be permanently covered, or which may become inaccessible. All piping is to be flushed clean before system operation.

### 1.5    Test and Trials

All work accomplished under these specifications shall be thoroughly tested at the expense of the Builder or component supplier both before and during trials, in order to demonstrate satisfactory workmanship and suitability for the purpose intended, and also that all requirements of the specifications have been satisfactorily fulfilled.

All tanks, lines, and hydraulic or pneumatic systems shall be pressure and/or hydro tested and proven tight. Closed piping systems shall be tested to pressures required by the system manufacturer or to at least 150% of maximum working pressure.

After completion of construction and the vessel is fully outfitted, an inclining experiment shall be carried out under the physical supervision of the Designer.

Upon completion of all specified work, a Dock Trial shall be conducted during which all machinery and electrical systems shall be tested and proven in proper operating condition. The Builder shall correct any deficiencies or adjustments promptly and prior to Final Sea Trials.

The Final Trials program shall include a schedule of daily events and shall include the testing of all systems and equipment to prove that the vessel conforms to this Specification and the vessel's intended purpose. All magnetic and gyro compasses shall be set by a compass adjuster to ensure accuracy.

The Builder shall meet all the expenses associated with the tests and trials including the cost of fuel oil, lubricating oil, hydraulic fluid, greases and provisions. All tests and trials shall be completed before the Date for Delivery of the vessel on May 15th, 2001.

### 1.6    Weight Control

The Designer shall prepare a preliminary weight calculation based on the Plans and Specifications. It is the Designer's responsibility to notify the Builder and Owner that

H&K 000047

additional equipment and fittings which create an increase an increase from the original displacement figures may cause deterioration in the performance of the vessel.

**1.7     Manuals**

The Builder shall supply two (2) sets of Operation and Maintenance Manuals at the date of delivery. The manuals shall comprise a series of high quality bound volumes in the Builders colors, with each volume having the vessel outline and name, and the relevant volume number.

**1.8     Plans**

On the date of delivery the Owner shall be furnished with the following plans. Two white prints of each shall be provided.

> Outboard Profile
> Below Deck Plan
> Main Deck Plan
> 01 Level Plan
> 02 Level Plan
> Docking Plan
> Main Engine and Generator Exhaust System
> Fuel Oil System Schematic
> Sea Water Cooling System Schematic
> Air Conditioning and Heating Schematic
> Bilge and Fire System Schematic
> Hydraulic System Schematic
> Electrical Schematic and Navigation Equipment
> Lighting Schematic
> Fresh Water System
> Engine Room Layout
> Compressed Air System Schematic
> Shaft Line Drawing
> Tank Arrangement, Capacities and Vents
> Black and Grey Water Systems Schematic

Where the Owner supplies items for inclusion in the construction of the vessel, it shall be the Owners responsibility to supply all relevant information to the Designer and Builder for subsequent inclusion in the drawings or manuals.

On the date of delivery the Owner shall be furnished with various suppliers manuals including the following:

> Main Engines and Gearboxes
> Auxiliary Generating Sets
> Radar, Radio, and Navigation Equipment
> Refrigeration Equipment
> Desalinators
> Domestic Waste System
> Tender Boats
> Safety Equipment

H&K 000048

Davit System
Anchor Windlass
Steering System
Fuel Oil Separator
Stabilisers
Bow Thruster
Pumps
Air Conditioning Plant
Door Details
Fire Fighting System

### 1.9 Change Orders

Change or additions to the Specifications and/or Plans occurring after the Contract signing shall be made only upon written request.  Any change in cost due to alterations or deletions requested by the owner shall be validated by the Owner's and/or Owners Representative authorised approval signature.  If a change involves a delay in completion of construction and/or engineering, the time extended shall be approved by the Owner and/or Owners Representative.

The change in cost therewith, and the time involved in delaying completion because of said change, shall be submitted by the Builder to the Owner's Agent.

Any items to be upgraded shall be at actual cost difference.  Any additional items will carry a 15% yard surcharge.  Labour rate is USD $30.00 per man-hour.

### 1.10 Insurance

The Builder will assume all risks and liabilities during construction and until completion and delivery to the Owner.  During the construction period, and until delivery, the Builder shall maintain Builder's Risk Insurance on the vessel and all components and materials, including those which might be delivered by the Owner for installation by the Builder.  Suitable evidence of such insurance shall be furnished to the Owner and/or Owner's Representative.

### 1.11 Inspection and Access

The Owner and/or Owners Representative may gain access to the vessel for inspection during normal working hours.  Builder shall provide a private office with phone for Owner's Representative throughout the construction period of the yacht.

Any comments or requests from the Owner and/or Owners Representative regarding construction of the vessel will be communicated directly to the Builder's Project Manager.

### 1.12 Progress Reports

On the 1st and 15th day of each month, during the construction period, the Builder shall submit to the Designer and Owner and /or Owners Representative, photographs showing progress of the vessels construction.

H&K 000049

## 1.13    Hull Characteristics

This vessels hull form shall be a medium displacement, moulded hull with bilge keels and moulded bulbous bow.

The following preliminary principal characteristics are proposed:

| | |
|---|---|
| Length Overall | 174'-0" |
| Beam (moulded) | 30'-0" |
| Max Beam | 32'-2" |
| Hull Depth Amidships | 19'-0" |
| Draft (75% load) | 9'-6" App. |
| Max Draft | |
| Displacement (100% Fuel & 50% Water) | 526 L.T. App. |
| Net Gross U.S Tonnage | Under 300 |
| Gross International Tonnage | |
| Design Speed at Max Cruise (Half Load) | 15 knots |
| Design Speed at Max  (Half Load) | 17 knots |
| Fuel Oil Tankage | 30,000 gal App |
| Potable Water Tankage | 10,000 gal App |
| Lube Oil Tankage | 1,400 gal App |
| Contaminated Oil Tankage | 1,400 gal App |
| Black Water Tankage | 2,500 gal App |
| Grey Water Tankage | 1,500 gal App |

## 1.14    Classification Society & Survey

The vessel shall be designed, constructed and classed to American Bureau of Shipping, Guide for Building and Classing Motor Pleasure Yachts and other rules invoked therein. Classification shall be ABS, ⊛A1, ⊛AMS and MCA Megayacht Code. Builder shall bear all costs incurred for ABS classification including drawing review.  International load line convention per MCA.

160' Specification

H&K 000050

### 1.15    Marking & Labeling

All equipment, systems and valves shall be properly marked for identification corresponding to the appropriate system and/or machinery drawing.

# Section 2 – Vessel Construction

### 2.1    Bulkheads

The hull bulkheads shall be arranged as shown on the contract drawings. All bulkheads shall have properly sized stiffeners to comply with ABS standards. All penetrations through watertight bulkheads shall be installed strictly in accordance with ABS requirements.

### 2.2    Tanks

The hull shall incorporate integral tanks for fuel, water and other tanks as specified. Amidships fuel oil tanks and aft potable water tanks shall be divided on centerline forming port and starboard tanks for transverse trimming. Where required by the ABS rules, the Builder shall fabricate and install cofferdams between tanks holding different types of liquids.

Access manholes shall be fitted in tanks to facilitate inspection and cleaning. Location of manholes is to be such that it does not detract from the décor in accommodation spaces.

Tank sending units and dip tapes shall be located adjacent to the manholes and readily accessible.

### 2.3    Main Engines Beds

The girders for the main engines shall be designed to be a structural member of the hull with sufficient strength and rigidity. The engine girders shall extend as far forward and aft as practicable and shall be well braced athwartships to ensure that maximum working stresses shall be evenly transmitted to the hull.

### 2.4    Rub Rails

Rub rails shall be finished with 316 stainless detail. Lower rub rail shall stop approximately amidships.

### 2.5    Superstructure

The superstructure shall be constructed of "Marine Grade" aluminum alloy. In general, the following types shall be used: Plate 5083-H32 or H116, Extrusions 5086-H1 12, Pipe 5086-H32.

Tri-clad, bi-metallic bar conforming to Mil-J-24445A shall be used to joint the aluminum superstructure to the steel hull.

H&K 000051

# Section 3 - Outfitting

### 3.1    Shaft Logs

Two (2) 1" wall structural tubing welded into hull and machined to accommodate a Johnson Dura-Max or Crane Shaft seal on forward end and Johnson bearing on aft end.

### 3.2    Shaft Struts

Two (2) single-type, foil-shaped, fabricated from 1-½" steel plate and 1" wall structural tubing. Tube shall be machined to accommodate a Johnson bearing. Bearing sleeves shall be set in "Chock-fast". Struts shall be welded into hull, continuous through hull bottom plating, and tied into hull structure.

### 3.3    Rudder Posts

Two (2) 1" wall structural tubing welded into hull extending approximately 9" above DWL. Tube shall be machined to accept a Johnson bearing. Bearing sleeves shall be set in "Chock-fast". The top of the rudderpost shall be flanged to accept a Wagener or equivalent supplied seal assembly or equivalent.

### 3.4    Stairways and Ladders

Stairways shall be installed as shown on contract plans. All permanent stairways in hull shall be fabricated from steel and stairways in superstructure shall be fabricated from aluminum. All exterior stairways shall have polished 316L stainless steel handrails. Coamings around exterior stairways shall have integral drip edge around opening in deck. Builder shall furnish and install ladders fabricated to Designer's drawings in the following locations:

> Engine Room Escape
> Crew Quarters Escape
> Collision Compartment
> Steering Gear Compartment
> Central Machinery Space

Additionally, all integral tanks and voids in hull shall have ladders installed adjacent to manholes.

### 3.5    Bulwarks

Bulwarks shall be fabricated and installed as per Contract Drawings. Main deck bulwarks shall be left open on the inboard side. All bulwark stiffeners shall be fair and true, avoiding any distortion. Inboard side of bulwarks shall be faired and painted as specified in Section 10.4.

The inboard side of all superstructure bulwarks shall be closed-in with welded aluminium plate. The painting and fairing shall be as specified in Section 10.5.

H&K 000052

### 3.6    Freeing Ports and Scuppers

Freeing ports and scuppers shall be sized to ABS requirements. Round bar shall be fully welded on both sides except in the case of the upper deck freeing ports, which shall have half round on one side. Lower side of all freeing ports and scuppers shall be raised above deck ¾".

### 3.7    Engine Room

Polished 316L stainless steel handrails shall be installed around main engines and other machinery and equipment as detailed on Contract Drawings.

Separate overhead cable trays shall be installed in the Engine Room for AC and DC wiring. Cable trays shall be recessed into false ceiling to where bottom of side rail flange is flush with perforated aluminum sheet in engine room overhead. Bottom side of cable tray shall be covered in a separate white 30% perforated aluminum sheet to allow for access and proper ventilation. Removable sheet shall be fastened with Cres 304 pan head screws. Top plate, side rails and rungs shall be painted International White to match Engine Room finish.

### 3.8    Engine Control Room

Engine control room shall house the main switchboard as specified in Section 7.4. Builder shall provide and furnish a built-in desk complete with storage drawers, chair space and chair. The storage drawers shall include one file drawer suitable for American size legal folders. The room shall also have shelves suitable for the stowage of equipment manuals. Cable trays installed in overhead of Engine Control Room shall be to the requirements of Section 3.7. All cables and piping entering the Engine Control Room shall be fitted with watertight stuffing tubes.

### 3.9    Tender Garage

Sides and overhead of Garage shall be finished in removable fire-retardant fiberglass panels painted in International White. Installation of panels shall be made weathertight to prevent water seepage behind panels during wash down.

Garage deck shall be steel sloped outboard, welded watertight, painted and finished in non-skid.

Two (2) aluminum cradles shall be fabricated for tenders.

### 3.10   Docking Plugs

The Builder shall install Cres 316L docking plugs per Designer's drawings in the lower part of each skeg compartment, rudders and any inner bottom voids.

H&K 000053

# Section 4 – Machinery and Equipment

### 4.1    Main Engines

Two Caterpillar 3516C, Electronically Controlled Marine Engines, each rated at 2200 BHP @ 1600 RPM, electric start, lubricating oil filters, heat exchanged cooled, 24V-alarm system, block heaters, drip pans, and two (2) mechanical instrument panels. Engines shall come with five (5) year manufacturers warranty. The colour of the main engines shall be painted Snow White.

### 4.2    Reduction Gears

Two (2) BW 751 ZF reduction gears, oil cooler, trolling valves and Vulcan coupling, ratio subject to design development. The colour of the reduction gears shall be painted Snow White.

### 4.3    Generators

Two (2) Caterpillar 170kw 212.5 kVA 120/240 volt three phase, 60 Cycle.  Generators shall be equipped as follows: Heat exchange cooled, 24V electric start, remote mount S-3B control panel, dry exhaust, anti-vibration mounts and painted Snow White.

Emergency Generator, One (1) Northern Lights 65kw @ 1800 rpm, 120/240v three phase. Generator shall be equipped as follows: Heat exchange cooled, 12V electric start, two (2) remote mount S-4 control panels, wet exhaust, anti-vibration mounts, sound enclosure, International White finish.  Generator shall be mounted in the Bosuns locker and used to power emergency fire pump.

### 4.4    Shafting

Duplex 2205 or equivalent stainless steel.  Shafts shall be fitted with spurs and machined to Contract Drawings. Diameters subject to design development.

### 4.5    Propellers

One pair, 1 R/H & 1 L/H, Bruntons, Teignbridge or approved equal, nickel-aluminum-bronze, 5 blade "S" class, standard taper bored 72" diameter, pitched to Designers specs. Final sizing subject to design development. Spares to be Owner supplied.

### 4.6    Rudders

Two- (2) foil shaped, semi-balanced per Contract Drawings, constructed of 3/8" thick Cres 316 plate welded to Duplex 2205 rudderstock.  Rudders shall be fitted with Cres 316L drain plugs.  Upper end of rudderstock shall be machined to accept upper bearing and tiller arm.  The tie bar shall be fabricated from, sch 80, Cres 316 pipe.

H&K 000054

### 4.7    Vibration Dampers

The main engines, reduction gears, and generators shall be soft mounted in accordance with the Contract Drawings. Main Engines shall be isolated from the hull structure using "Cushy Float" or equal resilient mounts.

All other reciprocating machinery shall be mounted on resilient mounts.  All piping to and from the machinery shall be connected by ABS approved flexible connections.

### 4.8    Exhaust System

Main engines shall be equipped with underwater exhaust fabricated from Cres 316 pipe. Exhaust main shall be water cooled, and discharging through the hull bottom.  Exhaust bypass shall discharge below boot stripe.

Generator exhaust shall be wet type fabricated from 316L pipe.

Emergency generator exhaust shall be wet type fabricated from sch 10 Cres pipe discharging overboard.

### 4.9    Fire Extinguishing System

| | |
|---|---|
| *Engine Room*: | Ultra Fog Sweden – Foam Fog System |
| *Engine Control Room*: | Ultra Fog Sweden High Pressure Fog System |
| *Garage*: | Ultra Fog Sweden High Pressure Fog System |
| *Auxiliary Machinery*: | Ultra Fog Sweden High Pressure Fog System |
| *Bosuns Locker*: | Ultra Fog Sweden High Pressure Fog System |

### 4.10    Engine Controls

Three (3) stations, Commercial Quality Twin Engine Kobelt or approved equal electronic system.  One unit installed in Pilothouse, two units installed on wing stations. A set of manual shift and throttle controls shall also be installed at the emergency helm station. System shall include Trolling Valve Control.

### 4.11    Hydraulic Steering

Wagner Hydraulic Steering System shall be installed.  System shall include hydraulic reservoir with 230v dual pump sets and dual 230v secondary pump sets, dual steering cylinders providing 4.0 ton metre torque over 2 x 35 degrees of rudder angle at 1450 psi system pressure. An additional manual pump with wheel and rudder angle indicator shall be installed in the Garage in the event of power loss to primary and secondary pump set. Interfacing shall be provided for automatic switching to secondary pump set in the event of power failure to the primary pump set.  System piping shall be Cres 304 seamless tubing with Cres 316 SAE 37 degree flared fittings.

System shall consist of the following components:

H&K 000055

One Shipset – Wagner/Summer Equipment Model LB2-4.0-EB4 Twin Rudder Electro Full Follow-Up Hydraulic Power steering with two 230v Electric Motor driven Pumpsets and two 230v Electric Motor driven Pumpsets.

Two (2) – Model L100-4219 double acting steering cylinders with chrome plated precision shafting piston rods, fitted with four quarter turn shut-off valves (stop valves), spherical end bearings, adjustable full strength rudder stops (set at 2 x 37 degree), and four (4) – short lengths of flexible hose.

Two (2) – Model LA4-4.0-35 Tillers, solid hub, 1/12 taper bore tillers fitted with local rudder angle scale strip bored and keyed to the vessel rudder stock diameter (max.175mm).

Two (2) – Model L100 spherical rod ends for rudder tie bar interconnecting pipe supplied by the shipyard.

One (1) – Model B3 Manual hand hydraulic helm pump with rudder lock valve located in the Garage for local emergency control.  Provides for 24 wheel turns over 15/15 degrees of rudder movement.

One (1) - 18" diameter steering wheel with spinner handle, aluminum construction with smooth rim fitted to helm pump located in the garage.

One (1) – 2 litre header tank with sight glass located above/adjacent to emergency helm pump.

Two (2) - ½" Shut off valves to isolate emergency helm pumps.

One (1) – Model 150 RAI meter (Master Station Meter) flush mounted, watertight, port and starboard markings, three colour face to be mounted directly over the emergency helm pump.

One (1) - Model Waterproof kit for mounting RAI Meter.

One (1) - Universal Rudder follow-up transmitter with feed back linkage to work in conjunction with RAI at emergency control station watertight with 50ft of cable to be installed about rudder stock.

One (1) – Model M1025 Accumotor Hydraulic Full Follow-up Control valve assembly.   24vdc solenoid with auto changeover valve to hand hydraulic providing auxiliary emergency steering with continuously variable acceleration and deceleration.

System relief valve, rudder lock valve and pressure line filter fitted with double acting relief valve and by-pass valve.

Solenoid package to provide an interface for electrical operation of the steering gear with an autopilot and/or electric controller, 3.5 wheel turns required hard over for full rudder movement 35-0-35 degree.

H&K 000056

One (1) – Model TA20 Hydraulic reservoir with 20 gallon capacity with return line filter, suction strainer, vent shut-off valve and filler port.

Two (2) – Model 2B-MA50 Hydraulic power units with 5HP electric motor 230/460/3/60 Hz electric motor with hydraulic pumps sized to provide a rudder speed of 11 seconds with both pumps running and 22 seconds with one pump running hard over to hard over.

Two (2) – ¾" Check valves to isolate power units

Two (2) – Model 2A-MA75 hydraulic power unit with ¾ Hp electric motor 24v.dc electric motor with each with hydraulic pumps sized to provide a rudder speed of 28 seconds hard over to hard over.

Two (2)- 5/8" Check valves to isolate power units.

Two (2) - ½" relief valves for DC pump set0 set at 400 psi.

One (1)– 6" dia.  Steering wheels with smooth rim stainless steel construction destroyer style.

Two (2) – Jog levers (NFU) non follow-up controller located at wing stations providing electric control of solenoid valves.

One (1) – Model 150 RAI Rudder Angle indicator meter (Master Meter) flush mounted, watertight, port and starboard markings, three-colour face.

Three (3) – Model 150 RAI meters (repeaters) flush mounted, watertight, port and starboard markings, three-colour face.

Three (3) – Model 150 watertight kit for mounting rudder angle indicator repeaters.

One (1) – Universal rudder follow-up transmitter with feedback linkage and 175ft of cable to be installed about rudderstock.

Four (4) – Sets installation, operation and service manuals.

## 4.12    Bow Thruster

Naiad Bow Thruster, 125Hp, AC, 230/460v, 3 phase electric driven with variable frequency control (see Section 7.4).  Three (3) Thruster Control Stations, jog lever type, spring centered.

## 4.13    Windlasses & Ground Tackle

Two (2) MUIR VRC15000/210/18 Windlasses or approved equal with vertical brake/hand wheel control, 208v, 14.5 HP, 3 phase with soft starters and A/C control box.

H&K 000057

System shall include two (2) Muir chain compressors and two (2) chain rollers. Two (2) Pool Type "N" HHP anchors: 500 feet of 1" galvanized stud link chain each side, fed through Cres 316L hawsers to anchor pockets. Anchor pockets shall be stainless steel type 316L polished to No.7 finish.

**4.13A   Warping Capstans**
Two (2) Muir VC13000 Capstans, or approved equal, 208v, 5.3HP, 3 phase with soft starters and A/C control box. Capstans shall be located on main deck aft as shown on contract drawings.

**4.13B   Anchor Washdown**
There shall be an integral and automatic washdown system for each anchor system. The system will utilise potable water from the vessel's potable water pressure system and shall automatically spray down each anchor and anchor chain as it is retrieved. Each hawse pipe shall be fitted with three (3) 1/8" ips inlets, 120 degrees apart. Each anchor pocket shall be fitted with two (2) fan spray nozzles, one 25 degree and one 80 degree. The washdown system shall be energised in parallel and at the same time the anchor windlass is energised in the retrieval mode.

## 4.14   Air Conditioning System

The Air Conditioning System will cool all designated compartments (TBD) of the Vessel at 72 degrees Fahrenheit warranted under weather conditions as approved by Cruisair. Cruisair chilled water air conditioning system and Fresh Air Make Up System shall be installed. Heating shall be provided by electric blower heaters mounted in fan coil units. Fan coil units shall be installed as shown on the Interior Designer' plans. Thermostat controls shall be digital. All condensate drains from the fan coil units shall have effective water traps and be piped to the Grey water tanks. Care shall be taken not to run condensate lines and chilled water lines next to or in close proximity with return lines.

### 4.14.1   Main Chiller Unit

Cruisair model FMT1417.1 TW5X 5 x 10-Ton total capacity shall be installed. Units shall have a total a total of 5 10 ton Scroll compressors. Input voltage shall be 208 volt 3 phase 60 cycle. Refrigerant to be used is R22. Chiller unit flow rate is to be specified by the manufacturer.

### 4.14.2   Chillwater Pumps

Two 5hp CPOD800B3X-H Centrifugal Pumps – One used as a spare.

### 4.14.3   Seawater Pumps

Two 5hp P10800B3X Centrifugal Pumps - One used as a spare.

H&K 000058

#### 4.14.4  Fresh Water Makeup Kit

One (1) expansion tank, one (1) pressure reducing/fill valve and one (1) pressure gauge.

#### 4.14.5  Fan Coil Units

**Subject to amendment as of July 23rd, 2001**

| | |
|---|---|
| Crew Cabins | 5 x CHBBL6-C<br>1 kW Blower Heater |
| Crew Galley / Lounge | 2 x CHBBL-12C<br>2 kW  Blower Heater |
| Laundry | 1 x CHBBL-12C<br>1.5 kW Blower Heater |
| Guest 1-4 | 8 x CHBBL-9C<br>1.5Kw Heat<br>( 2 units in each cabin ) |
| Control Room | 1 x CBBL12C |
| E.R. Air | 2 x CBBL-12C |
| Garage | 2 x CHBBL-18C |
| FWD Machinery | 1 x CHBBL9C |
| Dry Stores | 1 x CHBBL6C |
| Owner Baths | 2 x CHBB9C<br>1.5Kw Heat |
| Owners Stateroom | 2 x CHBBL24C<br>4 kW Heat |
| Study | 1 x CHBBL-12C<br>2 kW Heat |
| Galley / Breakfast | 1 x CHBLB-24C<br>4Kw Heat |
| | 1 x CHBBL-12C<br>2 kW Heat |
| Foyer / Powder Room | 2 x CHBBL-12C<br>2 kW Heat |

H&K 000059

| | |
|---|---|
| Dining | 2 x CHBBL-18C<br>3 kW Heat |
| Salon | 5 x CHBBL-18C<br>3 kW Heat |
| Pilothouse | 2 x CHBBL-18C<br>3 kW Heat |
| NavStation | 1 x CHBBL-12C<br>2 kW Heat |
| Captain | 1 x CHBBL-12C<br>2 kW Heat |
| Gym / PWDR Room | 1 x CHBBL-18C<br>3 kW Heat |
| Pantry / Stairs | 1 x CBBL-18C |
| Sky Lounge | 4 x CHBBL-18C<br>3 kW Heat |
| Fresh Air Make Up | 2 x CHB48C-MU   530 CFM   4 kW Aux Heat<br>1 x CHBBL18C-MU 200CFM 2 kW Aux Heat<br>1 x CHBBL24C-MU |

### 4.15    Stabilisers

NAIAD Model 510, 30sq.ft. fin size: single station control, fluid and mounting panel kit; two (2) hydraulic pumps (driven off of each main engine) with unloading valve, two (2) pressure filter assemblies, two (2) actuators, one (1) gyro, one (1) fluid conditioner reservoir. Each actuator shall be housed in its own watertight compartment located under the sub-floor in the guest stateroom compartment. Each watertight compartment shall have one (1) quick acting watertight hatch with steel weld-in frame and aluminum cover. Bilge suctions and float switches shall be installed in each compartment and integrated into the monitoring system panel. Passive roll at night anchor to be evaluated. Owner Supplied.

### 4.16    Manual Gauges

Two (2) sets each of manual gauges with start and stop (furnished w/ main engines, one set located in Engine Control Room and one set in Pilothouse).

### 4.17    Ventilation System

#### 4.17a - Engine Room and Tender Garage
Engine room ventilation shall consist of two (2) 24", 5hp, 3hp intake fans, 12,800 CFM @ 1800 RPM; and (2) 19", 2hp, 3ph exhaust fans, 6,100 CFM @ 1800 RPM. Tender

H&K 000060

garage ventilation system shall consist of (1) 19", 2hp, 3ph exhaust fan, 6,100 CFM @ 1800 RPM. Systems shall be equipped with Delta T FCI Ventilation Control Interface or equivalent and Adjustable Speed Drive. Two (2) FCI control panels shall be provided for each system, one installed in engine control room and one installed in pilothouse. Intake air shall be taken in through Delta T or equivalent Single Stage Moisture Eliminator Louvers. Delta T Smoke/Fire Dampers shall be installed upstream of intake and exhaust fans. Intake and exhaust fans shall be fitted Uniflex "Mighty Span" or equivalent U-type expansion joints, style 600 to isolate vibration from ships' structure. Vent ducting shall be fabricated from stainless type 304 sheet stock per Contract Drawings. The exhaust side of the system shall exit up through port and starboard uptake trunks, routed through both sides of the arch, terminating at the upper portion of the mast. All areas of uptake trunks shall be accessible for inspection and maintenance.

### 4.17b - Auxiliary Machinery Space
The ventilation system shall consist of (1) 19", 2hp, 3ph intake fan, 6,100 CFM @ 1800 RPM. System shall be equipped with Delta T FCI Ventilation Control Interface or equivalent and Adjustable Speed Drive. Intake air shall be taken in through Delta T or equivalent Single Stage Moisture Eliminator Louvres. A Smoke/Fire Damper shall be installed upstream of intake fan. Intake fan shall be fitted with Uniflex "Mighty Span" U type expansion joint, style 600 to isolate vibration from ships' structure. Vent ducting shall be fabricated from stainless type 304 sheet stock per Contract Drawings.

### 4.18   Tank Gauging System

The vessel shall be equipped with a tank gauging system manufactured by Vega or equivalent as outlined below:

| | |
|---|---|
| Fresh Water Tanks: | One (1) ea. Level transmitter, one (1) ea. Tank bar graph (%) / digital (gal) indicator. |
| Grey Water Tanks: | One (1) ea. 5 point multi-level sensor, one (1) ea. 5 point indicator w/ high-level alarm @ ¾ point. |
| Fuel Tanks: | One (1) ea. Level transmitter, one (1) ea. bar graph (%) / digital (gal) indicator. |
| Fuel Day Tank: | One (1) level transmitter, one (1) bar graph (%) / digital (gal) indicator w/ low level alarm @ 25% capacity. |
| Black Water Tanks: | One (1) ea. 5 point multi level sensor, one (1) each 5 point indicator w/ high level alarm @ ¾ point for each tank. |
| Clean & Dirty Oil Tanks: | One (1) ea. Level transmitter, one (1) bar graph indicator. |

In addition to the above, tape level indicators shall be installed in each tank, located adjacent to the tank manholes to assure easy access.

H&K 000061

## Section 5 - Piping Systems

### 5.1    General

Piping system materials, insulation and testing shall be in accordance with good shipbuilding practice. All references made to Cres shall be type 316 unless noted otherwise. Piping shall be installed with direct runs where possible with a minimum number of bends. All pipes subject to mechanical injury or undue vibration shall be adequately protected and/or supported. Piping shall be thoroughly cleaned after installation and before testing. The Builder shall install sufficient unions or flanges at equipment locations so as to simplify equipment removal and maintenance. The Builder shall avoid cutting vessels structure for routing of pipe where possible. Special care is to be taken to ensure that all mechanical systems operate extremely quietly, to achieve low noise levels.

The height of air escapes and overflows shall be as required by ABS. All vents shall have suitable non-return valves installed where applicable and be sized in accordance ABS as well. Flexible connections will be provided at all points where piping is connected to vibrating machinery in accordance to ABS requirements.

### 5.2    Sea Chests

**Engine Room**
The Builder shall furnish and install two (2) sea chests with cross-over in the Engine Room close to centerline using 8" IPS sch 80 Cres 316 pipe. The crossover shall be located between the sea valves and inlet with a Cres lug body butterfly valve actuated from grating level. The sea valves shall be 8" IPS flanged Cres 316 butterfly valves with 90-degree right angle drive, actuated from grating level. The vessel shall be equipped with two raw water strainers connected to the top of each sea valve. The strainers shall be Cres 316 8" IPS flanged bottom inlet / side outlets, manufactured to Contract Drawings by Nautical Outfitters. Removable Cres 316 strainer plates will be fitted to the bottom of the hull in way of the sea chests. Adequate zinc anodes will be placed inside the sea chests to alleviate corrosion of sea valves.

**Auxiliary Machinery Room**
The Builder shall furnish and install one (1) sea chest in the Auxiliary Machinery Room close to centerline using 6" IPS sch 80 Cres 316 pipe. The sea valve shall be 6" IPS flanged Cres 316 butterfly valve with 90-degree right angle drive, actuated from grating level. The sea chest shall be equipped with a raw water strainer connected to the top of the sea valve. The strainer shall be Cres 316 6" IPS flanged bottom inlet/side outlet. Removable Cres 316 strainer plate will be fitted to the bottom of the hull in way of the sea chest. Adequate zinc anode will be placed inside the sea chest to alleviate corrosion of sea valve.

### 5.3    Sea Water System

The seawater system shall provide service to the following machinery and equipment: Main engine and generator raw water cooling, raw water cooling to the main chillers, sea water supply to the desalinators and raw water to the fire fighting system.

H&K 000062

In general the system shall be constructed from Cres 316 sch 10 pipe with butt weld sch 10 fittings, fittings below 1-1/2" IPS shall be socket-weld.  Valves used throughout the system shall be Cres 316 valves as specified by the designer to A.B.S. requirements.

### 5.4    Bilge and Fire Fighting System

Bilge suctions shall be provided in each watertight compartment in the vessel with brass foot valves, leading to a bilge suction manifold, located in the engine room.  The bilge connections at the manifold shall be flanged.  Bilge manifold valves shall be of the stop check design with Cres trim.  Bilge water shall pass through a Signa OWS-1 oily water separator to remove oil prior to being discharged overboard.

An MP 2" x 2" Flowmax 10, or approved equal, self-priming, close coupled bronze centrifugal pump rated at 150 GPM @ 85' TDH, driven by a 5 HP, 3 phase, 240 VAC sealed motor, discharge shall be through an inline wafer check valve led directly overboard below the bootstripe via a flanged Cres seacock.  A crossover valve shall be installed between the bilge manifold and grey water manifold enabling the grey water pump to be used as a back up.  A pump suction priming line shall be installed from one of the sea chests to each pump with isolation valves located immediately adjacent to the pumps.  Pump isolation valves shall be located at the pump suction.  Isolation valves shall be 2-1/2" IPS bronze gate valves.  Connections to pumps shall be made via flanged flexible expansion joints.

The vessel shall be equipped with a fire fighting system in accordance ABS rules, taking primary power from the emergency fire pump located in the forward storage compartment below the forward two crew cabins.  Pump controls and pump discharge pressure gauge shall be located in the forward storage compartment and remotely mounted on the Pilothouse console.  Two Aurora 361 1-1/12 x 2 x 9c with 7.5" impeller, or approved equal, self priming, close coupled bronze centrifugal pump rated at 115GPM @ 220ft TDH, driven by a 15H.P., 3 phase, 240 VAC sealed motor, discharge shall be led directly to the fire main via a inline wafercheck valve.  Pump isolation valves shall be located at the pump suction and discharge.  Isolation valves shall be 2 1/2" IPS bronze gate valves.  The emergency fire pump shall take power from the generator as specified in section 4.3 and 7.5.

Additionally, two (2) engine room suctions shall be installed; one from each main engine raw water intake.  Bilge suction lines shall each be fitted with a 2-1/2" IPS bronze gate valve and strainer/foot valve.

Fire fighting system piping shall be fabricated from Cres 316, sch 10 seamless pipe and butt-weld fittings.  Exterior fire stations shall have custom fabricated hose racks as detailed on Contract Drawings.  Engine room fire station shall be equipped with a swing out hose rack.

The fire fighting stations shall be placed in the following locations:

- Aft bulkhead of engine room
- Port and starboard main deck near amidships
- Main deck forward
- Port and starboard upper deck near amidships
- Flybridge deck

H&K 000063

The bilge system shall include an audible and visual alarm system located in the Pilothouse, Captain's Cabin, Crew Lounge and Engine Control Room as specified in Section 7.10. The bilge alarm system shall be fully integrated into the Monitoring System panels. The system shall be activated by float switches located immediately adjacent to the bilge suction line in each watertight compartment.

## 5.5    Black & Grey Water System

**Black Water System**
A Headhunter marine head system shall be installed complete with toilets, and all instruments and controls. All waste from the toilets shall discharge to the appropriate black water tank. Owner Stateroom, Guest Staterooms and powder room shall have Headhunter Royal Flush toilets and bidets installed. The sundeck powder room shall have a toilet installed. Captains and Crew Heads shall have Headhunter Royal Flush Commercial SBS model CSBS-0-MHD toilets installed. The heads shall discharge through 1-1/2" IPS, sch 80 CPVC pipe and 90 degree long-turn sweep or 45 degree elbows. All toilet lines shall each run independently and directly as possible. Low points shall be avoided and lines shall have a continuous downward slope to the holding tank where practical. Standard long or short radius ninety-degree elbows shall not be used in runs from the toilets to the holding tanks.

Sinks that are fitted with garbage disposal units shall discharge to the black water tank.

The Builder shall furnish and install in the engine room one (1) Royal Fox type II treatment system, model no. RF-200B, or approved equal. Discharge shall be led directly overboard below the waterline, near centerline via a flanged bronze seacock for both MSD discharge and pump-outs for the holding tanks. A separate 1-1/2" IPS shore facility discharge line shall be installed for each tank, led directly from each tank, terminating aft on the boarding platform. Discharge piping shall be sch 10 Cres 316 pipe and fittings with 3-piece Cres socket weld ball valves.

**Grey Water System**
All lavatories, showers, and tubs shall gravity discharge into forward and aft grey water tanks. Piping shall be schedule 80 CPVC and arranged so that the maximum pitch possible is attained.
The builder shall furnish and install in the engine room one (1) grey water discharge pump, a MP 2" x 2" Flowmax 10, or approved equal, self-priming, close coupled bronze centrifugal pump rated at 150 GPM @ 85' TDH, driven by a 5 H.P., 3 phase, 240 VAC sealed motor. The suctions shall lead to a Young and Cunningham simplex grey water suction manifold located adjacent to bilge manifold. Manifold valves shall be of the stop check design with Cres trim, discharging the forward or aft grey water tank. Pump discharge shall terminate in the engine room and discharge through the bilge system overboard. Drain piping to grey water tanks shall be schedule 80 CPVC with union end CPVC ball valves. Grey water tank pump-out piping shall be 2" IPS, sch 10, Cres.

H&K 000064

### 5.6     Fuel Oil System

The fuel oil system shall be comprised of a total of five (5) tanks, no. 1 main tank, no. 2 main tank, no. 3 main tank, no. 4 auxiliary fuel tank for extended range, and a day tank. The system consists of four categories:

Transfer, Supply and Return, Fill and Tank Sounding.

The fuel transfer system shall enable transfer of fuel from tank to tank. The suction line to the centrifuge shall be tied into the suction side of the manifold and discharge line from the centrifuge to the discharge side of the manifold, upstream of the Fuel Flow Totaliser. The centrifuge shall also have gravity drain to the dirty oil tank. The transfer pumps shall have bronze "Y" strainer installed at the suction end. System piping shall be constructed from sch 10 Cres pipe with butt-weld fittings. This system shall include the following items:

One (1) duplex fuel oil transfer manifold, Young & Cunningham 2" IPS, flanged ANSI 125#, 5-way, 10 valve. Valve internals shall be globe stop check design with Cres trim.

One (1) fuel oil transfer pump, self-priming, Burks model X330WA6-BF, or approved equal, all bronze construction, 1-1/2" x 1-1/2", 3 hp, 230/460 VAC, 60 Hz, 3 Phase motor. 83 GPM @ 30 PSIG and 10' lift.

One (1) fuel oil transfer pump, Jabsco model 23550-1300, or approved equal, cast iron body, brass rotors and bronze vanes, 1-1/4" x 1-1/4", 24 VDC, 15 amp motor, 25 GPM.

One (1) fuel oil centrifuge, Alfa-Laval MMB-304 to purify the fuel prior to entering the day tank.

One (1) fuel oil transfer hand pump, Blackmer Series, model 414-414A, or approved equal.

One (1) Blancett model W1120L Fuel Flow Totaliser, 15-180 GPM flow range, or approved equal.

The fuel supply and return system shall draw from and return to the fuel oil day tank. This system shall service both main engines and both generators. System piping shall be constructed from sch 10 Cres pipe with socket-weld fittings. Flexible hoses connecting to the machinery shall be USCG approved fire-rated fuel hose to SAE J1942 with stainless steel reusable type fittings. The system shall be equipped with the following items:

Three (3)"Racor" fuel filters, #75-1000MAXM for each main engine.

Two (2)"Racor" fuel filters, #1000-MAM with vacuum gauge for each generator.

A separate 2" IPS pressure fuel fill system shall be installed with three (3) fill stations located on the starboard side of the boarding platform and port and starboard main deck, approximately amidships. The system will enable filling of each tank via the duplex fuel

H&K 000065

oil transfer manifold located in the engine room. Adjacent to the pressure fill shall be a 2-1/2" IPS gravity fill to no. 4 fuel tank. System piping shall be constructed from sch 10 Cres pipe with butt-weld fittings.

A separate 25-gallon fuel tank shall be installed in the Bosuns Locker for the emergency generator. Tank shall be mounted above the generator with sight level indicator. Tank shall also have independent fill and drain line piped to the forward fuel tank. Builder shall install one (1) fuel oil transfer hand pump, Blackmer Series, model 414-414A in the fuel line.

The yacht shall also be equipped with a tank gauging system, see Section 4.19 for specifications.

## 5.7    Lube Oil and Dirty Oil System

This system shall consist of a 400 gallon clean lube oil tank and a 400 gallon dirty oil tank. The oil tanks shall be integral to the inner bottom in the engine room. The system shall include two (2) separate transfer pumps and valve manifolds, one for clean oil transfer and one for dirty oil transfer. The clean oil transfer pump shall draw clean oil from the lube oil tank and fill the main engines, main engine reduction gears and generators. The dirty oil transfer pump shall draw the dirty oil from the main engines, main engine reduction gears and generators and pump to the dirty oil tank.

Clean and dirty lube oil transfer pumps shall be an Oberdorfer 990 bronze gear pump, 1" IPS, 22.3 gpm @ 50 psig, 230/460 vac, 3 phase, or approved equal. Both pump suctions shall be fitted with a 1" IPS "Y" type bronze strainer with 30 mesh screen.

Clean oil pump manifold shall be valved to draw oil from shore side facility and discharge into clean oil tank. Dirty oil pump manifold shall be valved to draw oil from dirty oil tank and discharge to shore side facility. Isolation valves to main engines, reduction gears and generators shall be fire rated, all other valves shall be ASTM B-43 brass ball type with stainless balls. Piping shall be brass, sch 40 seamless with brass threaded fittings conforming to ASTM B-43.

## 5.8    Chilled Water System

Chilled water piping shall be seamless copper tube type K, ASTM B88, with solder fittings. All piping in the system shall be properly insulated so as to prevent sweating. Refer to Section 4.14, Air Conditioning System for component specifications.

## 5.9    Potable Water System

The Builder shall furnish and install in the engine room, two (2) Matrix Silver 2600 Series 3000 gpd desalination units, or approved equal, 208 VAC, 3 phase and four (4) Headhunter water pressure pumps, model HHJQ4-230, 230 VAC, 8.8 amp. Four (4) Headhunter AVF-12 pressure accumulator tank mounted on resilient mounts.

The pressure sets shall take water from the potable water tanks and discharge through a Water purification system. The system shall provide service to the Galley, heads, bars, hot tub, fresh water washdowns (as specified in Section 8.19), anchor washdown, and hot

H&K 000066

water heaters. Additionally each icemaker shall be fitted with an AMF Cuno filter or approved equal.

Potable water system shall be equipped with four (4) 220 VAC, 50 gal quick recovery type water heaters with pressure relief valves. The hot water system shall be connected in a loop and include an inline circulating pump.

Potable water piping shall be seamless copper tube type K, ASTM B88 with solder fittings. All hot water piping shall be properly insulated.

### 5.10   Compressed Air System

The builder shall furnish and install a complete compressed system. The system shall provide service to the air starters on main engines, main engine controls (if applicable), sea chest blow down, ships service air and the air horns. Main piping from compressors to receivers, receivers to air starters and engine controls supply shall be seamless Cres type 316 pipe with 3000# socket-weld fittings. Suitable air dryers and filters shall be installed in the system to prevent contamination, accumulation of moisture and condensation in the airlines and components. Valves shall be Cres ball type with Cres balls. The system shall include the following equipment:

Two (2) Atlas Copco 3hp air compressors with two (2) 80 gal reserve tanks. Air storage tanks shall each be fitted with petcock at lowest point of tank for drainage of condensation.

Two (2) 50' self-coiling hose with quick disconnect and fittings, one located in engine room and one located in tender garage.

One (1) air station with regulator and pressure gauge located in Flybridge service bar.

### 5.11   Deck Drains

The builder shall furnish and install a deck drain system as specified on Designers plans. System shall provide drainage of all weather decks as well as Tender Garage. All drain piping shall terminate in the boot stripe. All overboard discharges shall be sch 80, Cres 316 shall have a flanged bronze gate valve and swing check valve. The overboard discharges shall be located in easily accessible areas for inspection and maintenance. Deck drains located in hull shall be Cres 316 and superstructure drains shall be aluminium 5083 fabricated to Designers plans. Piping in hull shall be sch 10, Cres 316 and superstructure piping shall be sch 40 aluminium 5086.

H&K 000067

## Section 6 - Thermal & Acoustic Insulation

**General**

Noise levels taken underway shall be measured at maximum continuous cruising speed with one generator and air conditioning system operating. Noise levels taken at anchor shall be measured with one generator running, air conditioning system and engine room ventilation system operating.

Moisture barrier and insulation shall extend below sub-floor and up to overhead. The moisture barrier shall be sandwiched between the hull frames and wood stripping on hull sides. Face of frames shall receive strips of Soundown WDI or approved equal prior to the installation of moisture barrier. All seams and joints, including around portlight spigots shall be sealed using Fibreglass weave waterproof tape.

Every effort shall be taken to reduce noise levels to the requirements listed below:

**Maximum Noise Levels Underway**

| | |
|---|---|
| Owners Stateroom | 55 |
| Guest Staterooms | 58-60 |
| Main Salon & Dining | 64 |
| Skylounge & Pilothouse | 58 |

**Maximum Noise Levels At Anchor**

| | |
|---|---|
| Owners Stateroom | 48 |
| Guest Staterooms | 51-53 |
| Main Salon & Dining | 57 |
| Skylounge & Pilothouse | 52 |

The Builder shall provide and install insulation throughout the vessel as detailed in this Section. Insulation shall be secured with appropriate non-corrosive retaining barbs. All seams and joints shall be sealed using high tack foil tape. Where two or more layers are specified, joints and seams shall be staggered to provide greater thermal and acoustical qualities.

The vessel shall be insulated as per Sensation Yachts Limited standard specifications.

H&K 000068

# Section 7 – Electrical System

## 7.1    General

The Builder shall furnish and install a 208/120, 3phase 60Hz volt electrical system. Installation of this equipment shall meet the standards for the vessel's intended use. Power supply to low voltage lighting shall be phase balanced throughout. All materials shall be to class and of good quality, suitable for marine use and shall be installed to A.B.S. using the best marine practice. All cables shall be to IEC 92-353 and A.B.S. specifications. Cables for communication and data circuits shall be screened run in separate cable trays from AC and DC cables power cable. All electrical sockets to be US style.

All cables that pass through decks and watertight bulkheads shall be enclosed in watertight stuffing tubes to ABS specifications.

## 7.2    Marking and Labels

The Builder shall develop detailed wiring diagrams for each deck of the vessel. Generally, all equipment shall be marked so as to ensure correct use. For essential equipment, all conductor ends for internal and external connections shall be marked for identification corresponding to the appropriate as-built diagram. All other wires are to be tagged at each end and identified on an as-built wiring diagram.

All switchgear, breakers and fuse gear for each circuit shall be labelled. If a switchboard contains two or more distribution systems with different voltages, the voltage for each system shall be indicated.

## 7.3    Shore Power Inlets and Cords

**Inlets**
The vessel shall be equipped to receive shore power from one (1) location; aft stbd side from two (2) 150 amp shore cords. Each shore cord shall be equipped with standard Hubbell or approved equal receptacles as outlined below. Entry cabinets shall also be equipped to receive phone, water and terrestrial TV aerial provided.

**Cords**
The Builder shall provide a total of two (2) 150' shore power cords with 150 amp Hubbell or approved equal plugs. The Builder shall supply and furnish two (2) 6' long pigtails. One (1) shall have 150 amp Hubbell or approved equal plugs on shore cord side and other end left bare for hard wiring to dock power. One (1) cord shall have 100 amp Hubbell or approved equal plugs on dock side end and 150 amp Hubbell or approved equal plugs on shore cord side. Both shore cords shall be housed in Cablemaster or equal units.

H&K 000069_

### 7.4    Main Switchboard

The Builder shall provide and install one (1) Main AC Switchboard, manufactured by Mac Arthur Switchgear. A non-conducting mat or grating shall be provided on deck in front of the switchboard. The 1250A bus voltage shall be 208/120 Vac, 60Hz, 3-phase, 4-wire (grounded neutral), plus ground. Internal wiring for instrument and control circuits shall be marked for identification. The manufacturer of the main switchboard shall supply an internal wiring diagram clearly identifying the circuitry. The switchboard shall conform to the following requirements and specifications.

### 7.4.1    General

The switchboard shall be housed in a dead front type, drip proof, deck-mounted steel enclosure with front opening access doors. A non-conducting safety handrail shall be fitted on the front. Generator start and stop controls shall be included on the switchboard. Complete voltage, amperage, frequency, kilowatt, kilowatt-hour, kVA, kVAr and power factor metering shall be included for each power source, eliminating the need to switch meters between different sources or phases. Ground-fault and synchronizing meters shall also be included for the bus. The shore power feed to the bus shall be protected by a circuit breaker, PLC monitoring of shore supply preventing transfer of power outside the voltage and frequency limits of the Shorpower Converter. The switchboard shall include twenty two (22) main distribution circuit breakers, 3 Incomer circuit breaker and circuit breakers for all control and monitoring circuits. No fuses shall be used anywhere in the system.

The fifteen (15) main distribution circuit breakers shall feed the following distribution panels:

1.    ACDB 1 Engine Room

2.    ACDB 2 Engine Room

3.    ACDB 3 Fwd Machinery Space

4.    ACDB 4 Fwd Machinery Space

5.    Main Bilge Pump

6.    Main Fire Pump

7.    ACDB 7 Guest

8.    ACDB 8 Crew

9.    ACDB 9 Main Galley

10.    ACDB 10 Main Foyer

11.    ACDB 11 Pilot house / Radio Room

12.    ACDB 12 Skylounge

H&K 000070

13.     ACDB13 Sundeck

14.     Emergency Switchboard

15.     Ultra Fog Sprinkler System

16.     CB16 Air Conditioning

17.     CB17 Galley Hob

18.     CB18 Port Windlass

19.     CB19 Starboard Windlass

20.     CB20 Galley Combi Oven

21.     CB21 Primary Steering Pump

22.     CB22 Shore Power

**7.4.2   Shorpower Converter (integral to main switchboard)**

| | |
|---|---|
| Capacity: | 125KVA |
| Input: | 180 to 520 volts, AC, three phase, 47.5 or 64 Hertz. |
| Output: | 208/120 volts, 60 Hz, 3 phase, 4 wire (grounded neutral), plus ground. |

**7.4.3   Seamless Transfer – ST2 (integral to main switchboard)**

Seamless transfer for two (2) generators.  Automatically transfers ships power to dock power and vice versa without interruption to the power buss.

**7.4.4   Auto Parallel – AP (integral to main switchboard)**

Automatically starts and parallels the standby generator to the buss for additional capacity during periods of peak power loading.  Also allows for uninterrupted transfer between generators.  Paralleling equipment for the generators shall be supplied by the Builder and shall be pre-tested with the generators by the generator manufacturer.  The paralleling equipment shall be mounted and wired within the switchboard enclosure.

**7.4.5   Auto Transfer – AT (integral to main switchboard)**

Upon failure of the existing power source, automatically starts and transfers the buss to the pre-selected standby generator.

**7.4.6   Modular Design – MD**

The Shorpower Converter input and output transformer module is supplied in separate enclosure, mounted separately from the main switchboard, location in the garage.

H&K 000071

**7.4.7    Bow Thruster – Controller – BTC (integral to main switchboard)**

Uses the Shorpower inverter to supply variable frequency AC power to drive the 125 hp electric bow thruster (see Section 4.12). Logic control, interface and connection circuits shall be included.

**7.4.8    Bow Thruster Master Control Panel – BTMP**

One (1) Master Control Panel shall be provided and installed in the pilothouse. Panel includes the following;

"System On-Off" and "Take Command" switches

"System On", "In Command" and "Overload" indicator lights.

One (1) Return-to-centre "Joy Stick" control for port and starboard operation of the thruster motor.

**7.4.9    Bow Thruster Remote Control Panel – BTRP**

Two (2) Remote Control Panels shall be provided and installed on the port and starboard wing stations. Panels includes the following:

"System On-Off" and "Take Command" switches

"System On", "In Command" and "Overload" indicator lights.

One (1) Return-to-centre "Joy Stick" control for port and starboard operation of the thruster motor.

**7.5   Main and Emergency Generators**

Two (2) main generators as described in Section 4.3 shall be installed.

The instrumentation for main generator output monitoring shall be located on the main switchboard panel. Generator monitoring is covered by ships monitoring system which is displayed on a touch screen located in the engine control room.

One (1) emergency generator as described in Section 4.3 shall be installed with local start located in the Bosuns locker and auto start via the main switchboard PLC.

The instrumentation for emergency generator output monitoring shall be located locally and on the pilothouse console. Engine instrumentation shall include start/stop, oil pressure, water temperature, via the ships monitoring system, kilowatt hour run on local engine mounted panel.

H&K 000072

### 7.6  Ships Lighting

**7.6.1    Emergency Lighting** - throughout the vessel

**Engine Room**
The system shall take power from the 120 VAC emergency generator power circuit which maintains a constant supply to the emergency LED lighting. 140 2watt units shall be installed with unlimited rating. A transitional power supply has been provided for ½ hour to supply emergency light in such a case that the emergency generator fails to start. MCA and ABS.

**7.6.2    External Lighting and Internal lighting**

Lights as required by MCA/Solas in passageways, monitoring stations and boat launching stations.

**7.6.3    Internal Lighting & Power Outlets**

An automated integrated lightening system has been provided. Sizes, make, quantities and location of lighting fixtures, switches and outlets shall be approved by the Interior Designer prior to installation. All lighting shall be 24 VAC. Lighting for Owners and Guests living spaces and entertaining areas shall have dimming capability. All owners and guests living spaces, as well as Captains cabin shall have 115 VAC rope lighting under valances and toe spaces with. All outlets shall be Vimar of Italy or approved equal.

All outlets shall be well placed to avoid contact with water. Ground fault interrupters (GFI's) shall be installed for all systems near water sources, including all exterior outlets, engine room, garage, heads, galley, Bosuns locker and laundry.

### 7.7    Low Voltage System

The Builder shall furnish and install a low voltage system composed of the following:

GENERATORS: Two (2) 8D gel cell marine grade 12 volt batteries in series for each generator providing 24 VDC output, four (4) batteries total. Batteries shall be wired to provide paralleling capability.

EMERGENCY GENERATOR: Two (2) 8D gel cell marine grade 12 volt battery to ABS

ELECTRONICS: Two (2) 8D gel cell marine grade 12 volt batteries, wired in series providing 24 VDC output. One (1) Uninterruptable Power Supply (UPS), Ferrups 1.5kVA w/controls, one for the Pilothouse. A 24 VDC distribution panel shall be installed in the Pilot House for the electronics, navigation lighting, and Pilot House lighting. Independent power supply for Radio equipment.

All batteries shall be secured and placed in polypropylene battery boxes with covers.

The Builder shall furnish and install the following battery chargers as manufactured by Newmar or approved equal:

H&K 000073

| Generator Batteries: | Two (2) 120V AC 60hz/24V DC 30 amp automatic battery charger. |
| Electronics Batteries: | One (1) 120V AC 60hz/24V DC 30 amp automatic battery charger. |
| Emergency Generator Battery: | One (1) 120V AC 60hz/12V DC 15 amp automatic battery charger |

### 7.8    Navigation Lights

The Builder shall furnish and install running lights, anchor lights and not under command lights per USCG International Navigation Rules.   The navigation lights shall be connected to the 24 VDC Pilot House distribution panel.

All light fixtures shall be Aqua Signal dual bulb or equal.   Running lights and anchor light shall be individually controlled.

### 7.9    Corrosion Monitor

One (1) "Electroguard", monitor only, installed in the Engine Control Room to monitor relative potential of hull to seawater, or equal.

### 7.10    Monitoring System

The Builder shall supply and install three (3) Monitoring System Panels that shall enunciate critical ship conditions. The panels shall be installed in the Pilothouse, Engine Control Room and Crew Lounge.   An additional audible and visual alarm from the Pilothouse panel shall be installed in the Captains stateroom with reset.

The panels shall monitor the following systems:

1.    Bilge Alarms
2.    Smoke & Fire Detectors
3.    Navigation Lighting
4.    Bilge Pumps
5.    Fire Pumps
6.    Security System
7.    Tank Gauge warnings for Black and Grey Water

11 Graphical overview pages and alarm lists will automatically be activated to service the alarm and status as per the colour codes following:

1.    Bilge Alarms – BLUE
2.    Smoke & Fire Detectors – RED
3.    Navigation Lighting – GREEN
4.    Bilge Pumps – YELLOW
5.    Fire Pumps – YELLOW
6.    Security System – WHITE

H&K 000074

The Monitoring System shall also activate an audible alarm that shall sound at each panel location upon failure of navigation lighting, activation of bilge alarms, security system and smoke/fire detectors. In addition to the above, the smoke/fire detectors shall also activate the vessels general alarm. The smoke/fire detectors shall be installed in each of the following areas:

1.  Crew Cabins
2.  Crew Galley
3.  Bonded Storage
4.  Forward Storage Compartment
5.  Laundry
6.  Crew Passage
7.  Guest Staterooms
8.  Guest Bathrooms
9.  Guest Foyer
10. Engine Room
11. Engine Control Room
12. Tender Garage
13. Bosun Locker
14. Master Stateroom
15. Master Bathrooms
16. Master Stateroom Closets
17. Master Stateroom Study
18. Main Galley
19. Breakfast Room
20. Main Deck Powder Room
21. Main Entry Foyer
22. Formal Dining
23. Main Saloon
24. Aft Lounge
25. Pilothouse
26. Captains Stateroom
27. Service Pantry
28. Skylounge Foyer
29. Skylounge Powder Room
30. Office
31. Skylounge
32. Auxiliary Machinery Room
33. Forepeak
34. Bow Thruster Compartment

## 7.11   Security System

The Builder shall supply and install an intrusion alarm system as manufactured by DCDS, or approved equal. The system shall consist of a central alarm system integral to the Monitoring System panels. The system shall be equipped with eleven (11) Entry/Exit Access Controllers. Entry/Exit Access Controllers shall be installed on the following doors marked with an asterisk:

(2)   Port & Starboard Pilothouse Doors*
(1)   Aft Skylounge Door*

H&K 000075

(2)     Port & Starboard Main Deck Entrance Doors*
(1)     Galley Entrance Door from Port Main Deck*
(1)     Aft Lounge Door*
(1)     Engine Control Room Entrance from Port Main Deck
(1)     Tender Garage Entrance from Boarding Platform*
(1)     Master Stateroom Study Entrance from Foyer*
(1)     To be advised by Owners Representative*
(1)     Foyer to Galley
(1)     Service Pantry Curved Door*
(1)     Foyer to Breakfast Room
(1)     Upper Pantry to Flybridge

All of the above listed doors shall be armed and monitored by magnetic contacts, concealed within the doors and door frames. All magnetic contacts shall be hard wired back to the Monitoring System Panels. The system shall have a normally closed circuit and the opening of any door, when armed, shall break the circuit and activate the alarm. When the alarm is activated, a pre-recorded voice message shall advise any intruder that he has entered a secured zone. A second means of annunciation shall be by siren. A third means of annunciation shall be by a strobe or oscillating light mounted on the vessels mast.

~~The system shall be divided into two separate perimeter zones. One zone shall arm the~~ Crew access doors and the other shall arm the remainder of the vessel and be referred to as the "Owners Area".

H&K 000076

## Section 8 – Exterior Outfitting

**General**

The underside of all exterior overhangs shall be covered using removable synthetic hard panels painted White. Fasteners for panels shall be industrial grade Velcro. Screws shall not be used to secure any overhead panels. All closed in steps on exterior stairs shall have step lights, manufacturer and model shall be approved by Owners Representative prior to purchasing.

Exterior built-ins shall be constructed in aluminium or composite as per Contract Drawings. Small exterior doors shall be fabricated using composite where practical. Fabricated storage or access compartment doors shall be fully gasketed with recessed doorframe to accommodate gasket. Hinges shall be concealed hinge arm type fabricated to Designers drawings. Door latches shall be polished 316L stainless steel flush push type.

The Builder shall provide and install cast 316L step plates with vessels name at each entrance. The builder shall also fabricate and install port and starboard name boards, constructed of polished Cres 316L. Name board shall be offset from the side, letters individually mounted and back lighted inside each letter as on Indiscretion.

### 8.1    Foredeck

Two (2) Pacific Coast, flush aluminium, concealed hinge watertight access door to forward storage compartment. Width of door shall be 36" with an approximate height of 42". Door shall have Cres 316L hand-wheels on both sides of door and shall have lock with inside latch keyed to match Owners requirements.

One (1) Pacific Coast, or equal, 24" x 24" flush aluminium watertight access escape hatch with steel frame to crew compartment.

One (1) Pacific Coast, or equal, 24" x 27" steel raised quick-acting watertight access hatch to forward collision compartment. Cover shall be spring balanced with Cres 316L hand-wheels on both sides.

Custom fabricated burgee staff.

Four (4) polished 316L stainless steel double bollards sized per Contract Drawings.

Two (2) anchor windlass systems (see Section 4.13).

One custom fabricated mast with navigation lights.

Certification from MCA exempting vessel from having Aux power crane from lowering and retrieval of rescue boat or crane.

### 8.2    Main Deck and Boarding Platform

One (1) Hydraulically actuated watertight transom door opening into Tender Garage. Door shall be hinged on the top and rotate upwards and outwards.

H&K 000077

Built-in port and starboard stairwell with polished 316L stainless steel handrails from main deck to boarding platform as shown on Contract Drawings. Entrance from Main Deck shall have polished stainless steel hoop style gates fabricated to match handrails.

Port and starboard aft boarding gates.

One (1) Opac Marine or Mullen & Noy, Telescoping Passerelle located in the upper portion of the starboard stairwell. This component shall have an extended reach of 17.5' from turntable. The turntable must extend aft approximately 5.5' from door in stairs to clear wing-walls. Unit shall also include doorbell, intercom and polished 316L stainless steel removable handrails as per current Indiscretion.

One (1) Opac Marine or Mullen & Noy, Telescoping Crane located on centre-line in overhead of garage.

Four (4) polished 316L stainless steel double bollards sized per Contract Drawings on main deck aft, adjacent to each warping windlass.

Two (2) polished 316L stainless steel double bollards sized per Contract Drawings located on boarding platform.

Two (2) Custom 316L stainless roller fairleads with openings lined in Cres 316L as per Contract Drawings.

Two (2) warping windlasses (see Section 4.13A).

Polished 316L stainless steel hoop style rails as shown on Contract Drawings (minimum 10" high). Rails on Boarding Platform shall be removable.

One (1) polished 316L stainless steel swim ladder from platform.

One (1) hot and cold shower in flush cabinet mounted in Garage.

Stern Anchor offset and flush with transom (use anchor as pocket)

MCA approved gasoline storage area (20 litres)

**8.3     Upper Deck**

Built-in seating as shown on Contract Drawings. All exterior cushions shall be fabricated from 4" close cell foam such as "Stay Dry" or approved equal. Builder shall supply appropriate canvas coverings for all exterior seating.

Polished 316L stainless steel hoop style rails as shown on Contract Drawings (minimum 10" high).

H&K 000078

### 8.4     Flybridge

Built-in seating as shown on Contract Drawings. All exterior cushions shall be fabricated from 4" closed cell foam such as "Stay Dry" or approved equal.
Builder shall provide and install a 8 person Spa complete with inline thermostat controlled heater and Spa-Pak pump and filtration unit. By-fold spa cover shall be upholstered using 4""closed cell foam such as "Stay Dry" or approved equal.

Built-in service bar as shown on Contract Drawings. Bar shall be equipped with the following:

> One (1) Refrigerator
> One (1) Ice Machine
> One (1) Stainless Gas Grill
> One (1) Instant Hot Water Tap (Insinkerator or approved equal).

All storage areas shown shall have fully gasketed weathertight hinge arm doors with Cres, 316L push latches. All storage areas shall be properly drained and plumbed into deck drain system.

Elevated skylight directly over atrium as shown on Contract Drawings, skylight shall be fabricated from tempered glass and hemispherical in shape.

Polished 316L stainless steel rails as shown on Contract Drawings (minimum 10" high).

Flybridge windscreen fabricated from perspex, mounted in polished 316L stainless steel frame. Top horizontal of frame to be circular in shape to form handrail.

### 8.5     Exterior Teak

#### 8.5.1     General

All teak shall be quarter sawn Burmese, naturally cured and free of any knots or cracks. Teak shall be fastened with epoxy glue and countersunk stainless fasteners and plugged. Teak decks shall be left natural In areas of teak decking, the teak shall stop 3" short of the outboard edge to provide a trough for water drainage. Teak workmanship and materials shall be covered under the vessels warranty.

#### 8.5.2     Teak Decking

The following areas shall be covered using 16mm thick teak planks.

Main Deck:          Port and Stbd side decks, aft deck and boarding platform.

Upper Deck:         Forward seating area, centre line access to fore deck, Portuguese walk around, port and stbd side deck and aft deck.

#### 8.5.3     Stairs

All exterior stair treads shall be covered in teak.

H&K 000079

### 8.6   Windows

The Builder shall furnish and install aluminium frame, weld-in type windows with 1" clear safety glass (Pilothouse), ¾" tinted tempered safety glass in master stateroom, ½" tinted safety glass elsewhere. Frame style and size for each area shall be specified by the Designer. Builder shall also provide ½" thick storm covers for the Master Stateroom windows and main deck side windows. Covers shall be stowed in the overhead of the Tender Garage.

### 8.7   Portlights

Twenty-one (21) oval portlights, SCM Stainless. All portlights shall include polished Cres 316L deadlight covers.

Two (2) round portlights, SCM Stainless. All portights shall include polished Cres 316L deadlight covers.

Four (4) oval fixed portlights weld-in steel frame.

### 8.8   Weathertight Doors

Two (2) double hinged weathertight custom aluminium / glass door, port & stbd (main deck); One (1) weathertight custom aluminium/glass door, (galley entrance port main deck); One (1) weathertight custom aluminium door, (engine room entrance port main deck); Two (2) weathertight hinged aluminium/glass doors (to aft main deck); Two (2) weathertight custom aluminium/glass sliding doors (pilothouse, port & stbd); One (1) double hinged weathertight aluminium/glass door (to aft deck from Skylounge); One (1) weathertight door/hatch (access to Flybridge service bar); One (1) weathertight sliding hatch (access to Flybridge starboard side aft). Manufacturer shall be Pacific Coast, or approved equal. Frame style for each door shall be specified by the Designer. All exterior doors shall be keyed alike except galley and port engine room access. All aluminium sliding doors shall be the dual axis type. All exterior doors shall be keyed alike. Means shall be provided to prevent rattles from doors in both the open and closed positions. Neoprene or approved equivalent stops shall be provided in door jams.

### 8.9   Watertight Doors

One (1) watertight quick acting concealed hinged aluminium door (boarding platform to garage). One (1) watertight fire-rated quick acting hinged steel door with fixed portlight, garage to control room. One (1) fume-tight, fire-rated hinged steel door, lead insulated with wire reinforced double glass window, engine control room to engine room. Two (2) fume-tight, fire-rated Winel sliding door, lead insulated with wire reinforced double glass window, aux. Mach. Room to engine room. . One (1) fume-tight, fire-rated hinged steel door, lead insulated with wire reinforced double glass window, crew mess to aux. Mach. Space. Two (2) watertight hinged doors to the dry storage area on machinery deck. Manufacturer shall be Pacific Coast, or approved equal. Frame style for each door shall be specified by the Designer. All exterior doors shall be keyed alike. Means shall be provided to prevent rattles from doors in both the open and closed positions. Neoprene or approved equivalent stops shall be provided in door jams.

### 8.10   Zinc Anodes

H&K 000080

Installed on hull, sea chests and underwater gear per Contract Drawings.

**8.11    Air Horn**

One (1) Kahlenberg Quintuplux Chimetone Airhorn with automatic signal timer.  Airhorn shall be chrome-plated brass with whistle light, solenoid actuated and mounted on mast.

**8.12    Searchlights**

Three (3) Electric Control searchlight, mounted on arch with jog stick controls in the wheelhouse and Flybridge helm.

**8.13    Fenders – (Owner Supply)**

Twelve (12) 36" x 18" polyfoam type with 1" nylon line, polar fleece covers and leather caprail hooks with sheepskin.

Two (2) large spherical fenders with polar fleece covers and leather caprail hooks with sheepskin.

**8.14    Dock Lines**

Eight (8) 100' – 1-1/2" braided black nylon dock lines with 48" eye splice.

**8.15    Boarding Ladder**

**8.16    Hawse Eye Cleats and Roller Fairleads**

Eight (8) stainless steel 316L hawser cleats; fastened through bulwark, approximately 6" x 12" inside diameter.

Four (4) polished 316L stainless steel hawser cleats (fwd); fastened through bulwark, approximately 8" x 15" inside diameter.

Two (2) polished 316L stainless steel roller fairleads, custom fabricated to Contract Drawings located on port & stbd main deck aft.

**8.17    Ensign, Burgee and Signal Staffs**

The Builder shall fabricate the following staffs:

One (1) Custom fabricated ensign staff.

**8.18    Fresh Water Washdowns**

Eight (8) bronze chrome-plated bibs installed in the following locations:

Tender Garage

H&K 000081

Port and Starboard Main Deck near Amidships
Main Deck Forward
Port and Starboard Upper Deck near Amidships
2 x Flybridge Deck (one each end)
Foredeck

All hose bibs shall be recessed in a 12" x 12" or smaller housing. In no instance shall any hose bib protrude outboard of any flat surface it is mounted to.

### 8.19    Water Pressure Inlet

Two (2) potable water fill stations shall be provided in the following locations:

Port and Starboard Main Deck near Amidships

All water pressure inlets shall be recessed in a 12" x 12" housing. In no instance shall any water pressure inlet protrude outboard of any flat surface it is mounted to.

### 8.20    Safety Equipment

The Builder shall provide and install two (2) 25 man round drum inflatable life rafts with hydrostatic release and shall also meet United States Coast Guard requirements as well MCA and SOLAS.

All safety equipment shall be to United States Coast Guard requirements and MCA supplied and installed by the Builder as outlined below:

- One (1) Inflatable Boat (4 person minimum) Foredeck launching arrangements.
- Twenty five (25) Lifejackets
- Twenty Five (25) Immersion Suits
- Two (2) Life Buoys with Smoke Canister
- Two (2) Life Buoys with Smoke and Light Canister
- Two (2) Life Buoys with Buoyant Line
- Two (2) Life Buoy with Gold Leaf Lettering
- One (1) Line Thrower
- Six (6) Parachute Flares
- Two (2) GMDSS Hand Held Radios
- One (1) EPIRB
- Two (2) SART Kannad Rescue Transponder
- General Alarm – Builder Supply
- Lighting – Builder Supply
- Twenty (20) Posters and Signs
- One (1) Safety Survival Manual
- One (1) Laminated Instruction Manual for Onboard Maintenance of Safety Equipment
- Lifesaving Signal and Rescue Poster – As Required

# Section 9 – Interior Outfitting

H&K 000082

**General**

The style of wall, floor and ceiling treatments and built-in furniture shall be executed to the plans provided by François Zuretti and Sensation Yachts Interior Designers. All drawers and furniture interiors constructed by the Builder shall be in clear finished timber. Drawers shall be fitted with full extension slides and appropriate sea-catches. Builder is responsible for built-in furniture only. All loose furniture will be Owner supplied. All fabrics, carpet, wallpaper and stone will be owner supplied.

Allowances shall be specified by the Builder and provided to the Owner for items such as door hardware, bathroom sinks and fixtures, overhead lighting, etc. The following list is the standard schedule for interior outfitting.

### 9.1    Hardware

All doors shall be fitted with Haefele hinges, chrome plated brass, three (3) per door. For interior staterooms and bathroom the door hardware shall be Valli & Colombo, chrome plated, Model #H163RR, "Sarissa" lever design; privacy locks on all stateroom entry doors. Shower and tub faucets shall be Grohe or approved 3equal. Sink faucets shall be Jado "Goldenram" or approved equal. Accessories shall be L. Suardi or approved equal. Other miscellaneous hardware to be of modern type, good quality, suitable for the purpose intended. A detailed list to be provided by the Interior Designer.

### 9.2    Telephone

Shore phone connections shall be located as specified in Section 7.3 for a four (4) line telephone system with a total of thirty (30) outlets located in the following areas:

|        |                                                    |
|--------|----------------------------------------------------|
| (1)    | Pilot House                                        |
| (2)    | Captain's Stateroom                                |
| (3)    | Salon                                              |
| (4)    | Galley                                             |
| (5)    | Two (2) in Owners Stateroom and Two (2) in Owners Study |
| (6)    | VIP Staterooms                                     |
| (7)    | Guest Staterooms                                   |
| (8)    | Sky Lounge                                         |
| (9)    | Engine Control Room                                |
| (10)   | Crew Galley                                        |
| (11)   | Crew Cabins                                        |
| (12)   | Office                                             |
| (13)   | Aft Lounge                                         |
| (14)   | Open Deck Aft of Skylounge                         |
| (15)   | Flybridge                                          |

### 9.3    Mirrors

Furnish and install 3/16" plate glass mirrors per Interior Designers specifications.

H&K 000083

**9.4     Aft Main Deck**

**9.4.1    Flooring**      Teak

**9.4.2    Ceiling**      Removable Velcro exterior panels

**9.4.3    Built-Ins**      Built-in bar as shown on Contract Drawings. Mahogany and Burl finished to the highest quality.  Countertop to be marble.  Bar shall be equipped with the following:

> One (1) Refrigeration (Scotsman RF33, or approved equal)
> One (1) Ice Machine (Scotsman DC33, or approved equal)
> Built-In Entertainment Centre

**9.5     Main Salon, Dining, and Foyer**

**9.5.1    Flooring**      Dining and Main Salon; carpeting and underlay supplied by Owner and installed by Builder.  Foyer in Marble.

**9.5.2    Walls**      Mahogany and Burl finished to the highest quality, or floor to ceiling glass.

**9.5.3    Window Trim**  Mahogany finished to highest quality.

**9.5.4    Ceiling**      Removable Velcro panels, padded and upholstered.

**9.5.5    Built-Ins**      Mahogany and Burl finished to the highest quality.  Salon Ent, Centre Dining.

**9.6     Skylounge**

**9.6.1    Flooring**      Carpeting and underlay supplied by Owner and installed by Builder.

**9.6.2    Walls**      Mahogany and Burl finished to the highest quality and fabric.

**9.6.3    Window Trim**  Mahogany finished to the highest quality.

**9.6.4    Ceiling**      Removable Velcro panels, padded and upholstered.

**9.6.5    Skylounge Bar**

**9.6.6.1  Flooring**      Carpet supplied by Owner installed by Builder.

**9.6.6.2  Bar Unit**      Mahogany and Burl finished to the highest quality.  Countertop to be marble or granite.

**9.6.6.3  Appliances**    One (1) Refrigerator (Scotsman RF33, or approved equal), One (1) Ice Machine (Scotsman DC33, or approved equal), One (1) Stainless Steel single sink.

160' Specification

Page 44

H&K 000084

### 9.7 Powder Rooms Main Deck and Upper Deck

9.7.1 **Flooring**     Marble Owner Supplied

9.7.2 **Walls**        Painted glass and applied wall paper

9.7.3 **Ceiling**      Removable Velcro panels, padded and upholstered.

9.7.4 **Built-Ins**    Mahogany and Burl finished to the highest quality. Vanity tops shall be marble or glass. Sinks, faucets and accessories as per yard standard.

### 9.8 Owners Stateroom/Study

9.8.1 **Flooring**     Carpeting and underlay supplied by owner and installed by Builder.

9.8.2 **Walls**        Mahogany and Burl finished to the highest quality and fabric.

9.8.3 **Window Trim** Mahogany finished to the highest quality.

9.8.4 **Ceiling**      Removable Velcro panels, padded and upholstered.

9.8.5 **Built-Ins**    Mahogany and Burl finished to the highest quality (including Study library and ent centre).

9.8.6 **Beds**         Beds shall have Sealy or Sleepyhead mattresses.

9.8.7 **Built-In Safe** Electronic Key Pad safe, fire rated.

9.8.8 **Appliances**   One (1) Refrigerator (Scotsman RF33, or approved equal). Located in study.

### 9.9 Owners Bathroom

9.9.1 **Flooring**     Floor shall be marble, (Owner Supplied)

9.9.2 **Walls**        Marble and applied wall paper.

9.9.3 **Ceiling**      Mirror or removable Velcro panels, padded and upholstered as per Interior Designers specifications.

9.9.4 **Built-Ins**    Mahogany and Burl finished to the highest quality with marble or granite tops. Vanities, Shower, Bath.

9.9.5 **Portlight Trim** Mahogany finished to the highest quality.

9.9.6 **Toilets**      One (1) Headhunter Royal Flush Superbowl. One matching Bidet..

9.9.7 **Sinks**        Two (2) bottom mount, to be selected by Sensation Yachts Ltd.

9.9.8 **Tub**          One (1) Kohler K-1496H whirlpool unit or approved equal.

H&K 000085

| 9.9.9 | **Shower** | Marble with Hans Grohe fittings. |
|---|---|---|
| 9.9.10 | **Accessories** | Two (2) sink faucets, one (1) bath faucet, one (1) shower faucet, two (2) toilet paper holders, two (2) towel bars, two (20 robe hooks. |

### 9.10   Four (4) V.I.P. Staterooms

| 9.10.1 | **Flooring** | Carpeting and underlay supplied by Owner and installed by Builder. |
|---|---|---|
| 9.10.2 | **Walls** | Mahogany and Burl finished to the highest quality and fabric. |
| 9.10.3 | **Portlight Trim** | Mahogany finished to the highest quality. |
| 9.10.4 | **Ceiling** | Removable Velcro panels, padded and upholstered. |
| 9.10.5 | **Built-Ins** | Mahogany and Burl finished to the highest quality. Beds, Bedside cabinets, entertainment system cabinet. Refrigerators in each stateroom. |

### 9.11   Four (4) V.I.P. Bathrooms

| 9.11.1 | **Flooring** | Marble. |
|---|---|---|
| 9.11.2 | **Walls** | Applied wall paper. |
| 9.11.3 | **Ceiling** | Removable Velcro panels, padded and upholstered. |
| 9.11.4 | **Built-Ins** | Mahogany and Burl finished to the highest quality with marble or granite tops. |
| 9.11.5 | **Portlight Trim** | Mahogany and Burl finished to the highest quality. |
| 9.11.6 | **Toilets** | One (1) Headhunter Royal Flush Superbowl. One matching Bidet. |
| 9.11.7 | **Sinks** | Two (2) bottom mount, to be selected by Sensation. |
| 9.11.8 | **Tub / Shower** | One (1) Grohe unit. |
| 9.11.9 | **Accessories** | Each will consist of two (2) sink faucets, one (1) shower faucet, one (1) toilet paper holder, one (1) towel bar, one (1) robe hook. |

### 9.12   One (1) Guest Stateroom

| 9.12.1 | **Flooring** | Carpeting and underlay supplied by Owner and installed by Builder. |
|---|---|---|
| 9.12.2 | **Walls** | Mahogany and Burl finished to the highest quality. |
| 9.12.3 | **Ceiling** | Removable Velcro panels, padded and upholstered. |
| 9.12.4 | **Portlight Trim** | Mahogany finished to the highest quality. |

H&K 000086

9.12.5   **Built-Ins**         Mahogany and Burl finished to the highest quality.   Beds, Bedside Cabinets, Entertainment Cabinet. Refrigerator in each stateroom.

**9.13    One (1) Guest Bathroom**

9.13.1   **Flooring**          Marble.

9.13.2   **Walls**            Applied wall paper.

9.13.3   **Ceiling**          Removable Velcro panels, padded and upholstered.

9.13.4   **Built-Ins**         Mahogany and Burl finished to the highest quality with marble or granite tops.

9.13.5   **Portlight Trim** Mahogany finished to the highest quality.

9.13.6   **Toilet**           One (1) Headhunter Royal Flush Superbowl. One matching Bidet.

9.13.7   **Sink**            One (1) bottom mount, to be selected by Sensation Yachts Limited.

9.13.8   **Tub / Shower**  One (1) Grohe unit.

9.13.9   **Accessories**      Each will consist of one (1) sink faucet, one (1) shower faucet, one (1) toilet paper holder, one (1) towel bar, one (1) robe hook.

**9.14    Main Galley**

9.13.1   **Flooring**          Commercial grade tile.

9.14.2   **Walls and Cabinetry** White Formica with Corian countertops Wood trim. Stainless Steel cabinets around cooking and washing areas.

9.14.3   **Windows**         White Formica trim.

9.14.4   **Ceiling**          Removable panels, White Formica.

**9.15    Crew Galley and Mess**

9.15.1   **Flooring**          Linoleum and Carpet.

9.15.2   **Walls and Built Ins** Coloured Formica with Corian or equivalent countertops.  Walls to be vinyl covered.

9.15.3   **Portlight Trim** Coloured Formica and wood trim.

9.15.4   **Ceiling**          Removable panels, White Formica.

H&K 000087

| 9.15.5 | Appliances and Equipment | Electrolux professional range. |

One (1) Walk-In Cooler/Freezer.  The Builder shall fabricate and install a walk-in cooler and freezer to be located on the machinery deck.

| 9.15.6 | Countertops / Tabletops | Corian or equivalent. |

**9.15    Laundry**

| 9.16.1 | Flooring | Commercial grade tile or similar. |
| 9.16.2 | Walls and Cabinetry | Coloured Formica |
| 9.16.3 | Countertops | Stainless Steel and Formica |
| 9.16.5 | Ceiling | Powdercoated steel sheet. |

**9.16.6   Appliances and Equipment**

Two (2) each, Electrolux, or approved equal full size heavy duty Washers and Dryers.

One (1) Ironing Machine (Owner Furnished).

One (1) Stainless Steel single soaking sink.

One (1) Fold-down built-in ironing board.

**9.17    Dry Provisions Storage and Bonded Storage**

A forward storage compartment shall be installed underneath the crew cabins.   Storage area shall be insulated, and have built-in shelving with keepers finished in white Formica and latching doors.

**9.18    Upper Deck Service Pantry**

| 9.18.1 | Flooring | Carpet. |
| 9.18.2 | Walls | Mahogany and Burl finished to the highest quality and fabric. |
| 9.18.3 | Window Trim | Mahogany finished to the highest quality. |
| 9.18.4 | Ceiling | Removable panels. |
| 9.18.5 | Built-Ins | Mahogany and Burl finished to the highest quality.   Countertops to Corian or equivalent. |

H&K 000088

| 9.18.6 | Food Lift | One (1) Homewaiter 75, manufactured by Inclinator or equal.   Travel shall be from Upper Deck Service Bar to Flybridge Service Bar with 25 feet per minute speed. |

### 9.19    Captain's Stateroom

| 9.19.1 | Flooring | Carpeting and underlay supplied by Owner and installed by Builder. |
| 9.19.2 | Walls | Mahogany and Burl finished to the highest quality and fabric. |
| 9.19.3 | Ceiling | Removable Velcro panels, padded and upholstered. |
| 9.19.4 | Built-Ins | Mahogany and Burl finished to the highest quality. |
| 9.19.5 | Built-In Safe | Electronic Key Pad safe, fire rated. |

### 9.20    Captain's Bathroom

| 9.20.1 | Flooring | Linoleum. |
| 9.20.2 | Walls | Formica and Beech finished to the highest quality. |
| 9.20.3 | Ceiling | Removable Velcro panels, padded and upholstered. |
| 9.20.4 | Built-Ins | Beech finished to the highest quality with Corian countertop. Bed, Cabinet and Wardrobe. |
| 9.20.5 | Shower | Built-in fibreglass. |
| 9.20.6 | Toilet | Headhunter CSBS-0-MHD |
| 9.20.7 | Sink | One (1) bottom mount, to be selected by Sensation Yachts Limited. |
| 9.20.8 | Accessories | Sink faucets, shower faucets, toilet paper holders, robe hooks, towel bars. |

### 9.21    Crews Staterooms

| 9.21.1 | Flooring | Carpeting and underlay supplied by Owner and installed by Builder. |
| 9.21.2 | Walls | Beech, Formica and Vinyl covered. |
| 9.21.3 | Ceiling | Removable Velcro panels padded and upholstered. Formica in hallways. |
| 9.21.4 | Built-Ins | Low gloss Formica with wood trim. |
| 9.21.5 | Beds | Beds shall have 4" high quality foam mattress. |

H&K 000089

**9.22    Crew's Bathrooms**

**9.22.1  Flooring**         Floor shall be Linoleum.

**9.22.2  Walls**            Formica.

**9.22.3  Ceilings**         Formica.

**9.22.4  Built-Ins**        Formica.

**9.22.5  Showers**          Built-in fibreglass.

**9.22.6  Toilets**          Headhunter CSBS-0-MHD

**9.22.7  Sinks**            Moulded Corian or similar sink and countertop with backsplash.

**9.22.8  Accessories**      Sink faucets, shower faucets, toilet paper holders, robe hooks, towel bars.

**9.23    Pilothouse**

**9.23.1  Flooring**         Pilothouse flooring shall be carpet.

**9.23.2  Window Trim**  Padded leather.

**9.23.3  Ceiling**          Removable Velcro panels, padded and upholstered.

**9.23.4  Built-Ins**        Mahogany and Burl finished to the highest quality.

**9.23.5  Windshield**       Five (5) electric wipers, one for each of five (5) centre windows.
**        Wipers**           Hepworth 295M pantograph with integral washers.   Separate   on/off,
                             fast/slow and intermittent timer controls.

**9.23.6  Pilothouse**       One (1) curved seat located on centre line with table.  Seating shall be
**        Seating**          elevated approximately 36" above cabin sole.   Cushions shall be
                             sculptured upholstery as per Interior Designer with storage and/or
                             drawers under seating.

**9.23.7  Control Console**
                             A console shall be installed and fitted with a standard array of engine and
                             electrical instruments all neatly arranged. Sensation Yachts Limited shall
                             develop the console layout and submit to Owner and Designer for
                             approval prior to commencement of work.  One (1) set of engine controls
                             as specified in Section 4.10.  One (1) electronic steering station with
                             stainless steel Destroyer type wheel shall be installed as specified in
                             Section 4.11.  One (1) bow thruster control as specified in Section 4.12.
                             One (1) Danforth 6" Constellation type C-651A flush mount.  Surface to
                             be finished in leather, wood and stainless steel.

**9.23.8  Defoggers**
                             Three (3) electric defoggers shall be installed on each of the five centre
                             Pilothouse windshields

H&K 000090

# Section 11 - Electronics

**General**

The following list of electronics is the preferred list of equipment that the Builder shall supply, mount and install. The Builder, based on his experience, shall place a cost estimate on the generic equipment listed in this Section and provide the Owner with a U.S. dollar amount "Allowance" as to what the Owner may purchase within the Contract Price. Once the Owner advises the Builder, in writing, of what specific electronic equipment he wishes installed on the yacht, the Builder will advise what the actual cost is, in writing, to the Owner.

The Owner may, at his option, choose to exceed the cost allowance given by the Builder. In this event the Owner shall be responsible to pay the Builder at the time of closing the additional costs.

The Builder shall be responsible for supplying and installing all electronic mounting brackets, cables, power supplies, peek and surge suppressers, antennas, transducers and interface devices as necessary to meet the specification. All electronic cabling shall be run separately.

The Builder shall make available to the Owner's Representative and shall deliver to the Owner at the time of delivery, CAD drawings of all Electrical Systems, Templates, Pull Lists and As Built Drawings of all electronic components as specified in this Section of the Contract Specification.

## 11.1    Communications

### Satellite Communications System
1 x Satellite Communications Package to be worldwide and be interfaced to the Phone System, Satcom C". To be decided after Owner consultation.

### VHF Radios
3 x VHF Radios with Antennas, 1 x VHF/Hailer with Antenna, Hailer Amplifier and 1 Hailer Horn including all required mounts and brackets.

### Single Side Band Radio
1 x SSB Radio with Antenna Tuner, Antenna and System Cables including all mounts and brackets.

### Cellular Phone System
3 x US cellular Phone System interfaced to the Phone System including Antenna and Mount.

3 x GSM Tellular (European) Cellular Phone System interfaced to the Phone System including Antenna and Mount.

## 11.2    Telephone/Intercom Systems

1 x PBX phone System with 12 CD's and 30 extensions including exterior stations on the gangway and side decks, with the ability to be interfaced to the Satcom and Cellular Systems. Owner to approve phone manufacturer and locations.

H&K 000091

### 11.3    Radars

2 x Furuno FR 211SBB X-band Radar's with 8' Antennas one with ARPA and ARPA Target Data Output to the Charting System, to be interfaced to the Gyro, GPS's and Speed Log with a Full Function Remote Display on the Fly Bridge.

### 11.4    Navigation

2 x DGPS Systems to be interfaced with full redundancy to the electronic package to be interfaced to both Radars, charting system, Autopilot and instrument system.  Transas System to be installed.

### 11.5    Computer & Navigation Programs

Stand Alone Computer System with 17" flat screen LCD Display and backlit keypad and mouse.  This Computer must be able to support the Transas Charting Systems and be interfaced to the vessel's Transas NS2400 (ECS) Charting System with charts for Eastern USA, Caribbean and the Mediterranean.  System must be worldwide compatible.

**Instruments**
Instrument system to include Speed, Log, Depth, Wind and Heading information (from the Gyro) and to be displayed in the wheelhouse, Flybridge and wing stations.

Give options for other displays in the Captains Cabin and Crews Mess.  This system will also be interfaced with Charging System, Radars and GPS's.  There will also be a second stand alone depth system with displays at the wheelhouse and on the Flybridge.

1 x Navtec Receiver with Antenna and Mount.

### 11.6    Autopilot and Steering

Autopilot System to consist of one (1) Station (wheel) with heading support by a gyrocompass.  The autopilot will interface with vessels steering system via Solenoids.

### 11.7    CCTV Systems

Closed Circuit TV System to consist of five (5) colour (two pan/tilt/zoom in the engine room, and three fixed on of the main side decks and aft deck).  This system will be controlled from the wheelhouse and crew area and also modulated into the entire Television system.  A separate monitor shall be provided for crews' area.

### 11.8    TV Antenna Systems

Satellite TV Antenna System (world wide compatible) (Owner Supplied)
Satellite TV Antenna System with Fourteen (14) DSS Fourteen (14) European Receivers and Four (4) L/F Controls are modulated into the TV distribution system.

Over the Air Antenna System
Over the Air Antenna System for TV and AM/FM Signals to be mounted on the Mast/Arch and connected to the TV distribution system.

H&K 000092

160' Specification

H&K 000093

B

H&K 000094

**Exhibit B:**
**General Arrangements and Profiles**

1

H&K 000095



H&K 000096



H&K 000097



H&K 000098

c

H&K 000099

**Exhibit C:**
**Request for Variation Orders No. _____**

SENSATION YACHTS LIMITED ("the Builder") and DARBY MARITIME LIMITED ("the Purchaser") under the Vessel Construction Agreement dated _____, 2001 ("Agreement") and relating to the Vessel 174' Sensation New Build S418 hereby jointly certifies that the following variation orders and/or request for additional work has been requested in accordance with Article 10 and the terms and conditions as follows:

1.    Purchaser has made this request on _____ day of _____, 200__,

2.    Builder will respond to this request by _____ day of _____, 200__ (Must be within 10 calendar days of the date requested in paragraph 1), and

3.    The scope of the work covered by this request is as follows:

The Builder:                                    The Purchaser:

_____          _____
SENSATION YACHTS LIMITED          DARBY MARITIME LIMITED

Dated: _____, 200__     Dated: _____, 200__

1

H&K 000100

D

H&K 000101

## Exhibit D:
## Protocol of Delivery and Acceptance

_____ of SENSATION YACHTS LIMITED ("the Builder") hereby delivers to DARBY MARITIME LIMITED ("the Purchaser") the motor Vessel _____ (name) with, for identification purposes, Hull No. _____ ("the Vessel") in accordance with the terms and conditions stipulated in the Vessel Construction Agreement dated _____, 200__.

The Builder has no further duties and responsibilities for the Vessel, except the duties imposed under the Builder's warranties of title, quality and performance.

The Purchaser hereby accepts the delivery and takes full and final possession of the Vessel in accordance and conformity with the terms and conditions of the said Vessel Construction Agreement and Addendum.

PURCHASER accepts delivery, possession and responsibility this _____ day of _____

200___ in the _____ at _____ hours.
<br>     **Country Name**

The Builder:           The Purchaser:

_____    _____

**SENSATION YACHTS LIMITED**   **DARBY MARITIME LIMITED**

Dated: _____, 200__    Dated: _____, 200__

1

**H&K 000102**

E

H&K 000103

**Exhibit E:**
**Interior Designer's General Arrangement and Profile**

1

H&K 000104



H&K 000105



H&K 000106



H&K 000107

F

H&K 000108

## Exhibit F:
## ABS Classification Standards

At the time of Delivery, the Builder must provide an original notarised statement from an authorised representative from the American Bureau of Shipping certifying that the Vessel has met all requirements of class.

The actual ABS Certificate of Class will be provided when available.

H&K 000109

G

H&K 000110

## Exhibit G:
## MCA Compliance Standards

The Vessel is to be constructed and completed by the Builder under the survey and certified for compliance with the MCA Code of Practice for Safety of large commercial sailing and motor vessels.

1

H&K 000111

H

H&K 000112

## Exhibit H:
## United States Coast Guard Compliance Standards

The Vessel is to be constructed and completed by the Builder in order to comply with the United States Coast Guard Compliance Standards for the safety of large commercial sailing or motor vessels.

1

H&K 000113

H&K 000114

**Exhibit I:**
**ISM Compliance Standards**

All maintenance schedules and other checklists must be made available to the Purchaser by the Builder upon delivery of the Vessel in order to obtain ISM compliance.

H&K 000115

1

H&K 000116

**Exhibit J:**
**Surveyor's Report from Burness, Corlett & Partners, Ltd.**

H&K 000117

1

**BURNESS, CORLETT AUSTRALIA PTY LTD**
THE MARITIME CONSULTANTS

BCA/0137

# REPORT ON VISIT TO SENSATION YACHTS

## NOBLE HOUSE II

### 9 March 2002

BCA0137 BCP/a/

Burness, Corlett & Partners Ltd.,
Beresford House,
Town Quay,
SOUTHAMPTON,
Hampshire.
SD14 2AQ

Tel. No. +44 23 8033 9469
Fax No. +44 23 8033 9440
E-Mail: bc@bcp-southampton.com

Burness Corlett Australia Pty Ltd,
P.O. Box 659,
Brookvale,
New South Wales 2100,
Australia.

Tel. No. +61 2 9938 0199
Fax No. +61 2 9938 2139
E-Mail: bc@bcp-aust.com

*Rev.3  Mar 2002*

H&K 000118



BURNESS, CORLETT AUSTRALIA PTY LTD
THE MARITIME CONSULTANTS

BCAU137

# LIST OF ITEMS FOUND DURING VISIT
## THAT REQUIRE ATTENTION ON
### SY18 - NOBLE HOUSE II
3 March 2002

1. Suggested insulation. Welding of sandwiches welding has not been done in accordance with the approved welding procedure and ABS rules. Approval from ABS design office for the arrangement used on the vessel should be obtained.

2. Welding in high vibration and stress areas should be double continuous. The stiffeners in way of the main condenser are at present just only staggered intermittent welding.

3. The sea water piping is fabricated from 316 stainless steel. See water system piping should be fabricated from more suitable material such as Cuni.

4. The sewerage piping arrangement currently leads to the raw sewage in the deck before treating. This is hazardous due to the bacteria that build up in the deck. A system of treating the raw sewage and then storing the clean sewage in the tank for later discharge into black and water system.

5. Maximum noise levels are not specified in all areas. There are no vibration levels specified. (will require guidance from SGP).

6. A preliminary stability book has not been produced. Existing damaged stability calculations have been based on the current arrangement using a much lighter weight estimate. There is genuine concern that the vessel may not meet IMO requirements in it's current configuration.

7. Stiffener and connections on all engine room bulkhead in way of the stern tubes are not in accordance with good marine practice and possibly ABS rules.

8. Transverse stern frame between engine girders on frame 46 has no stiffeners. Such a large plate field should have stiffeners attached.

Page 1

Rev.0 - Mar 2002

H&K 000119

NO. 042  P002

BURNESS, CORLETT AUSTRALIA PTY LTD.
THE MARITIME CONSULTANTS

BCA/0137



9. The engine girder arrangement has been changed from the original ABS approved drawing. New design approval should be obtained from ABS.

10. The drain holes along the centreline keel in the engine room appear to be too small and should be increased in size.

11. The forward deep tank stiffeners have been welded using intermittent welding. Welding in all voids should be continuous welding to seal all areas.

12. The grey water vent pipe has a drop down and will form a trap. This should be modified to ensure traps are not incorporated in all vent pipes.

13. The sewage discharge & A/C compressor rafts are not resiliently mounted. All machinery should be resiliently mounted.

14. Detail design of all seatings needs to be checked during construction to ensure installation is in accordance with good marine practice.

15. Sea inlet grilles appeared to be too small. BY engineering design department has recalculated and have proposed a modified grille.

16. Brackets for pillars in stbd stabilizer compartment end in a plate field and should be modified.

17. Although most tanks have been tested, many are now having pipes fitted through the watertight boundary. All of these tanks will require the penetrations to be retested.

18. Not all pipes have been isolated. Some of the isolation is poorly done and should be redone to a higher standard.

AND  19. 44 X-rays have been taken of the hull welds. Further X-rays should be allowed for other Owner surveyor requested X-rays, in particular of the superstructure to ascertain the general quality of the aluminium welding.

20. Large lifting lugs have been fitted which may be used to overload the structure. Builders to fit safe working loads on all lifting lugs fitted.

21. Pipes and ducts have been mounted on the internal ceiling. These items should be mounted off the structure. All ceilings are to be check for these mountings.

Rev.0  Mar 2002                                                          Page 2

H&K 000120

**BURNESS, CORLETT AUSTRALIA PTY LTD**
THE MARITIME CONSULTANTS

BCA-0137

22. Suspended ceilings is a new system and the supports may rattle in service. Shipyard should investigate to ensure no rattles will occur.

23. Internal walls near the central stairway have been hard mounted and should have resilient mounts.

24. Owners cabin and aft Guest cabins have been hard mounted to the structure. Vibration isolators should be fitted.

25. Plastic pipe clips have been used in some areas to hold piping. Plastic clips should not be used.

26. The day tank outlet penetration is directly over a cable tray. Piping runs and cable trays are to be kept as far apart as possible.

27. The cables in the crew cabins is messy and should be clipped in a neat manner before linings are installed.

H&K 000121

**BURNESS, CORLETT AUSTRALIA PTY LTD**
THE MARITIME CONSULTANTS

BCA/0137



Rev.0  May 2002

Page 1

H&K 000122



BURNESS, CORLETT AUSTRALIA PTY LTD
THE MARITIME CONSULTANTS

BCA0137

Rev.0  Mar 2002

H&K 000123

K

H&K 000124

# Exhibit K:
## DARBY MARINE LIMITED CHANGE ORDERS

MIA1 #1115527 v8

H&K 000125

1

## DARBY MARITIME LIMITED CHANGE ORDERS

## AS

## ADDENDUM TO PURCHASE TERMS AGREEMENT BETWEEN DARBY MARITIME LTD AND SENSATION YACHTS LIMITED FOR THE PURCHASE OF THE 174' MOTOR YACHT SY18.

1. Rescue boat position – **TO BE ON aft bridge deck under AN APPROVED SUNBED ARRANGEMENT**
2. **INCLUDES MCA APPROVED LAUNCHING ARRANGEMENTS**
3. Bow thruster spec. What wind will it hold boat against?
   **ABILITY TO HOLD VESSEL AGAINST 35 KNOTS TO BE STATED IN CONTRACT**
4. Stern anchor
   **FULL MECHANISM - FITTED**
5. Galley – layout to change per chef, sinks required in servery, remove dishwasher, add small domestic fridge. Galley sink to have a direct overboard option
   **REDESIGN IN DISCUSSION WITH OWNER'S REPRESENTATIVE – BUDGET ALLOCATION US$8600**
6. Communications package to include 2 x Imarsat B systems.
   **– US $70,000 – BUDGET ALLOCATION; ALTERNATIVE SYSTEM (F77) MAY BE FITTED IN DISCUSSION WITH OWNER'S REPRESENTATIVE**
7. Mast layout drawing – OK
8. Upper aft deck bulwarks detail needs to be modified to better "flow" with the ships lines
   **TO BE APPROVED FROM DRAWING**
9. Awning to be built into the overhead of the main aft deck. To be hidden in folded state and extend mechanically
10. Yard supplied vs. Owner supplied furniture to be defined
    *Per contract drawings* **– INCLUDES JACUZZI BAR STOOLS, SUNBEDS AND SUNDECK UMBRELLAS**
11. Yard to provide spa spec. - OK
12. Gym. Remove Stbd or both central mast supports to allow expansion of gym. Reduce size of powder room.
    **IN DISCUSSION WITH OWNER'S REPRESENTATIVE**
13. Etch atrium glass top with Noble House "coin" symbol. Match this in the cabinet top at the bottom of the stair well. Lighting under bar should pick up this color
14. The flybridge venturi TO rake aft
15. Round window to be added to aft wall of gym with etched "coin"
16. The aft main deck doors and cabinets shall be finished in teak
17. Two additional bar seats required on flybridge
18. Guest shower in cabin #1 shall have a built-in seat
19. There shall be a wine cooler on the flybridge (20 bottles)
20. A glass fronted humidor shall be built into the bridge deck cabinets
    **SUBJECT TO ZURETTI AND LIST APPROVAL, OR ALTERNATIVELY A COUNTERTOP HUMIDOR TO BE SUPPLIED SUBJECT TO OWNER'S APPROVAL.**
21. The crew mess seating shall be extended aft and the crew galley modified.
    **DESIGN TO BE APPROVED BY OWNER'S REP AS PER CONTRACT DRAWING**
22. The captain's cabin ensuite shall be expanded into the captain's cabin and the wardrobe arrangement redesigned.
    **DESIGN TO BE APPROVED BY OWNER'S REP AS PER CONTRACT DRAWING**
23. A sink shall be added to the bridge deck servery
24. Folding sunbeds to be included in the Stbd flybridge seating
    **DESIGN TO BE PRODUCED TO INCORPORATE LAY OUT AREA**
25. The master bed framework shall be altered to accommodate a waterbed mattress

H&K 000126

26. The laundry shall have an additional washer and dryer; total to be 3x washers/3x dryers
27. Master cabin modifications per Zuretti
    - *SYL to modify the bed head wall at no charge. Cabinets to be modified per Zuretti / Mr. Brady*
28. A base for a telescope shall be built into the flybridge bar
29. Provide computer network schematic and capability
30. TV's in the master, study, skylounge and salon are to be wired to network
31. 6 x-rays needed for dedicated superstructure areas
32. Tender details – Sean Booth design, as per Century CC2800 spec
    **LARGE TENDER SPECIFICATION to include 2 x 225hp 4 STROKE YAMAHA ENGINES SMALL TENDER TO BE CONSTRUCTED TO AT MINIMUM THE EQUIVALENT NOVURANIA SPECIFICATIONS**
33. Umbrella holders to be built into bar
    **UMBRELLAS PROVIDED PER ITEM 9**
34. Spare set of propellers to be included with the vessel.
    **SECURED IN LAZARETTE DECK SPACE**
35. Yard deliverable spare parts list?
    - *Per Contract*
36. Fuel and oil levels upon delivery?
    *Litres on board at handover shall be billed to buyer*
37. Provide direct access from control room to lazarette rather than from the engineers cabin.
38. 2nd engineers cabin. (Second watertight door, extra internal door, extra bed, double bed in 1st cabin, design, construction and MCA submissions.) **FULLY FITTED OUT CABINS AS FOR FORWARD CREW AREA**
39. Certify the boat with an unmanned engine room
    **VESSEL TO BE DELIVERED CERTIFIED UMS – BUILDER TO ADVISE**
40. Stainless steel striker plate on bow, incorporating the load line numbers
41. Galley door to be hinged on the leading edge
    **IN CONJUNCTION WITH GALLEY LAYOUT CHANGES**
42. Main stair handrail detail to include wrought iron and mahogany design
    - *Zuretti and Mr. Brady*
43. Entertainment package to be upgraded as discussed
    **ADDITIONAL BUDGET ALLOCATION OF $119,158.00**
44. Automatic sliding hatch to flybridge
45. Hydraulic steering low pressure alarm
46. Dehumidify the makeup air into the lazarette
47. Add soft starts to the seven chillers
48. Chilled water booster pump (1 x additional)
49. Sea chest Cathelco system **TO BE FITTED ON BOTH FORE AND AFT SYSTEMS**
50. Sea water cooling – create a removable section in each major pipeline for inspection purposes
51. Grey water system: add an additional pump
52. Fuel transfer system – add an additional AC pump
53. Exchange the existing fuel oil centrifuge with a MMPX – 403 self cleaning unit
54. Add a 24VDC fuel transfer pump to the emergency generator system
55. Add an oil filter to the system to filter oil between the tank and engines
56. Watermakers – upgrade to 2 x 3600gpd units
57. Add European outlets to guest ensuites, master ensuite, master study, and both salons
58. Aft deck ensign mast to be teak – **DESIGN AND MEASUREMENTS TO BE AGREED WITH OWNER'S REP**
59. Handrail and cap rail details:
    The **MAIN DECK** shall have a teak handrail from the forward fashion pieces aft continuously around the stern **MOUNTED BY STAINLESS STEEL POSTS ON A PAINTED CAP RAIL.**
    The main deck cap rail forward of the fashion pieces shall be **TEAK MOUNTED ON THE METAL CAPRAIL.**
    The **BRIDGE DECK** cap rail forward of the forward fashion pieces **ON THAT LEVEL** and extending across the back of the Portuguese bridge seats shall be **TEAK MOUNTED ON THE METAL CAPRAIL.**

H&K 000127

**THE BRIDGEDECK HAND RAILS AFT OF THE FASHION PIECE SHALL BE TEAK MOUNTED ON STAINLESS STEEL POSTS ON THE PAINTED CAPRAIL.** All stand-lone stainless steel handrails shall be of continuous (non-loop) construction
**DRAWING TO BE PRODUCED – TO BE APPROVED BY OWNER'S REP**

60. If weight allows, the flybridge aft deck and spa surround shall be teak clad
61. Bar top to be built around the aft edge of the spa
62. Custom sound shieldS for main generators **TO BE FABRICATED AND FITTED**
63. Vessel to be delivered with one 'X' Band, and one 'S' band radar fitted and in service, with all construction costs borne by builder.

It is understood by the undersigned parties that the 62 points detailed above are to be completed in full before delivery, and that no further charges can be made by Sensation Yachts or any of it's Sub-Contractors in respect of any of the above items, with the following exceptions:

Items 26 & 41; Final specifications and layout yet to be determined by FZ/GB. Builder to be advised of any additional costs.

Items 28 & 29; Owner to supply all equipment to create wireless network. Builder agrees to allow Owner's IT representative to work with yard designers on this project.

Item 38; If significant unexpected costs are required to certify the vessel UMS, the supporting documents pertaining to the costs must be presented to the Owner's Rep and a decision will be made as to the outcome.

Both parties agree that the purchase price includes the extension of the vessel from its current size to 174', all modifications, fit out, classification acceptances and drawings. It further includes an additional 2 x 10ton air conditioning compressors and lazarette air handlers, and a viewing window from the control room to engine room.  It is also agreed that there is a P.C. Sum of US$455,000 for all installed, furniture (drop in), fabrics, walls, ceiling coverings, carpet, floor coverings, drapes and blinds, marble.  The US$455,000 includes $40,000 Euros for F.Z. costs to select the above items with G.B.  Any additional cost will be generated by the owners (G.B.) discretion in conjunction with F.Z.

It is further understood that faxed signatures of acceptance as may appear below are to be considered binding to the contract.

For, and on behalf of Sensation Yachts (NZ) Limited           For, and on behalf of Darby Maritime Ltd

Ivan Vladimir ERCEG                                          Gregory Alan BRADY
Managing Director                                           Director

**H&K 000128**

For the Buttler:

_____                    23 / 3 / 02
_____                    Date
Ivan L...
11 Selwood Road, Howernou, Auckland 5, New Zealand
PO Box 79-020 Auckland 5, New Zealand
Ph: 64-9-8372210 / Fax: 64-9-8361775

Witness:


_____                    _____
                                            Date


For the Purchaser/Guarantor:

_____                    3/22/02
Darby Maritime Limited / Greg Brady                Date
PO Box 858489
Richardson, TX  75083-3489
Ph: 972-644-3167 / Fax: 972-644-3273

Witness:

_____                    3/22/02
                                            Date


28

H&K 000129



EXHIBIT B

## AMENDMENT TO VESSEL CONSTRUCTION AGREEMENT

THIS AMENDMENT TO VESSEL CONSTRUCTION AGREEMENT is made this _16_ day of September, 2004, among Darby Maritime Limited, a Cayman Islands company ("Purchaser"), Greg Brady, and Sensation Yachts Limited, a New Zealand company ("Builder").

Recitals:

(i)     The parties entered into a Vessel Construction Agreement dated on or about March 29, 2002 (the "VCA"); and

(ii)    The parties now desire to amend the VCA as hereinafter set forth;

NOW THEREFORE, in consideration of the premises, the mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.     Article 2 of the VCA is modified as follows:

The "Delivery Date" is extended from "October 31, 2002" to a date that is sixty (60) days after the date the Purchaser actually makes the Initial Payment and the deposit of the Escrow Funds as required by Paragraph 5 of this Amendment. The Builder acknowledges that it has no basis or right to request any further extension of the Delivery Date based on events or circumstances arising or existing prior to the date of this Amendment.  The Purchaser acknowledges that it has no claims or rights against the Builder in respect of any delay in delivery of the Vessel which has occurred prior to the date of this Amendment, and thus, delivery of the Vessel on the Delivery Date, as extended herein, shall constitute timely delivery.

2.     Attached to this Amendment as Exhibit "1" is a list of outstanding work which the Builder is required to carry out in order to complete the construction of the Vessel.  The Builder agrees that it shall complete the construction of the Vessel in accordance with Exhibit "1".

3.     In Article 9 of the VCA, the Contract Price is changed from US$22,600,000.00 to US$22,730,641.51. The changed Contract Price includes all costs and charges and amounts to complete the construction of the Vessel in accordance with Exhibit "1".

4.     With respect to Article 10 of the VCA, the Builder acknowledges that it has no basis or right to assert any claim for a Variation based on construction of the Vessel, or any request or demand received from the Purchaser, through the date of this

1 

Amendment.  In Article 10(a) of the VCA, the Contract Price is changed from US$22,600,000.00 to US$22,730,641.51.

5.   In Article 11(a) of the VCA, the Contract Price is changed from US$22,600,000.00 to US$22,730,641.51.  The Builder acknowledges that the Purchaser has paid the Builder the total sum of US$20,340,000.00, leaving a revised balance due of US$2,390,641.51.  Of this amount, within three (3) Business Days following execution of this Amendment, the Purchaser shall pay the Builder US$649,992.51 (the "Initial Payment") and deposit US$1,740,649 (the "Escrow Funds") with Russell McVeagh, Barristers and Solicitors, Auckland, New Zealand as escrow agent (the "Escrow Agent"). The Escrow Agent shall hold and disburse the Escrow Funds in accordance with the Escrow Agreement attached hereto as Exhibit "2," which the parties and the Escrow Agent (whose signature the Purchaser is obligated to procure) shall sign concurrent with execution of this Amendment.  To the extent that the Builder has completed the construction of the Vessel, other than for minor defects which do not affect (i) the operational integrity of the Vessel or any of its systems or equipment or (ii) the Purchaser's use and enjoyment of the Vessel, and provided that such defects (the "Defects") would not cost more than US$100,000 in aggregate for the Builder to remedy, the parties agree to issue a payment instruction to the Escrow Agent for the Escrow Funds to be released other than that portion of the Escrow Funds that relates to the cost of remedying the Defects (the "Retained Amount").  If the parties are unable to agree on the Retained Amount, the Retained Amount shall be determined by Don Brooke (acting as an independent expert appointed jointly by the parties, upon reference of the matter to Mr Brooke by either party) whose determination shall bind the parties (other than in the case of manifest error or fraud).  In respect of any such Defects, the Builder shall promptly remedy those Defects.  If the Builder fails to remedy the Defects within 30 days, or such other time as agreed between the parties, (such period being the "Remedial Period") the Purchaser may elect to have the Defects remedied elsewhere at the Purchaser's cost.  If the Builder remedies all Defects within the Remedial Period, upon completion of such work the parties agree to issue a payment instruction to the Escrow Agent for the Retained Amount to be released to the Builder.  If the Builder fails to remedy all Defects within the Remedial Period, at the expiry of the Remedial Period the parties agree to issue a payment instruction to the Escrow Agent for such amount of the Retained Amount that represents the cost of the remedial work actually carried out by the Builder within the Remedial Period (as determined by Don Brooke) to be released to the Builder, and for the balance of the Retained Amount to be released to the Purchaser.  In the case of the release of any Escrow Funds to the Purchaser, the parties also agree that the Contract Price shall be adjusted accordingly.

6.   With respect to Article 15 of the VCA, in subclause (b), "US$3,000.00" in line 2 is changed to "US$4,500.00" and the language "after thirty (30) days from the Delivery Date" in lines 2 and 3 is deleted.

7.   With respect to Article 16 of the VCA, the Builder acknowledges that the Purchaser now holds, and at all times since execution of the VCA has held, title to and ownership of the Vessel and Equipment contracted and/or supplied, or to be contracted



and/or supplied, pursuant to the VCA. To further evidence the Purchaser's title, the Builder, concurrent with execution of this Amendment, shall execute and deliver to the Purchaser a builder's certificate and bill of sale in form reasonably acceptable to the Purchaser's counsel, and cause Michael Erceg to execute and deliver to the Escrow Agent a Release Deed Poll in the form attached hereto as Exhibit "3" to be held by the Escrow Agent and not registered until the Initial Payment and the deposit of the Escrow Funds required by Paragraph 5 of this Amendment are made by the Purchaser. The provisions of this Paragraph 7 shall not in any way prejudice the Builder's rights to exercise its possessionry lien as set out in Article 16(e) of the VCA.

8.      With respect to Article 17(m) of the VCA, the Builder acknowledges that the Vessel's Draft exceeds 9'6" under the required loading conditions. To compensate for the excess Draft, the Builder, at its expense, without right to further extension of the Delivery Date, and prior to delivery, shall effect those changes to the Vessel's swim platform described in Exhibit "1" attached hereto. In exchange, the Purchaser agrees to waive any right to assert a default or claim damages under the VCA based on the Builder's failure to comply with the Draft requirement.

9.      Article 25 of the VCA is deleted. Any dispute between the parties in relation to any technical requirements or technical provisions of this Amendment or the VCA, including any claim under the warranties in Article 17 of the VCA, any dispute under Article 12.02 of the VCA and any dispute in relation to those matters set out in Exhibit "1", may be referred by either party in the first instance to Don Brooke (who shall be jointly appointed by the parties to act as an independent expert and to facilitate the resolution of any dispute under this Article.) Mr Brooke shall give an opinion on any dispute brought before him and shall use his best endeavours to facilitate an agreement between the parties but his opinion shall not be binding on the parties. The costs and expenses of Mr Brooke shall be borne equally by the parties. In the event the parties are unable to facilitate an agreement on any dispute within 7 days of the dispute being referred to Mr Brooke then determination of the dispute is to be referred to a single arbitrator under the terms of the Arbitration Act 1996 of New Zealand. The arbitrator's determination shall bind the parties (other than in the case of manifest error or fraud). The arbitrator shall be as agreed between the parties or failing agreement within 7 days, as nominated by the President of the Arbitrators' and Mediators' Institute of New Zealand Inc. Each party waives any claim to attorneys' fees or costs of any kind relating to prior arbitration proceedings or otherwise incurred with respect to issues arising under the VCA to date.

10.     In Article 29 of the VCA, sub-article (a) is deleted and replaced with the following:

(a)     Builder's Use:

        The Purchaser shall allow the Builder or its designee to use the Vessel for two weeks (i.e., two continuous seven (7) day periods or one (1) continuous fourteen day period) during each of the first two (2)

1753693v13 AMENDMENT TO VESSEL CONSTRUCTION AGREEMENT.DOC



one year periods following delivery of the Vessel, subject to the following terms and conditions:

(i)     The Purchaser shall have the right to approve the individuals to be on board the Vessel during each use period, which approval shall not be unreasonably withheld.

(ii)     The Builder shall pay all running and provision expenses associated with use of the Vessel during each use period, to the same extent as if the Builder had chartered the Vessel under a standard Mediterranean Yacht Brokers Association charter agreement.

(iii)     The Purchaser shall provide the Vessel's crew.  The Builder shall have no right to provide additional or substitute crewmen.

(iv)     The Builder shall be entitled to exercise its rights to use the Vessel during the months of September and January (excluding January 1st to 7th) in each year of the two year period (i.e. September 2004, January and September 2005 and January 2006).  The Builder may use the Vessel for a continuous fourteen (14) day period in either the relevant January or September (but not both) or for continuous seven (7) day periods in each of the relevant January and September.

(v)     The Builder shall endeavour to provide the Purchaser with at least thirty (30) days' written notice of the commencement date of any desired use period.   The Purchaser may require the Builder to reschedule any use period if the Purchaser, no later than forty five (45) days prior to commencement of that period, books a charter to a third party for the same period or any part thereof.

(vi)     The Builder must accept delivery of the Vessel from the Purchaser at its then current location and redeliver the Vessel to the Purchaser at the same location.  The Purchaser, however, shall have no obligation to permit the Builder to use the Vessel in any waters that would or might result in adverse tax consequences to the Purchaser.

(vii)     The Builder may request the use of the Vessel at times other than those set out in subparagraph (iv) of this paragraph 10(a) and if the Vessel is not in use at the time the Builder has requested it, the Purchaser will make it available on similar terms to those set out in subparagraphs (i) to (iii) inclusive and sub-paragraphs (v) and (vi) of this paragraph 10(a).  The Purchaser, however, may decline any request to use the Vessel from May 1st through August 31st or from November 15th through January 7th, or when the Purchaser has scheduled its own use or charter by a third party.

11.    In Article 29 of the VCA, sub-article (c) in line three and five is amended by deleting in each case "the courts of London, England" and replacing such words with "the courts of New Zealand".

12.    The parties agree that performance of the VCA, as amended herein, shall constitute compliance, in full, with the terms of the arbitrator's rulings previously issued in the arbitration proceedings among the parties held in London.

13.    The Purchaser and Builder irrevocably agree and acknowledge that:

(a) this Amendment constitutes full and final settlement and satisfaction of all matters, issues and claims under the VCA or otherwise in relation to the construction of the Vessel provided that nothing in this Paragraph 13 shall limit or affect:

(i)    Article 17 of the VCA concerning warranties in respect of all defects in respect of the Vessel which shall remain in full force and effect; and/or

(ii)   the parties' rights and obligations as set out in this Amendment;

(b) neither party shall take any action in any jurisdiction to enforce in full or in part any decision, award (or any partial decision or award) from any proceedings or arbitration that has commenced and/or been completed prior to the date of this Amendment; and

(c) the covenants and releases set out in this Paragraph 13 are intended to confer a benefit on, and be enforceable by, the officers, servants and agents of the Purchaser and Builder as if those persons were a party to this Amendment.

14.    The terms of this Amendment shall govern over any inconsistent terms in the remainder of the VCA, which as amended herein, is ratified and declared to be in full force and effect. Any terms which are defined in the VCA which are used in this Amendment, unless redefined in this Amendment, shall have their defined meanings.

15.    Each party shall execute such further documents and do such further things within that party's power as may be commercially reasonable to carry out the intent of this Amendment including, without limitation, executing any documents reasonably required to register the Vessel.

16.    This Amendment may be executed in counterparts, which, together, shall constitute one and the same instrument. The execution of this Amendment by either party evidenced by facsimile transmission shall be deemed an original for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment the day and year first above written.

Darby Maritime Limited by

_____          _____
Witness Signature                         Director
                                          GREG BRADY
_TERESA TROTTIER_                         Print Name
Print Name

_____
Occupation
_DALLAS, TEXAS_
Address

SIGNED by Greg Brady
in the presence of:                       )
                                          )

_____
Witness Signature

_TERESA TROTTIER_
Print Name

_____
Occupation
_DALLAS TEXAS_
Address

Sensation Yachts Limited by

_____          _____
Witness Signature                         Director
_Paul Sills_                              IVAN ERCGG
Print Name                                Print Name
_Broker_
Occupation
_Auckland_
Address

6

**Exhibit 1**

(Punch List)



# NOBLE HOUSE

This Punch List (together with the punch list relating to non-class items) sets out and references those areas and items of SY18 that have not been completed to date, these items are covered under classification society ABS/MCA, which are the classes that SY18 are built under contract. In relation to the areas and/or items specified in this Punch List:

(a)    any area or item which is the subject of ABS and/or MCA class regulations and/or requirements shall be completed in accordance with such regulations and/or requirements; and

(b)    any reference to an area, item or concern which is to be "as per contract" (or any similar reference) means that such area, item or concern is to be completed in accordance with the Specification and all other relevant provisions as contained in the Vessel Construction Agreement dated on or about March 29, 2002 (as amended).

## AREAS/ITEMS/CONCERNS TO BE COMPLETED IN TERMS OF THE CONSTRUCTION AGREEMENT

1.  **Passerelle and intercom system:**
    To work as per manufacturer's specifications and to class regulations as per contract.

2.  **Rescue tender crane and storage.**
    Crane is to conform with all class regulations as per contract.

3.  **Tender crane and associated launching arrangements.**
    To operate as per manufacturer's specifications. Locking mechanisms for the cradles to be installed for the safe operation of launching and recovery, to meet class regulations as per contract.

4.  **Fresh water system and associated equipment.**
    As per contract and class regulations.

5.  **Black water system and associated equipment.**
    As per contract and class regulations.

6.  **Grey water system and associated equipment.**
    As per contract and class regulations.

7.  **Petrol stowage locker.**
    To be installed as per class requirement and agreed location, starboard side swimplatform locker. To hold fuel as per contract amount (50 liters).

8.

8. **Side boarding ladders.**
   *SYL is to provide one ladder unit to the value of $12000.00 USD. This includes installation and stowage. The ladder must have safe launching and retrieval methods as per class regulations. SYL is to provide the second unit at Darby's cost as per change order, which is attached hereto as part of Schedule 1. (Marquipt Sea Stairs + turn table as already agreed).*

9. **Telephone and communications equipment and systems.**
   To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements.

10. **Air-conditioning, ventilation equipment and systems.**
    To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements.

11. **Dehumidifier equipment and systems.**
    To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements.

12. **Bilge system and equipment.**
    To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements.

13. **Tank gauges.**
    To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements.

14. **Lube oil system (Clean and dirty).**
    To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements.

15. **Lighting equipment and systems, interior and exterior.**
    To be installed and operated as per contract and manufacturer's specifications and class regulations/requirements and Work to be completed list ("Work to be completed List") which is attached hereto as Schedule 2.

16. **Laundry fit out.**
    To be installed and operated as per contract and manufacturer's specifications and class regulations and as per WIP List.

17. **Dive compressor installation.**
    To be installed and operated as per manufacturer's specifications and class regulations/requirements.

18. **Ships compressed air system.**
    To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

19. **Security system.**
    To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

20. **Equipment and system labeling.**
    To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

21. **Detail of anchor chain stoppers.**
Fair, paint and complete to class regulations/requirements.

22. **Sundeck skylight arrangement.**
To be installed as per contract, manufacturer's specifications and class regulations/requirements.

23. **Fire systems and all equipment.**
To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

24. **Stern anchor system and equipment.**
To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements and Work to be completed List.

25. **Windlass and Capstain systems.**
To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

26. **Emergency Generator.**
To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

27. **Stainless Steel external handrails.**
To meet class requirements and standards.

28. **Pilot house windscreen washers/wipers**
To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

29. **Storm shutters.**
To be installed and operated as per contract, manufacturer's specifications and class regulations/requirements.

30. **ABS/MCA Certification**
To be certified as per contract.

31. **Back Pressures**
To be within manufacturer's specifications and class regulations.

32. **Unmanned Machinery Space (UMS)**
Periodical UMS as per Sensation yachts and class requirements.

33. **MCA.**
Compliant as per contract.

34. **ABS.**
Compliant as per contract.

35. **United States Coast Guard Compliance Standards.**
Compliant as per contract.

36. **Stability.**
Compliant as per class regulations/requirements.



# NOBLE HOUSE

Gentlemen,

This Punch List (together with the punch list relating to class items) sets out and references those areas and items of SY18 that have not been completed to date. Some of these items are not covered under classification society ABS/MCA, which are the classes that SY18 are built to under contract. In relation to the areas and/or items specified in this Punch List:

    (a)    any area or item which is the subject of ABS and/or MCA class regulations and/or requirements shall be completed in accordance with such regulations and/or requirements; and

    (b)    any reference to an area, item or concern which is to be "as per contract" (or any similar reference) means that such area, item or concern is to be completed in accordance with the Specification and all other relevant provisions as contained in the Vessel Construction Agreement dated on or about March 29, 2002 (as amended).

## AREAS/ITEMS/CONCERNS TO BE COMPLETED IN TERMS OF THE CONSTRUCTION AGREEMENT. These are Non class items.

1.  **All exterior cupboard doors, hatches, covers and other items. (Sundeck marble, main deck awning, BBQ and all exterior furniture and equipment to be installed by SYL)**
    Finishing detail sealed weather tight integrity, fittings to be as per contract spec unless otherwise agreed by the parties.

2.  **Garage fit out.**
    Finishing detail of walls to be uniform with all other walls, ceiling and floors. Floors are to have the hollows (low areas) removed and kingboard installed as per agreement already reached between the parties (the kingboard is at the owner's expense). Stowage of dive tanks to be agreed (at the owner's expense).

3.  **Name boards.**
    Installation as per placement instructions and drawings already approved by the parties.

4.  **Bulwark doors port and starboard.**
    To be flush and level with bulwarks.

5.  **Audio/video equipment and systems.**
    To be installed and operated as per manufacturer's specifications, external speakers to be installed as per agreement already reached between the parties, TV lift to be installed and operated as per manufacturer's specifications and agreed drawings.

6.  **Television system.**
    To be installed and operated as per contract and manufacturer's specifications.

7. **Closed circuit TV system.**
   To be installed and operated as per contract and manufacturer's specifications.

8. **Control room fit out.**
   Install a matching panel to house the water tight door indicator lights, the same as smoke door indicator panel. Painting and varnishing detail to be completed.

9. **Engine room fit out.**
   Painting detail to be completed. White perforated sheet to go over electrical cable trays.

10. **Fwd machinery space fit out.**
    Painting detail to be completed.

11. **Dry storage area fit out.**
    Shelving detail to be finished, product restraining/locking mechanisms to be fitted.

12. **Exterior headliners.**
    Detail under rescue tender crane base to be finalized and design to be approved by Darby. SYL to install as per approved design.

13. **Main deck aft door.**
    Exterior teak detail to be varnished. To include top and bottom capping and also door panels. Stainless steel plate on door runner to be 316L. Interior door trim to be mahogany.

14. **Detail of anchor chain stoppers.**
    Painting and fairing to be completed.

15. **All fairleads port and starboard.**
    As per Work to be completed list ("Work to be completed List"), which is attached hereto as Schedule 2.

16. **Spacer plates on aft hawse pipe outlets.**
    As per Work to be completed list ("Work to be completed List"), which is attached hereto as Schedule 2.

17. **Exterior cap rails.**
    Entry ways hinged, varnished and all joints to be sealed.

18. **Exterior paint rectifications.**
    As per paint agreement which is attached hereto as Schedule 3.

19. **All teak deck rectifications.**
    As per teak agreement which is attached hereto as Schedule 4.

20. **All unpainted areas throughout the vessel.**
    All unfinished and reworked areas to be painted and completed.

21. **Gym aft window**
    To be installed as per contract.

22. **Striker Plate.**
    To be modified as required by Work to be completed List and to protect hull and paint work.

23. **Generator enclosures.**
    Sound shield to be painted to engine room detail.

24. **Sundeck spa and bar**

Installation drawings to be completed (plan and end elevations) and approved by Darby before installation by SYL.

25. **Exterior Umbrella Mounting**
    As per contract and Work to be completed List

26. **Sundeck forward bar.**
    Drawings to be completed and approved by Darby. SYL to install as per design.

27. **Drawings.**
    Copy of all vessel drawings to be provided in paper and electronic format where possible.

28. **Tenders**
    As per contract and manufacturer's specifications.

29. **AMS Floor plating.**
    To be polished and aligned correctly.

30. **Work to be completed document (Work to be completed List).**
    All matters in this document, which is attached hereto as Schedule 2, are incorporated into and form a part of this Punch List

31. **Teak repair document.**
    All matters in this document, which is attached hereto as Schedule 4, are incorporated into and form a part of this Punch List.

32. **Swim platform document.**
    All matters in this document, which is attached hereto as Schedule 6, are incorporated into and form a part of this Punch List.

33. **Sea trials document.**
    All matters in this document, which is attached hereto as Schedule 7, are incorporated into and form a part of this Punch List.

34. **Elevations.**
    These drawings, which are attached hereto as Schedule 8, are incorporated into and form a part of this Punch List.

35. **Paint repairs document.**
    All matters in this document, which is attached hereto as Schedule 3, are incorporated into and form a part of this Punch List.

36. **Change orders.**
    The change orders, which are attached hereto as Schedule 1, are incorporated into and form a part of this Punch List.

37. **Installation of owner supplied items.**
    All matters in this document, which is attached hereto as Schedule 9, are incorporated into and form a part of this Punch List.

38. **Stainless Steel external handrails.**
    SYL to complete handrails and Darby to approve finish detail.

39. **Rescue Tender crane and storage.**
    Crane boom will meet class regulations as per contract. Crane boom to be removable and attached by either a hinge or sliding pin operated system. The actual crane revolving base will remain the same. Port aft corner hand rail will have to be made hinged or removable for operation.
    The boom will be constructed out of the most light weight material possible (Carbon, Kevlar, Alloy).  The boom is to be stored under the sunpad arrangement.

13,

40. **PC Sums approved purchases.**

All matters in this document, which is attached hereto as Schedule 10, are incorporated into and form part of this Punch List.

**Schedule One**

(Change Orders)

I764165 v1 AKL

## CHANGE ORDERS TO BE COMPLETED BY THE BUILDER

| Change order prefix | Change order # | Request type | Area | Change requested |
|---|---|---|---|---|
| 18-933 | 71 | Change order | Garage | Add retractable fuel hose to fill tenders |
| 18-933 | 72 | Change order | Transom | Add 4 x Underwater fibreoptic lights in transom |
| 18-933 | 73 | Change order | Phone System | Add a computerised billing system to the phone system |
| 18-933 | 76 | Change order | Crew's mess | Modify the crew's freezer to a fridge |
| 18-933 | 86 | Change order | Wheelhouse | Wheel house , radio room and service area floor shall be dark teak with black inlay with urethane finish. Price based upon a planked and graphite inlay design. Approx. 21.5 m2 |
| 18-933 | 91 | Change order | Flybridge | Change the BBQ on the sundeck to the model requested by owners rep. |
| 18-933 | 93 | Change order | Bridge deck aft | Add bolster pads to the rear of the sunpads. (This will entail raising the handrails aft) |
| 18-933 | 108 | Change order | Upper salon bar | Stools to be sea-fastened through the floor |
| 18-933 | 111 | Change order | Main salon | Add a wine cooler to cabinet next to the main salon bar and behind the upper salon bar. |
| 18-933 | 176 | Change order | Guest cabin 2 | TV Frame to be adapted to the new size of the LCD TV |
| 18-933 | 228 | Change order | Main Foyer | Create a decorative splashboard in order to use the main foyer port-side cabinet as a servery. |
| 18-933 | 245 | Change order | Main aft deck | Install automatic sliding doors (capable of dogging) with teak exteriors and mahogany interiors |
| 18-933 | 300 | Change order | Pool area | Provide one additional handrail to sundeck spa. Total of two hand rails |
| 18-933 | 301 | Change order | AMS | Fuel system to have a ball valve between the fill station and manifold and a method of directing the return fuel to designated tanks |
| 18-933 | 303 | Change order | Pilothouse | Upgrade the X-band radar to IMO approved LCD display radar that would make your entire bridge "match" with 4 LCD screens and an all "glass" bridge. |
| 18-933 | 304 | Change order | Pilothouse | Upgrade the Interphase depth sounder/forward looking scanner to a PC180 which will give you two transducers and a full 180 degree forward looking "sonar" capability. |
| 18-933 | 308 | Change order | Swimstep | Provide a recessed potable water outlet on the swimstep. Provide two outlets in the lazzerette. Darby to approve final location |
| 18-933 | 310 | Change order | Flybridge | Require the installation of 2 flush mounted umbrella mounting bases around the sundeck spa. Owners rep to decide location. |

| 18-933 | 321 | Change order | Upper salon/foyer | Smoke door to be "held open" by a magnetic catch and tied into the fire alarm system as per class requirements. |
|--------|-----|-------------|-------------------|-----------------------------------------------------------------------------------------------------------------|
| 18-933 | 328 | Change order | Crews cabin 1 | Install an extra Tridata Combi repeater in crews cabin #1. Position to be approved by client. |
| 18-933 | 331 | Change order | Swim step extension | Install two water tight hatches in the swimstep extension , either side of centerline. Hatches to be teak covered with a hex-nut and T handle opening mechanism. Hatches to be alarmed. |
| 18-933 | 344 | | Flybridge | Install 4 flood lights on the mast, 2 fwd facing and 2 aft facing. |
| | 349s | Change order | Aft bridge deck | Make adjustable head rests fwd and aft on the aft bridge deck seating Pt & Stbd |
| | 350s | Change order | Stairwell | Stairwell from the upper deck pantry to the galley to be varnished teak with non skid strips inserted into the fwd edge of all steps |
| | 351 | Change order | Stairwell | Stairwell from upper deck pantry to the sundeck to have mahogany walls and varnished teak stairs with non skid stips insert on the fwd edge of all steps |
| 18-933 | 5 | CO | Flybridge | Install a fridge and icemaker next to the sundeck BBQ. Models to be approved by Darby. |
| 18-933 | 341 | Change order | Upper salon | The upper salon is to have motorized curtains, wired to vimar switches via controller boxes. Also to have remote control feature available. |
| 18-933 | 347 | | Dining room | Change the upper panels of the sliding doors from Bur to curved glass as per the approved drawings. |
| 18-933 | 348 | | Skylounge | Add a mahogany cabinet under the stairs behind the bridge deck bar to hold glasses. Include a light and Plexi shelves |
| 18-933 | 349 | | Galley | Change the cupboard over the Galley Winecooler to a shelf for a coffee maker and storage for coffee cups |
| 18-933 | 350 | | Upper foyer | Install teak flooring in the bridge deck foyer area per the bridge flooring style (black inlay and urethaned) |
| 18-933 | 354 | | Captain's Cabin | Install owner supplied gun locker under bed |
| | 364 | Change order | Galley | Add an insinkerator to the inboard galley sink, aft pantry sink and crew mess sink. Model to be approved by Darby. |
| 18-933 | 369 | | GC 2 | Add a Pullman bed to the wall of GC2 as shown in the Zuretti elevations, berth will not be recessed into the wall. |
| 18-933 | 371 | Change order | Flybridge | Cover the sundeck bar working surface (total lower section) in varnished teak with fiddle edge detail |
| 18-933 | 384 | Change order | Transom | Install attachment points at waterline on swimstep to hold 4 fenders at each end. |

| 18-933 | 385 | Change order | Upper salon | Mount router switch in phone cupboard and run two cables with RJ45 ends to the router cupboard |
|---|---|---|---|---|
| 18-933 | 386 | Change order | Upper pantry | Add owner supplied cupboard to the upper pantry over the bench, with same details as the lower unit |
| 18-933 | 389 | Change order | Galley | Upsize the galley fridge under the sinks to model approved by Darby and remove drawer above |
| | 394 | Change order | Lazarette | Add cradles and tracks for the two jetski?s |
| | 402 | Change order | Study | Install glass shelving with lighting for Cognac set. Owner rep to approve design |
| | 405 | Change order | Main salon | Install power outlet in floor for piano |
| | 373A | Change order | Engine room | Manufacture and install a work bench and sink in the engine room |
| | 408 | Change order | Boarding ladder | mount and supply a  second boarding ladder on the PT main deck |
| | 410 | Change order | Piano | Install mounting point for owners supply piano |
| | 409 | Change order | Sundeck spa | Recess the sundeck spa into the teak capping. |
| | 411 | Change order | Exterior | Mount umbrellas on the back of the portugese seating area |
| | 413 | Change order | Dining room | Service door to be held open with magnet and connected to fire system. |
| | 397 | Change order | Owners study | Install parqet teak flooring with urethane coating to approved design |
| | 352 | Change order | Aft bridge deck | Install the owners supply seating arrangement |
| | | | Galley | Door from galley to main foyer to open into the main foyer towards the port side |
| | | | Galley | Door from the galley to the upper pantry to open electricaly with kick switches on both sides |
| | | Change order | Bar areas Equipment | Bar areas are to be supplied with equipment as per contract. Where equipment not specified Darby to approve equipment. |
| | | Change order | Crew mess | Additional shelves to be added to the crews mess galley as per owners rep drawing. |
| | | Change order | Swim step | Swim step hand rails plus swim step boarding ladder to be installed to approved drawings |
| | | Change order | UMS | SYL to complete the vessel to class requirment for PUMS |
| | | Change order | Swim platform | Fabricate and install additional Bollard bases on the Swim platform Port & Starboard. |
| | | Change order | Owners Shower | Install a Steam Shower in the Owners shower. Model to be approved by Darby |
| | | Change order | Owners Bathroom | Replace the Marble in the Owners Bathroom, deposit paid to Paiotti, remaining amount to be paid. |

18

## Schedule Two

(Work To Be Completed list)

## Work To Be Completed

**WORK IN PROGRESS that will be completed.**

| # | Area | Task | Status | Work To Be Completed |
|---|------|------|--------|----------------------|
| 1 | Tender/jetski cradles | Provide the options of moving the cradles from stowed position to launching position | | Drawing to be generated and approved by Derby, for controlling the safe movement of the tenders and wave-runners. SYL to install as per approved design. |
| 2 | A/C chilled water | Pump for the A/C chilled water increased to match backup. Extra pump to be purchased by Derby. | Waiting for invoice to purchase spare pump | Derby still waiting on invoice from SYL for spare pump. |
| 3 | Sundeck | Automatic door to have SYS hinges | Work in progress | WIP agreed SYL will change hinges to SYS. |
| 4 | Garage | Please supply information of the proposed ceiling plan. | WIP | Verbal agreement has been reached in respect of a proposed ceiling plan, and Derby is awaiting final drawing for approval before SYL construct and install the ceiling. |
| 5 | Garage | The wall panels on PT and STBD sides of the garage have no camery | SYL to rectify | SYL has agreed to rectify the symmetry so all walls match |
| 6 | Boarding areas | Cast S/S name plates to be designed for all of these areas | Photo's of design have been given to PM | design agreed as per photo. SYL to manufacture and install onboard |
| 7 | Medical | Please supply the budget for all equipment supplied | Awaiting budget | Quotes have been submitted, SYL to supply or Credit provided to Derby for our own purchase |
| 8 | Sundeck spa stools | Drawings given to SYL for construction | Stools to be constructed and installed by SYL as per drawing | Stools to be constructed by SYL to the drawings provided by Derby. |
| 9 | Passarelle | Storage area required for the handrails | Need to check garage drawings for available space | area to be approved by Derby for storing of handrails and SYL to provide and install approved storage system. |
| 10 | Space propeller hatch cover | A winch was supplied to lift the hatch cover. What is the status of installation | | WIP, SYL to install owners supplied winch assembly., Winch to use 2:1 ratio on the lift. |
| 11 | Mast | A safe climbing arrangement needs to be arranged from the sundeck to the gymnasium roof | | SYL to provide a removable aluminium ladder to be used at spa area. Mounting locators to be installed on gym roof. |
| 12 | Flag pole | Please supply design of leading pole | | design to be approved-syl to install |
| 13 | A/C | Some pipe work, valves and drain lines have not been insulated | This is critical to avoid condensation | SYL will insulate all pipework relating to the A/C system including drains. |
| 14 | Safety attachment point | Sundeck brow to have safety point | | SYL to install pad eye mount in location approved by Derby. |
| 15 | Laundry | Sink and bench to be installed | | Agreed on type of sink and S/S side bench arrangement. To be installed by SYL against fwd bulkhead, sbd side with workbench covering the fire cylinder to allow access. |
| 16 | Galley | Fold out bench to be flush | | SYL will install the correct hinges so the small extension is flush with the main bench when in the folded out position. |
| 17 | Wheelhouse | A/C ducting inlet is required through poles behind seating area | | SYL to install ducting poles out of st/st and have laminated mahogany |
| 18 | Courtesy lighting | All exterior emergency lighting needs to come on when exterior overhead lighting is turned on | This is needed so all lights are working in normal operation and the emergency lighting is not noticable | SYL to insure emergency lighting will turn on when general exterior lighting is on. |
| 19 | Potable water system | Needs to be modified so all tanks can be drawn from | | WIP, SYL to install crossover pipe so pump can draw from all tanks. |
| 20 | Fridge/Freezer | What type of shelving arrangements will be supplied | | shelving layout is to be approved by Derby and installed by SYL. |
| 21 | Control room | Entrance platform from side main deck too small and dangerous | Need to agree on rectification to make safe while at sea | Norman Lymer to decide (MCA Surveyor). SYL to modify if required. |
| 22 | Stern anchor | Area measurements are needed to determine the anchor shank size possible as there is a rubber stopper required to block water access | | The type and weip of anchor to be approved by Derby and installed by SYL. |
| 23 | Fire and safety plan | Revised plan to be checked by JM | | Waiting return from MCA |

| Code mm|| | | Work To Be Completed |
|---|---|---|---|
| 24 | Main deck awning | Proposal presented for the main deck awning | colour sample was selected and given to PM for umbrella fabric to be used. Electric motor option to b installed at Darby's cost. Has been ordered. |
| 25 | Aft deck hawse pipes | Fabricate and Install larger radius outlets on the aft hawse pipes. | SYL to install spacer plates to stop lines rubbing on the paint. | SYL, to supply and install to the approved drawings. |
| 26 | Anchor chain roller | Modifications are being done to the anchor system as there is a conflict in the stowed position. | SYL to repair and modify system | WIP, anchor shank my need to be shortened. It has been agreed to fix or replace for new ones at SYL cost. |
| 27 | Fairleads | All fairleads have been installed without correct painting inside the mounting. Also when load has been applied the fairleads have moved in there mounting positions. | Fairleads need to be removed and the mounting supports need to be built up to the correct size so no movement can occur the painted. | SYL to correct all issues. |
| 28 | Generator exhaust | Due to the lower draft the exhaust outlets are mostly under water. | The shroud section on the outside of the hull to be extended enough so that the exhaust gas can escape without bubbling under the water. | SYL, to be fabricated and installed abroad, so exhaust gas is directed away from the hull and above water level. |
| 29 | Generator sound shields | Sound proofing needs to be installed where cutouts and pipes now penetrate the shield. Also the sound shields need to be painted white | These need to be as sound proof as possible. | SYL, will complete sound proofing and paint shields. |
| 30 | Forepeak hatch | A system is needed to support the hatch in the open position | A gas strut should be installed to assist the operator and provide safe operation. | SYL, to supply and install a gas strut. |
| 31 | Gymnasium | Overhead light in front of gym not in center | Needs to be moved to center position | SYL, to move into correct position. |
| 32 | Bow striker plate | This area requires more fairing. | During installation fairing was removed from below the striker plate and needs to be replaced. | SYL, to repair the areas that require fairing. |
| 33 | Exterior step lights | Oval shaped lights were rejected | Round lights agreed upon to be installed | SYL, to supply and install requested lights on all external step areas. |
| 34 | Exterior fire hoses | Hatches or doors are required to cover the fire hoses | Design required for approval | SYL, will supply and install covers as per design approved |
| 35 | Captains bathroom | Light switch is on the wrong side of the doorway | Needs to be moved to correct position | SYL, to reposition the light switch |
| 36 | Life jackets | Storage area is required. | Drawings show area but no cupboards installed | Design of fibreglass box to be approved by Darby. SYL, to fabricate and install fibreglass box to approved design and installed behind the bridge deck aft seating arrangement on stb side. |
| 37 | Taps and faucets | Many of the taps and faucets are not labeled in english | All taps and faucets are to be labeled in English | SYL, to change All labels to english |
| 38 | Power outlets | All guest bathrooms, master study and both salons require European outlets as per contract | Currently white American outlets have been installed | SYL, to change outlets to European type |
| 39 | Lower foyer | Cabinet construction has not commenced | Cabinet is to be built to approved drawings | SYL, to construct cabinet to approved drawings |
| 40 | Master wardrobe | Door direction blocks the outboard cupboard | Door direction to be changed to open inboard and toward centre of vessel. | SYL, to change door direction |
| 41 | Rescue tender | Supply the ceiling detail of the main deck as the cable pulley is the lowest point and the swaged design over the crane assembly. | We await this information and proposals | Crane assembly to be made with removable boom and be stowed as low as possible to maximise the sunbed area. |
| 42 | TV swivel. | owners cabin and bathroom and guest cabin 1 | | Darby to supply GC1 swivel and SYL to supply owners cabin and bathroom manual swivels. SYL is to Install all swivels. |
| 43 | Swim platform bollards | Two bollard bases to be installed on the platform either side | | Darby to supply bollards & SYL to supply and install base mounting arrangement. |
| 44 | 850 tender T/Top | Design for the T/Top needs to be approved | SYL, may purchase the standard T/Top from Rayglass and modify it to fold down | Standard Sv/6T T-top by Ray Glass to be purchased and modified to fold fwd by SYL. |
| 45 | Sundeck | A/C air handler cupboard on pt side of sundeck leaks water | Need to repair | SYL to repair |
| 46 | Caterpillar controls | The Caterpillar control panels in the control room and on the bridge have moisture condensation in side | Need to check with Cat on replacement | SYL, to check Warrenty with caterpillar |
| 47 | Air start system | Bronze flap type non return valves have been installed in the system | These valves will chatter and be unserviceable in a short period of time | SYL, to replace with correct valves. |

2ₗ

## Schedule Three

(Paint Agreement - Exterior paint rectifications)

22

# Paint Defect List
# Noble House
# 19th May 2004

**Areas Disscused:**

**Sky Deck:**

- Mast- Underside of the first level needs to be faired and painted. SYL to rectify.
- Mast- the legs need to be faired and painted- mast still being attached. SYL to rectify.
- Non-skid needs to be applied to all walking surfaces on the mast for safety reasons. SYL to rectify.
- Mast needs to be checked over for general fairing, as some of the higher levels need attention, the fairing appears to be rushed in it sanding process. SYL to rectify.
- The mast arch has a lump in the overhead that needs to be removed. SYL to rectify.
- Bridge brow- Non-skid as wide as the window section needs to be applied for the safety of the person washing down the brow. It will extend to the horizon of the brow. Change order
- The fly bridge deck non-skid needs to be cleaned up and assessed, as there are areas of damage from the workers and tapelines that look like they may peel. Will be re-painted by Sensation
- Any rust staining needs to be removed. SYL to rectify.
- Inside of lockers? Will be painted.

**Aft Bridge Deck:**

- All flat surfaces to be painted, once aft seating has been installed. Agreed
- Any rust staining needs to be removed in this area. SYL to rectify
- The aft outboard transom behind the rescue tender crane needs to be faired, as there are hollows from internal welding. SYL to rectify.

23 

- Port outboard side there is a blister that needs to be removed and patched up. (Check cause of blister) SYL to rectify.
- Stairwell leading to main deck has runs and scratches Possible re-spray, SYL to rectify.
- Both side deck scuppers need to be faired and repainted, as there is a noticeable fairing line. SYL to rectify.
- Runs on support poles. SYL to rectify.

**In Front Of Bridge:**
- Any rust staining in the area SYL to rectify.
- Paint scuppers in this area SYL to rectify.
- Inside of lockers? Will be painted.

**Fore Deck:**
- Deck needs to be non-skid SYL will complete.
- Flats above boson lockers need to be non-skid SYL will complete.
- Windlass tray needs to be cut back and painted to remove rust staining SYL will rectify.
- Mast base needs to be faired and painted In progress
- Rust stains around the bow area to be repaired. SYL to rectify.
- Chaff marks around outboard side of bow, from towing. SYL to repair.
- Antifoul line below the striker plate needs to be filled and painted. SYL to rectify.
- Fairleads need to be removed, painted and installed. Rust is weeping from drain holes SYL to rectify.
- Floors in both boson lockers and emergency generator. Will be painted.
- Sides of forepeak where welding marks are present from installation of striker plate to be painted. SYL to rectify.

**Side Decks:**
- Deck head on stb stairwell has a ridge which needs to be removed In progress

24

- Area around the boarding gate on the stb main deck needs to be repainted due to damage SYL to rectify.
- The galley wall needs to be painted again In progress
- Various chips and runs in both stairwells SYL to rectify.
- Rust marking on all flat surfaces and scuppers, needs to removed In progress
- Stb aft locker A/C locker needs to be painted due to discoloration. Will be painted.
- In all overheads where there has been welding or any cutting, there needs to be primer and paint applied to stop rusting SYL to paint all areas.

**Main Deck:**
- Top of transom door needs to be painted In progress
- Top of the crane, as there was alterations made as it was installed. SYL to rectify.
- Fair leads need to be removed and the inside painted to prevent rust SYL to rectify.
- Paint inside of Hawse pipes Will be done.

**Swim Platform:**
- Stairwell up to main deck needs to be painted due to damage SYL to rectify.
- Transom wall needs runs removed SYL to rectify.
- Port and stb quarters need rust removed SYL to rectify.
- Stb quarter has runs-around rub rail height SYL to rectify.
- Rub rail has damage and rust staining SYL to rectify.

**Port Side:**
- Whole side below the cap rail needs to be faired again to remove sanding marks and the wobble in the rub rail line Areas have been agreed upon as per attached drawing.

**Garage:**
- Storage area under floor needs painting. Will be painted.
- Shore power locker needs to be painted. Will be painted.
- Inside of garage door needs painting Will be painted.
- Garage floor Floor to be leveled and painted.

25

- Control room stair well needs painting Will be painted.
- Engine room under floor needs grates removed and all the beams painted Will be painted
- Areas around the gear boxes on both engines need to be painted- worker damage Will be painted.
- Attention to all piping and valves as the undersides of them is not painted Will be painted.
- Walls in the tank deck need to be painted as the old paint is discolored SYL to rectify.
- The under floor area needs to be cleaned and inspected
- Steering compartments need painting Will be painted.
- The A/C room needs attention to all piping to make sure it is all painted. Will be painted.
- Any spilled paint needs to be cleaned up, especially off the electrics and other machinery Will be done.
- The walls need to be painted to match the rest of the machinery as there is discolored paint Will be rectified.
- The escape hatch locker under the guest stairwell needs to painted. Will be painted.
- Stabilizer compartments need to be painted Will be painted.
- All chips scratches and damage through the entire vessel from the remaining fit out need to be fixed. Will be rectified.

The notations marked in red is the response of Sensation Yachts to the points raised by Darby Maritime and agreed to by both parties.

**Schedule Four**

(Teak Agreement - Teak deck rectifications)

I764165 v1 AKL



# NOBLE HOUSE

### MINUTES 24TH FEB 2004

### TEAK DECK DEFECTS

Persons present:       Michael Kumerich, Scott Robinson, Andrew Lawrence

Areas of discussion & concern:

- <u>Main aft deck area:</u>   Water logged and lifting from deck.

    Where fitted, bollard area, teak strips (long length) not in uniform with other side, eg, port side not equal to stb side.

    Escape hatch trim and surrounding area not to satisfactory standard of craftsmanship.

    Boarders not sealed with approved teak sealant, or sealed at all.

    Port side fwd by stairs leading up to bridge deck aft, teak looks like patch work, not to satisfactory standard of craftsmanship. Looks like brick work, different thickness and lengths.

    Area surrounding bollards, capstans and hawse pipes to be teaked with nice marketry look.

    Aft stb side by passer Elle, teak marketry to end by inner bal walks, to allow no access for water to build by the passer Elle.

- <u>Main deck:</u>        Escape hatches to have centre where handle is inserted to have locking mechanism level with teak deck.

    Proposal from SYL for gangway entrances. Darby proposes teak. (I believe this is what is proposed by SYL).

    Stb side gangway entrance, outer side plank to be replaced as Michael pointed out.

- <u>Bridge deck aft:</u>      Teak around stb side stair case support poles, both marketry's are different to each other, one is bigger but round, the other is smaller however has tabs sticking out.
        Teak deck not finished around aft seating area, still to decide and discuss on where the teak will finish.

        Port side fwd of stair case, edging could be in equal lengths and in two.


- <u>Bridge deck forward & Fordeck:</u>      Teak caprail needs stripping to bare wood and resealing then varnished coats applied.
        Teak deck in front of fwd seating area is lifting from deck, water damage and is not sealed on the edges.

        Steps in front of bridge leading down to foredeck area not teaked, contract calls for *All exterior stair treads shall be covered in teak.*


- <u>Fly bridge:</u>           Teak not installed/ laid yet.
- <u>Swim platform:</u>        Teak not installed/ laid yet.


ADDITIONAL LIST ADDED 18TH MAY 2004

BRIDGE DECK FWD
- Fix forward corners on either side of seat to be symmetrical.
- Fix Margins on port and stb wing stations to be symmetrical.
- Re check for delaminating on stb side fwd of bridge seating.
- Re check for delaminating on stb side deck.

MAIN DECK
- To lift stb bulwark deck by side boarding platform.
- To lift stb aft corner by transom door
- To access level and flat of aft deck and agree on solution.

## Schedule Five

(Intentionally left blank)

## Schedule Six

(Swim Platform)

32



33-H.



34

## Schedule Seven

(Sea Trials)

35

Phone: 0064-09-8372210
Fax:0064-09-8361775

# SENSATION YACHTS

**Sea Trials Programme**

53 Metre
Medium Displacement motor yacht

Sensation Yard No. SY18

# "NOBLE HOUSE"

Phone: 0064-09-8372210
Fax:0064-09-8361775

# Sea Trials Programme

| | |
|---|---|
| Vessel Name: | "NOBLE HOUSE" |
| Yard No: | SY 18 |
| Classification Society: | American Bureau of Shipping (ABS) |
| | Maritime &Coastguard Agency (MCA) |
| Class Notation: | ABS, +A1, +AMS<br>MCA, (Megayacht Code) |
| Date(s) of Trials: | 1.<br>2.<br>3.<br>4.<br>5. |
| Flag State: | Cayman Islands |
| Port of Registry | George Town |

## Trial Sea Conditions:

1.  Weather conditions should preferably not exceed Sea state 2 and/or Beaufort wind Force 3. In case of weather conditions exceeding these limits corrections for wind and sea will be applied. An upper limit for wind speed is about 11m/s, (Beaufort 5-6).
2.  Any proposed correction procedures to be applied to the results are to be submitted to the Owner's representative prior to the trials.
3.  Before the sea trials are conducted an Inclining Experiment is to be carried out
4.  The Vessel is to be loaded in accordance with the contract Sea Trials Condition (ref Para 1, "Ballasting for Trails", page 9) and trimmed in accordance with an approved Sea Trials condition, this to be determined after the final inclining experiment.

37

Phone: 0064-09-8372210
Fax:0064-09-8361775

# **List of Representatives and Crew**

Master:                              ... ... ... ... ... ... ... ... ... ... ... ... ....
                                     ... ... ... ... ... ... ... ... ... ... ... ... ....

Engineer.                            ... ... ... ... ... ... ... ... ... ... ... ....
                                     ... ... ... ... ... ... ... ... ... ... ... ... ....

Owners Representative.               ... ... ... ... ... ... ... ... ... ... ... ....
                                     ... ... ... ... ... ... ... ... ... ... ... ... ........

ABS Representative.                  ... ... ... ... ... ... ... ... ... ... ... ....

SYL Representatives.                 ... ... ... ... ... ... ... ... ... ... ... ....
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
v                                    ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........
                                     ... ... ... ... ... ... ... ... ... ... ... ........

38

Phone: 0064-09-8372210
Fax:0064-09-8361775

## Introduction

This Schedule of Sea Trials sets out the protocol for commissioning of ship's systems and the conduct of sea trials for vessels built at the yard of Sensation Yachts Ltd.

Together with other documentation recording the dockside/afloat commissioning of Ship's Systems, it records the performance and verifies the testing of the ship and it's operating systems.

The sea trials represent those tests, which must be conducted when the vessel is in an operational mode at sea and are designed to demonstrate:

- Contractual requirements
- Survey requirements
- Compliance with International Maritime Standards
- Engine manufacturers requirements
- Ships performance

Items may be deleted or added by mutual agreement to cover individual vessels.

Phone: 0064-09-8372210
Fax:0064-09-8361775

**Sea Trials**

Prior to the departure for sea trials, all systems and equipment, which are considered essential for the safety of the people on board and the safe operation of the vessel, are to be operational and on board the vessel. This includes:

1. The basic controls of engine rpm, steering and thruster
2. Radio equipment and internal communications
3. Life raft(s) and life jackets carried for all on board
4. Bilge pumping systems
5. Fire pump(s), hydrants, hoses & other fire fighting items
6. Sufficient portable fire extinguishers to be available
7. Anchors, windlass & capstans
8. All electrical generators functioning
9. All electrical circuits operational and in a safe condition
10. Navigation aids all available as needed for the trials
11. Essential machinery protection devices operational
12. Structural fire protection completed
13. All fire dampers, doors & escape hatches operational
14. Fixed fire extinguishing system operational
15. Fire detection system operational or arrangements in place for manual fire patrols
16. Any other requirements to the satisfaction of the responsible ship's Master.



Phone: 0064-09-8372210
Fax:0064-09-8361775

## <u>Sea Trials – Schedule of Events</u>

List of preferred schedule of trials

1.   Engine & gearbox

2.   Steering gear

3.   Bow thruster

4.   Turning circles

5.   Slow Speed maneuvers

6.   Zig Zag

7.   Crash stop

8.   Anchors

9.   Speed trials

10.  Endurance Run

11.  Stabilisers


**Magnetic compass adjustment will take about 1 hour**


Weather dependant



Phone: 0064-09-8372210
Fax:0064-09-8361775

## TABLE OF CONTENTS

**Paragraph number:**                                                      **Page number**

1.  Ballasting for Trials                                             9
2.  Engine & Gearbox Commissioning Trials                            9
3.  Endurance Run.                                                   9
4.  Speed Trials                                                     10
5.  Turning Circles                                                  10
6.  Crash Stop                                                       10
7.  Zig-Zag Trial                                                    10
8.  Slow Speed Manoeuverability Trial                                10
9.  Electrical Insulation Tests                                      10
10. Noise & Vibration (At sea & at anchor)                           10
11. Air conditioning and ventilation                                 11
12. Stabiliser Tests                                                 11
13. Bow thruster manoeuvring tests                                   11
14. Steering gear tests                                              11
15. Anchor and capstan tests                                         11
16. All deck machinery                                               12
17. Engine room ventilation                                          12
18. Galley, pantry and laundry equipment.                            12
19. Fire fighting/safety equipment and fire/smoke alarm systems      12
20. T.V., Hi-fi and all entertainment facilities.                    12
21. Check of all accommodation spaces.                               12
22. All electrical, lighting, electronics, navigation and
    communication equipment.                                         12
23. All hot and cold fresh water and sanitary systems.               12

Phone: 0064-09-8372210
Fax:0064-09-8361775

24. Refrigeration tests (freezer & chiller)    12

25. Deployment and retrieval of all boats, tenders, rescue boat

    and water toys.    12

26. General Alarm test.    12

    List of additional Commissioning Tests ABS & MCA    14

    Commissioning & Trials Attachments:    16-33
    (Refer to these for individual test data)
    Trial Comments & notes    33

All of these tests are to be witnessed by authorised Darby maritime representatives before sign off and handover of the vessel can be completed.

Phone: 0064-09-8372210
Fax:0064-09-8361775

_**Refer to attached Commissioning & Trials Attachments for individual data**_

1. **Ballasting For Trials**

   Trials are to be conducted with the vessel ballasted to the contract specifications before the carrying out of sea trials

   The following sea trial conditions are contracted:
   - Draft 9' 6" (approx) with 50% fuel oil (15000 US gallons) and 50% fresh water (5000 US gallons)
   - Design speed at Max cruise (half load) 15 knots
   - Design speed at Max (half load) 17 knots

   Refer to "Tank Statement" attachment for make up of total "ballast".

2. **Engine and Gearbox Commissioning Trials**

   Details of the commissioning requirements of the engines and gearboxes are as advised by the manufacturers representative. Engines run individually in 100-rpm increments to full H.P. settings. The engines must also achieve a minimum of 1% over full power rpm.
   Refer to the separate report from Caterpillar representatives, Gough Gough & Hamer Ltd.
   Engines have been run prior to the sea trials as part of the commissioning procedures. Refer to commissioning report.

3. **Endurance Run**

   A four consecutive hour endurance run at maximum continuous rating of the propulsion machinery is to be made. Engine operating parameters are to be recorded (temperatures, pressures etc) along with fuel consumption.

4. **Speed Trials**
   The speed of the Vessel is to be tested by four double runs over a recognised measured distance, e.g. by means of satellite position fixing system (DGPS) working up minimum recommended revolutions in approximately equal increments, to full power. The approach to and the departure from the measured distance is to be of sufficient length to allow the machinery to settle down to constant conditions before starting the next run.

   The Shipbuilder is to produce a fuel consumption curve at the load displacement against main engine RPM for Owner's future reference and in order to calculate the range of the vessel at the contract speed.

Phone: 0064-09-8372210
Fax:0064-09-8361775

The speed trial is to demonstrate that the vessel at contract displacement is capable of achieving a speed of not less than the contract speed, under the ambient conditions stated in the specification.

For results see separate attachment

### 5. Turning Circles

Turning trials ahead are to be carried out at full speeds to both port and starboard using maximum helm angle (speed dependent). The diameter of the turning circles and the times taken to complete the full circle are to be recorded.

### 6. Crash Stop

A crash stop from full ahead to zero speed is to be demonstrated to ensure that the machinery does not falter, stall or stop in going into reverse. The crash stop will be timed and distance measured. The crash stop should be completed from full speed, and possibly one other chosen speed.

### 7. Zig-Zag Trial

Zig-Zag trials are to be completed from full and cruising speeds. Normal manoeuvre is from full speed, with head to wind, 20° of port rudder is applied and held until the ship's head is 20° to port of the original heading. The rudder is then put 20° to starboard until the ship's head is 20° to starboard of the original heading. Repeated as needed.

### 8. Slow Speed Manoeuverability Trial

Slow speed manoeuvrability is to be demonstrated, both ahead and astern, with one and both engines running. The speed at which rudder effect is lost is to be noted.

### 9. Electrical Insulation (*Normally taken alongside*)

Electrical insulation measurements are to be taken for principal item of electrical machinery, and associated circuits, and recorded. Records of insulation resistance readings are to be supplied to the Owner's Representative.

### 10. Noise & Vibration. (At sea & at anchor)

Noise and vibration levels are to be measured whilst underway and at anchor. Noise levels taken underway shall be measured at maximum continuous cruising speed with one generator and air conditioning system operating. Noise levels taken at anchor shall be measured with one generator running, air conditioning system and engine room ventilation system operating.



Phone: 0064-09-8372210
Fax:0064-09-8361775

Every effort shall be taken to reduce noise levels to the requirements listed below: (dBA)

**Specification noise levels (dB):-**

MAXIMUM NOISE LEVELS UNDERWAY
Owners Stateroom          55
Guest Staterooms          58-60
Main Salon & Dining       64
Sky lounge & Pilothouse   58

MAXIMUM NOISE LEVELS AT ANCHOR
Owners Stateroom          48
Guest Staterooms          51-53
Main Salon & Dining       57
Sky lounge & Pilothouse   52

**MCA Recommended Noise Levels on board:-**

Engine room                     110
Engine control room             75
Sleeping cabins                 60
Mess rooms                      65
Corridors & bathrooms           80
Galleys                         75
Ship's whistle at bridge wings      110

11. **Air conditioning and ventilation** (At sea and alongside)

The manufacturers agents will commission the systems alongside prior to sea trials. The air conditioning system would normally be in operation during the sae trials as needed.

12. **Stabiliser trials**

As per manufacturer's schedule.

13. **Bow thruster**

Manoeuvring tests at sea and alongside. Usually the time for turning 90° sectors, to port & to starboard. The thruster should be effective in winds of up to 35 knots

14. **Steering gear tests**

As per Classification Society requirements.

46

Phone: 0064-09-8372210
Fax:0064-09-8361775

### 15. Anchor capstan testing

As per classification society requirement, and efficient self-stowage of cables.

### 16. All deck machinery

Including winches, capstans etc.

### 17. Engine room ventilation

Temperature and flow. Operation of dampers

### 18. Galley, pantry and laundry equipment.

Running of all items

### 19. Fire fighting/safety equipment and fire/smoke alarm systems only

All of these items are covered either individually or as a Survey.

### 20. T.V., Hi-fi and all entertainment facilities.

Commissioned by the supplier

### 21. Check of all accommodation spaces.

### 22. All electrical, lighting, electronics, navigation and communication equipment.

All of these items are covered either individually or as a Survey.

### 23. All hot and cold fresh water and sanitary systems.

These will also have been tested alongside prior to sea trials.

### 24. Refrigeration - freeze and chill units

Owners requirement:-These units (2) are to be run for two hours continuously with the doors open, followed by 24 hours on each unit with the doors closed. *This will have been tested alongside prior to sea trials*

### 25. Deployment and retrieval of all boats, tenders, rescue boat and water toys.

With the exception of the Rescue Boat, these items will be demonstrated alongside, not at sea.

Phone: 0064-09-8372210
Fax: 0064-09-8361775

### 26. General Alarm Test

With vessel at full operational speed, sound the general alarm. Check that the alarm is clearly audible from all spaces throughout the vessel.

All of these tests are to be witnessed by authorised Darby maritime representatives before sign off and handover of the vessel can be completed.

### Notes:

### Compass Adjustment

Adjustment of magnetic compass/s by licensed compass adjuster.

Phone: 0064-09-8372210
Fax:0064-09-8361775

## List of Additional Commissioning Tests ABS & MCA

1. Demonstration of Eight Main Engine starts in total. Normally carried out alongside, not at sea. Demonstration of eight main engine starts from the main engine/s without replenishment of air supply. The starting air receivers to be at atmospheric pressure initially and all starts to be completed within 60 minutes

2. Dead ship start up

3. Loss of normal electrical power (black out & restart)

4. Emergency generator functions

5. Genset load sharing tests

6. Emergency lighting

7. Bilge pumping

8. Direct engine room bilge, (port main engine)

9. MARPOL/IOPP OWS & 15ppm alarm

10. MARPOL sewage & garbage

11. Fixed fire extinguishing system (Ultra Fog)

12. Transom door demonstration

13. Watertight doors and hatches

14. Alarm monitoring system. (Three displays)

15. Tank content/sounding systems

16. Electrical system insulation tests

17. Reduction gear sets, geartooth contact record

18. Radio/GMDSS survey

19. Gyro compass alignment

20. Radar set alignment

21. Rescue boat launch & recovery

22. Manual fire alarm positions

23. Navigation light system

24. Storm shutter demonstration

25. Emergency battery supplies & chargers

26. Means of escape

27. Portlights and deadlights



Phone: 0064-09-8372210
Fax:0064-09-8361775

**28.** Ventilation. Accommodation & Crew quarters.

**29.** Potable water supplies & emergency reserve

**30.** Embarkation arrangements

**31.** Safety Equipment survey

**32.** Noise Survey for Crew Accommodation spaces.

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.1**          **Commissioning & Trials Attachment**

**SY 18 Tank Statement.**

| Tank | Volume (litres) | S.G. | Weight |
|------|-----------------|------|--------|
| 1 P Fuel | | 0.87 | |
| 1 S Fuel | | 0.87 | |
| 1 Center Fuel | | 0.87 | |
| 2 P Fuel | | 0.87 | |
| 2 S Fuel | | 0.87 | |
| 3 Fuel | | 0.87 | |
| 4 Fuel | | 0.87 | |
| 5 Fuel | | 0.87 | |
| 6 Fuel | | 0.87 | |
| P FO Overflow | | 0.87 | |
| S FO Overflow | | 0.87 | |
| 1 Fresh Water | | 1.0 | |
| 2 Fresh Water | | 1.0 | |
| 3 P Fresh Water | | 1.0 | |
| 3 S Fresh Water | | 1.0 | |
| 4 Fresh Water | | 1.0 | |
| Black Water | | 1.025 | |
| Grey Water | | 1.025 | |
| P Dirty Oil | | 0.924 | |
| S Dirty Oil | | 0.924 | |
| P Fwd Clean LO | | 0.924 | |
| P Aft Clean LO | | 0.924 | |
| S Fwd Clean LO | | 0.924 | |
| S Aft Clean LO | | 0.924 | |
| Waste Oil | | 0.924 | |
| Oily Water | | 0.924 | |

Draft Fwd:-… … … … … ….Draft Aft:-… … … … … … ….Trim:-… … … … … … ….

Displacement:-… … … … … … … … … … …

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.2**              **Commissioning & Trials Attachment**

**Engine & Gearbox Trials.**

The Caterpillar engine representatives, Gough, Gough & Hamer Limited, will produce engine-operating parameters including % load and fuel burn at 100rpm intervals from idle speed to rated rpm plus 16 rpm.

Machinery monitoring is usually by "normal" or "abnormal" sensor indicators /alarms, with the exception of the main engine cylinder exhausts which do have a thermocouple temperature readout.

There are few facilities for the obtaining of actual water, air & oil temperatures or pressures.

52

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.3**              **Commissioning & Trials Attachment**

**Endurance Trials**

The endurance trial duration is a minimum of four (4) hours with both main engines running at maximum continuous rating. (contract cruising speed 15 knots)

A record of fuel consumption, temperatures and pressures is to be kept for the duration of the trial.

Noise and vibration levels may also be recorded and monitored.

Heating, ventilation and air conditioning systems may also be demonstrated and monitored.



Issue 1

Sensation Yachts Ltd
Auckland, New Zealand
Phone: 0064-09-8372210
Fax:0064-09-8361775

## No.5      Commissioning & Trials Attachment

### Speed Trials

| Draft aft | Course magnetic | Displacement |
| Draft fwd | Course gyro | |
| Draft mean | Echo sounder | |

| Run No. | Time Hrs / min | Course degrees | Log/GPS knots | Engine rpm P | Engine rpm S | Measured time Mins / secs | Speed knots | Wind Speed | Wind Direction | Waves Height | Waves Direction | Water depth | Roll | Pit |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |

**Remarks: See next page for any additional observations.**

Sea Trials Programme

Phone: 0064-09-637 2210
Fax: 0064-09-8361775

**Speed Trials**

Additional Observations:

55

Fax:0064-09-8361775

**No.6**             **Commissioning & Trials Attachment**

**Turning circles**

| Place | | Distances. (GPS) | |
|-------|--|------------------|--|
| Wind | | | |
| Sea | | Courses. (Compass) | |

| MEASUREMENTS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|

| Turning Circle | | Port | | | Stbd | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Approach course | | | | | | | | | | |
| Approach speed | | | | | | | | | | |
| Engine shaft speed Port | rpm | | | | | | | | | |
| Stbd | rpm | | | | | | | | | |
| Rudder position:- | degr. | min | sec | min | sec | min | sec | min | Sec |
| Turning    0° - 90° | | | | | | | | | |
| 0° - 180° | | | | | | | | | |
| 0° - 270° | | | | | | | | | |
| 0° - 360° | | | | | | | | | |
| Advance "A" | m | | | | | | | | |
| Tactical diameter "B" | m | | | | | | | | |
| Dimension "C" | m | | | | | | | | |
| Initial heel | degr. | | | | | | | | |
| Steady heel | degr. | | | | | | | | |
| Engine shaft speed    Port | rpm | | | | | | | | |
| Stbd | rpm | | | | | | | | |

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No 6 Turning circle cont'd.**

**Turning Circles and distances "A", "B" and "C".**



The start point is when full rudder is applied.

The tactical diameter "B" is obtained after 180°. If the turn is carried on for 540° the smaller actual turning circle may be obtained.

Distance A is the advance of the vessel from the start point

Dimension C is the difference between the initial circle and a subsequent circle

51

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.7**          <u>**Commissioning & Trials Attachment**</u>

**Crash Stop**

| Place | | Distances (GPS) | |
|---|---|---|---|
| Wind | | Speeds (GPS) | |
| Sea | | | |

Vessel equipped with: Reverse gearbox and Bridge control

| Measurements | | | | | |
|---|---|---|---|---|---|
| CRASH STOP | | | | | |
| Approach course | | | | | |
| Approach speed | | | | | |
| Engine speed      port | | | | | |
|                   Stbd | | | | | |
| Time from start to: | | | | | |
| 1) Full astern power | | | | | |
| 2) Stopping of vessel | | | | | |
| Stopping distance | | | | | |
| Engine speed      port | | | | | |
|                   stbd | | | | | |
| Course when stopped | | | | | |
| | | | | | |
| | | | | | |

58

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.8**                    **Commissioning & Trials Attachment**

**Zig-Zag Trial**

Conditions:

Place:-... ... ... ... ... ... ... ....Wind:-... ... ... ... ... ... ....Sea:-... ... ... ... ... ... ... ...

Approach speed:-... ... ... ... .....knots

Rudder angle to be used:-... ... ... ... ... ...20°

Course difference to be used:-... ... ... ... ...20°

Target course to Port:-... ... ... ... ... ... ... ... ... ... ... ... ... ....

Original course:-... ... ... ... ... ... ... ... ... ... ... ... ... ... ...

Target course to Starboard:-... ... ... ... ... ... ... ... ... ... ...

Directions:

1. Note start time
2. Apply chosen rudder angle to port. (20°) and note time to achieve 20° of port rudder
3. Note time when heading reaches the chosen degrees from original to port.
4. Apply 20° of starboard rudder and note time to achieve 20° of starboard rudder.
5. Note time when heading reaches 20° to starboard of original course.
6. Apply 20° of port rudder and note time taken to achieve 20° of port rudder.
7. Repeat the above procedure for 5 or 6 rudder movements.

| Rudder Angle applied | Time when rudder angle reached | Heading required (20° from original) | Time when 20° heading change reached |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

59

**No.9**         **Commissioning & Trials Attachment**

**Slow Speed Manoeuverability Trial & Helm Effect Test**

1. Helm effect test is to be performed from ship speeds of 5 knots down to engine idle speed.
2. The speed is measured whilst 20° of helm is applied to port & starboard.
3. At each successive speed reduction the helm is applied to port & starboard.
4. The ship's speed is recorded when the rudder becomes ineffective in controlling the ship.
5. The test is conducted with both engines running and with alternate single engines running.
6. The tests can be made for both ahead and astern directions.

| | | **Helm Effect at speed in knots** (angle/effect) | | | | |
|---|---|---|---|---|---|---|
| **Ahead** | **Astern** | **5** | **4** | **3** | **2** | **1** |
| Both | | | | | | |
| | Both | | | | | |
| Port | | | | | | |
| | Port | | | | | |
| Stbd | | | | | | |
| | Stbd | | | | | |
| | | | | | | |

**Remarks:-**

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.10**          <u>**Commissioning & Trials Attachment**</u>

**Electrical insulation**

Insulation readings (Megger readings) are to be taken for the principal items of electrical machinery.

Suitable precautions must be taken to isolate all electronic equipment, diodes etc that may be damaged by this test procedure.

A list of electrical items tested along with the insulation readings obtained will be provided.

The insulation readings are to be taken after all items have been commissioned and run under normal working conditions.

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.11**                    **Commissioning & Trials Attachment**

**Noise and Vibration**

Noise and vibration levels are to be measured as detailed on page 11 and 16 above.

**1)**

At Anchor (1 x genset, air conditioning & engine room ventilation all running)

| Space | Required dB | Actual dB | Remarks |
|---|---|---|---|
| Owners Stateroom | 48 | | |
| Guest Staterooms | 51-53 | | |
| Main Salon & Dining | 57 | | |
| Sky lounge & Pilothouse | 52 | | |
| Crew Accommodation Aft | 60 | | |
| Crew Accommodation forward | 60 | | |

**2)**

Underway (1 x genset, air conditioning & engines at continuous cruising output)

| Space | Required dB | Actual dB | Remarks |
|---|---|---|---|
| Owners Stateroom | 55 | | |
| Guest Staterooms | 58-60 | | |
| Main Salon & Dining | 64 | | |
| Sky lounge & Pilothouse | 58 | | |
| Crew Accommodation Aft | 60 | | |
| Crew Accommodation forward | 60 | | |

**Comments:-**

62

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.12**          <u>**Commissioning & Trials Attachment**</u>

**Air Conditioning and Ventilation**

The air conditioning system will be commissioned prior to sea trials. The manufacturers agent will assess the system against the contract specification and a commissioning report will be drawn up.

During sea trials the air conditioning system can remain in operation during the Endurance Run.

**No.13**

**Stabiliser Trials**

The stabilisers will be commissioned prior to sea trials. During sea trials the stabilizers will be in neutral (centered) for speed trials. For the Endurance Run the stabilisers will be in normal operating mode.

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.14**          **Commissioning & Trials Attachment**

**Bow Thruster**

The bow thruster will be commissioned to less than full power settings prior to sea trials.

The thruster will be used for departures from the wharf.

Full power thruster trials will be carried out during sea trials, consisting of operation to turn full circles to port and starboard.

If desired the maximum speed of the vessel at which the bow thruster Is effective may be established.

Conditions: -

Position... ... ... ... .....Wind... ... ... ... .....Sea:-... ... ... ... ....Rudder Angle... ... ... ... ... ....

| Turning to Port | Course | Time for 90° Turn | Power KW/ Amps |
|---|---|---|---|
| 0° | | 0 secs | 0 |
| 90° | | | |
| 180° | | | |
| 270° | | | |
| 360° | | | |
| 450° | | | |
| Steady turning speed, degrees / min | | | |

| Turning to Starboard | Course | Time for 90° Turn | Power KW/ Amps |
|---|---|---|---|
| 0° | | 0 secs | 0 |
| 90° | | | |
| 180° | | | |
| 270° | | | |
| 360° | | | |
| 450° | | | |
| Steady turning speed, degrees / min | | | |

Thruster to remain effective in winds up to a maximum of 35 knots/

**No.15**               Commissioning & Trials Attachment

## Steering Gear Tests

Main steering. Rudder movement of 35º on one side to 35º on the other with the ship at deepest seagoing draft and running ahead at maximum speed, and from 35º on either side to 30º on the other side in not more than 28 seconds

Auxiliary steering. Rudder movement of 15º from one side to 15º on the other side within 60 seconds, with the ship at it's deepest seagoing draft and running ahead at one half of the maximum service speed, or 7 knots, whichever is the greater.

Conditions:-

Place ... ... ... ... ... ... ... ... ...Wind ... ... ... ...... ... ... ...Sea ... ... ... ... ... ... ... ...

Twin rudders. Two main & two auxiliary steering pumps + hand hydraulic pump

| Pump No. | | Main No 1 | Main No2 | Aux No1 | Aux No1 |
|---|---|---|---|---|---|
| Approach course | | | | | |
| Approach speed | | | | | |
| Engine speed | Port | | | | |
| | Stbd | | | | |
| First turn to | Port | | | | |
| | Stbd | | | | |
| 0 - 35 | Secs | | | | |
| 35 – 30 | Secs | | | | |
| 35 – 30 | Secs | | | | |
| Rudder midships and reduce to half speed or 7 knots for auxiliary tests | | | | | |
| 0 – 15 | Secs | | | | |
| 15 - 15 | Secs | | | | |
| 15 - 15 | Secs | | | | |
| Midships | Secs | | | | |
| | | | | | |

65

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.15**              **Commissioning & Trials Attachment**

**Steering Gear Continued**

Operation of hand hydraulic pump from MCR:-

Time to move rudder 0º to 15º-… … … … … … … … … … … … … … .… … … …

Time to move rudder 15º to 15º… … … … … … … … … … … … … … … .….

Change over of main pumps and back again.

Change over of auxiliary pumps and back again.

Change over between main and auxiliary units.

Steering controls and transfer between control circuits at the navigation bridge and also locally. (Two separate control circuits for the main steering and one for the auxiliary steering).

Rudder angle indicator, bridge & auxiliary station

Motor running indicators

Auto restart after a power failure, main & auxiliary

Hydraulic test of piping system (min 1.25 x MWP)

Emergency power supply / operation

**Remarks:**

Phone: 0064-09-8372210
Fax:0064-09-8361775

**No.16**          **Commissioning & Trials Attachment**

**Anchor Windlass Test**

Two electric windlass units are fitted.  Each to demonstrate:-

Braking, clutch function, power lowering, power hoisting, proper riding of chain through hawse pipe, and spurling pipe with proper stowage of the cables.

Also each unit is to lift 82.5 metres of free hanging chain (where depth of water permits, otherwise alternative to be agreed by ABS Surveyor), normally at 9 metres / minute mean speed.

**Conditions:-**                    Position... ... ... ... ... ... ... ... ... ... ....

Wind... ... ... ... ... ... ...Sea... ... ... ... ... ...Water depth... ... ... ... ... ... ...

**Equipment:-**

Anchors:-.......off each ...  .......kg.    Standard / HHP / SHHP    2 x windlasses... ...

**Requirements:-** ... ... ...m/min;  pull:-anchor + ........x 27.5m lengths chain.

PORT ANCHOR

Length of chain winched out          :... ... ... ... .....lengths of 27.5m

Length of chain dropped from brake:... ... ... ... ... .....lengths of 27.5m

Heaving time:-

For the ... ... .....length/s:... ... ......min... ... ......secs.          speed........ ... ...m/min

For the ... ... .....length/s:... ... ......min... ... ......secs          speed... ... ... ....m/min

Anchor stowed satisfactorily after... ... .....trials.

Cable compression lock and claw assembly satisfactory:... ... ... ... ... ... ... ... ....

Operation of brake and windlass satisfactory:... ... ... ... ... ... ... ... ... ... ... ... ...

SARBOARD ANCHOR

Length of chain winched out          :... ... ... ... .....lengths of 27.5m

Length of chain dropped from brake:... ... ... ... ... .....lengths of 27.5m

Heaving time:-

For the ... ... .....length/s:... ... ......min... ... .....secs.          speed........ ... ...m/min

For the ... ... .....length/s:... ... ......min... ... .....secs          speed... ... ... ....m/min

Anchor stowed satisfactorily after... ... .....trials.

Cable compression lock and claw assembly satisfactory:... ... ... ... ... ... ... ... ....

Operation of brake and windlass satisfactory:... ... ... ... ... ... ... ... ... ... ... ... ...

67

Phone: 0064-09-8372210
Fax:0064-09-8361775

## Commissioning & Trials Attachment

### Notes re Trials and Individual Test Items

68

**Schedule Eight**

(Elevations)

See attached bound plans

69

I784165 v1 AKL

**Schedule Nine**

(Installations of owner supplied items)

116

24/03/04

## OWNER SUPPLY ITEMS INSTALLED BY SYL

**SUNDECK:**

- Fwd Sundeck bar stools (total 5).
- Gymnasium equipment (bowflex, running machine). Change order

**BRIDGE DECK:**

- Aft deck dining table (two legs).
- Aft deck bar assembly.
- Skylounge DVD desk aft.
- Bar and bar stools (4).
- Loose furniture to be sea secured (couches, chairs, tables).
- Pilot house chairs (2).

**MAIN DECK:**

- Bar stools (3).
- Wall cabinet behind bar unit. Change order
- Loose furniture to be sea secured (couches, tables, chairs).
- Dining table.
- Study desk.
- Study sideboard.
- Madams vanity.

**TANK TOP:**

- Rotary iron. Change order

**GENERAL:**

- All wall and reading lamps.
- Mirrors and acrylic panels.
- Floor, wall and ceiling covers.

Items marked with change order will be charged to Darby.

## Schedule Ten

(PC Sums - approved purchases)



**Exhibit 2**

(Escrow Agreement)

**SENSATION YACHTS LIMITED**

Builder

**DARBY MARITIME LIMITED**

Purchaser

**RUSSELL MCVEAGH**

Escrow Agent

---

**ESCROW AGREEMENT**

**US$1,740,649**

---

**RUSSELL McVEAGH**

*123*

**AGREEMENT** dated                                                2004

**PARTIES**

     **SENSATION YACHTS LIMITED ("Builder")**

     **DARBY MARITIME LIMITED ("Purchaser")**

     **RUSSELL MCVEAGH ("Escrow Agent")**

**INTRODUCTION**

A.    The Builder and the Purchaser have entered into an amendment agreement ("**Amendment Agreement**") on or about the date of this agreement, amending the Vessel Construction Agreement between the Builder and the Purchaser dated on or about 29 March 2002.

B.    The Amendment Agreement provides, *inter alia*, for the payment of the Escrow Funds by the Purchaser into an escrow account to be maintained by the Escrow Agent.

C.    The Escrow Agent shall hold and disburse the Escrow Funds in accordance with the terms and conditions set out in this agreement.

**AGREEMENT**

**1.    DEFINITIONS**

1.1    Unless otherwise defined in this agreement, words and phrases defined in the Amendment Agreement shall have the same meaning in this agreement.

1.2    In this agreement "**tax**" includes any present or future tax, levy, impost, duty, rate, charge, fee, deduction or withholding of any nature and whatever called, imposed or levied by any governmental authority, together with any interest, penalty, charge, fee or other amount imposed or made on or in respect of any of the foregoing, and "**taxes**" are to be construed accordingly.

**2.    DEPOSIT OF ESCROW FUNDS**

2.1    **Deposit:** The Purchaser shall, within five Business Days following execution of the Amendment Agreement deposit the Escrow Funds with the Escrow Agent.

2.2    **Retention of Escrow Funds:** Upon receipt of the Escrow Funds by the Escrow Agent, the Escrow Agent shall hold the Escrow Funds on trust for the Purchaser in an interest bearing account on immediate call with Westpac Banking Corporation in the name of the Purchaser, to be disbursed pursuant to the terms of this agreement. The Escrow Agent shall not be liable to either the Purchaser or the Builder for any loss of or diminution in any investment so made.

2.3    **Interest:** Interest earned on the Escrow Funds while in the Escrow Account shall be paid (less any withholding taxes which are required by law to be deducted) to the Purchaser by the Escrow Agent at the same time as the Escrow Funds are released.

2.4    **Payment:** The Escrow Funds shall be released on receipt by the Escrow Agent of, and in accordance with the directions contained in, an irrevocable payment instruction,

generally in the form set out in the schedule to this agreement, signed by both the Purchaser and the Builder. The Purchaser and the Builder shall give directions to the Escrow Agent in accordance with the Amendment Agreement.

2.5   **Backstop rule**: If no such notice is given, the Escrow Agent shall retain the Escrow Funds in its possession until directed by a final, non-appealable order of a court or arbitral body, whereupon the Escrow Agent may make such disposition in accordance with such joint instructions, court order or arbitration order.

## 3.   DUTIES OF THE ESCROW AGENT

3.1   **Authorisation**: The Escrow Agent is hereby authorised and directed to hold the Escrow Funds in trust for the Purchaser in accordance with this agreement.

3.2   **Liability of Escrow Agent**: Except for its own negligence or wilful misconduct, the Escrow Agent shall not be liable in any circumstance whatsoever in relation to the matters contained in this agreement.

3.3   **Reliance by Escrow Agent**: The Escrow Agent shall be entitled to rely upon the notice given under clause 2.4 without being required to determine the authenticity or the correctness of any fact stated therein or the propriety, validity or execution of or the service thereof. The Escrow Agent may rely, and shall be protected in acting or refraining from acting, upon any such notice, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

3.4   **Authority irrevocable**: This agreement, and the authority of the Escrow Agent, shall be irrevocable and shall not be subject to termination or modification by the Purchaser or the Builder except where all of the parties consent to the termination or modification.

3.5   **Warranty**: Each of the Purchaser and the Builder represents and warrants that this agreement has been duly and validly authorised, executed and delivered by such party and constitutes a valid and binding obligation of such party, enforceable against such party in accordance with its terms.

3.6   **Conflict**: If at any time the Escrow Agent receives conflicting notices, claims, demands or instructions with respect to the Escrow Funds, the Escrow Agent shall rely on the notice given under clause 2.4 and shall make payment in accordance with such notice.

3.7   **Resignation**: The Escrow Agent may resign at any time by giving the Purchaser and the Builder 10 Business Days' prior written notice to that effect, provided that a successor escrow agent shall first have been appointed, shall have signed an agreement in the same or similar terms to this agreement, and shall have received payment of the Escrow Funds in cleared and immediately available funds from the Escrow Agent. In such event, the successor escrow agent shall be such person, firm or corporation as is mutually selected by the Purchaser and the Builder who shall sign an agreement in the same or similar terms to this agreement. In the event that the parties are unable to agree on a successor escrow agent in terms of this clause, the successor escrow agent shall be such person nominated by the president for the time being of the Auckland District Law Society.

## 4.   INDEMNITY

4.1   The Purchaser and the Builder, jointly and severally, agree to pay on demand, as well as to indemnify, defend and hold the Escrow Agent harmless from and against, all costs, damages, assignments, solicitors' fees, expenses, obligations, liabilities and claims of

125

any kind which the Escrow Agent may sustain, incur or pay in connection with or arising out of this agreement, including, without limitation, any fees and expenses which it may incur or sustain in any legal action arising from this agreement or involving the subject matter hereof, whether or not commenced by the Escrow Agent provided, however, that the foregoing indemnification shall not apply to the Escrow Agent in the event of its negligence or wilful misconduct in connection with the performance of its services hereunder.

**5.      ACKNOWLEDGMENT**

5.1     The Escrow Agent shall within two Business Days following receipt of the Escrow Funds in accordance with clause 2.1 of this agreement, acknowledge in writing to each of the Purchaser and the Builder that it holds the Escrow Funds on the terms set out in  this agreement.

**6.      COSTS**

6.1     All costs, losses and other liabilities (including legal expenses on a full indemnity basis and goods and services and similar taxes thereon) incurred or sustained in connection with:

(a)     the negotiation, preparation, signing, administration and release of this agreement; and

(b)     the granting of any waiver or consent under, or the giving of any variation or release of, this agreement,

shall be shared equally by the Purchaser and the Builder.

**7.      NO ASSIGNMENT**

7.1     This agreement shall not be assignable by any party without the prior written consent of the other parties.

**8.      AMENDMENTS**

8.1     All amendments or variations to this agreement must be in writing and must be signed by all of the parties to this agreement.

**9.      TERMINATION OF OBLIGATIONS**

9.1     Upon payment of the Escrow Funds and interest on the Escrow Funds under and in accordance with this agreement, this agreement shall be deemed to be terminated and the Escrow Agent shall be released and discharged from all further obligations hereunder.

**10.     GOVERNING LAW**

10.1    This agreement shall be governed by and construed in accordance with the laws of New Zealand and the parties irrevocably agree to submit to the non-exclusive

jurisdiction of the Courts of New Zealand in relation to any question or issue relating to the interpretation or application of this agreement.

## 11.    COUNTERPARTS

11.1    This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Executed counterparts transmitted by facsimile shall be effective as originals.

## 12.    BUILDER'S ACKNOWLEDGMENT

12.1    The Builder acknowledges that the Escrow Agent is the firm of solicitors which acts for the Purchaser and the Builder agrees that the Escrow Agent may continue to act as solicitors for the Purchaser notwithstanding the appointment of the Escrow Agent to hold the Escrow Funds and perform its other obligations under this agreement.

## SIGNATURES

**SENSATION YACHTS LIMITED by:**

and witnessed by:

_____
Signature of director

_____
Name of director

_____
Signature of witness

_____
Occupation

_____
City/town of residence

**DARBY MARITIME LIMITED by:**

and witnessed by:

_____
Signature of director

_____
Name of director

_____
Signature of witness

_____
Occupation

_____
City/town of residence

*127*

**RUSSELL MCVEAGH by:**

_____

Signature of authorised signatory

_____

Name of authorised signatory

*128*

## SCHEDULE

**Date:** **[ ]**

**To:** Russell McVeagh
Vero Centre
48 Shortland Street
**AUCKLAND**

**Attention:** Gerard Brown

### ESCROW FUNDS - PAYMENT DIRECTION

1.  Terms defined in the escrow agreement dated **[ ]** ("**Escrow Agreement**") between Darby Maritime Limited, Sensation Yachts Limited and Russell McVeagh shall have the same meaning in this notice.

2.  The Builder and the Purchaser hereby irrevocably instruct you pursuant to the provisions of clause 2.4 of the Escrow Agreement that the specified amount of the Escrow Funds is to be released to the Builder[, and the balance of the Escrow Funds is to be released to the Purchaser], in accordance with the details attached.

3.  The Builder and the Purchaser further hereby irrevocably instruct you pursuant to the provisions of clause 2.3 of the Escrow Agreement that the interest on the Escrow Funds so released is to be released to the Purchaser in accordance with the details attached.

**DARBY MARITIME LIMITED by:**

_____
Signature of authorised signatory

_____
Name of authorised signatory

**SENSATION YACHTS LIMITED by:**

_____
Signature of authorised signatory

_____
Name of authorised signatory

**[attach specified amount of Escrow Funds and relevant account information]**

**Exhibit 3**

(Release Deed Poll)

AMENDMENT TO VESSEL CONSTRUCTION AGREEMENT.DOC

## RELEASE DEED POLL

**DEED POLL** dated        September 2004 given by Michael Anthony Erceg ("**Secured Party**") in favour, and for the benefit, of Sensation Yachts Limited ("**Debtor**") and Darby Maritime Limited.

## INTRODUCTION

1.      The Debtor has:

  (a)      granted a security interest in all of the Debtor's present and after-acquired personal property, including the Vessel as described under the heading "Released Property" below ("**Personal Property**"); and

  (b)      charged all of the Debtor's present and future interests in, and all of the Debtor's present and future rights in relation to, any land and any other property, other than any personal property to which the Personal Property Securities Act 1999 applies, ("**Other Property**"),

  to the Secured Party, which is detailed in the security agreement between the Secured Party and the Debtor dated on or about 18 October 1999 ("**Agreement**").

2.      A financing statement (numbered FV92T5RWPU84576H) has been registered by the Secured Party in the Personal Property Securities Register in respect of the Personal Property.

## OPERATIVE PROVISIONS

A.      The Secured Party releases and discharges the property detailed under the heading "Released Property" below ("**Released Property**") from all security interests granted to the Secured Party under the Agreement or otherwise from the date of this deed poll but without prejudice to any remaining rights, powers and remedies of the Secured Party in the Agreement and in respect of any other property remaining subject to any security interest and without releasing or discharging the Debtor or any other person or any body corporate or any other security or securities for the time being held by the Secured Party for the payment of any monies owing to the Secured Party under the Agreement, any collateral instrument or otherwise.

B.      The Secured Party will forthwith (and in any event not later than one week following the date of this deed poll) register a financing change statement amending financing statement number FV92T5RWPU84576H so that the collateral description in that financing statement clearly no longer includes the Released Property.

## Released Property

The Vessel, being the 174 foot Sensation Motor Yacht having builder's number SY18, as described in the Construction Agreement between Darby Maritime Limited and the Debtor, dated on or about 29 March 2002 (as amended) ("**Construction Agreement**") (including any interest in it and its engines, machinery, boats, tackle, outfit, tools, pumps, gears, furnishings, appliances, fittings, spare and replacement parts, other belongings and appurtenances and any Equipment (as defined in Article 2 of the Construction Agreement)).

SIGNED as a deed by Michael Anthony
Erceg in the presence of:

_____
Signature

_____
Signature of witness

_____
Occupation

_____
City/town of residence

i705596 v2 AKL

SEP 16 04 03:55P    NOBLE HOUSE                    +64 9-9775752      P.3

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1261 (REV. 9-92) | BUILDER'S CERTIFICATION AND FIRST TRANSFER OF TITLE | OMB APPROVED 2115-0110 |

## I. PHASE OF CONSTRUCTION COVERED BY THIS CERTIFICATE

☒ ENTIRE CONSTRUCTION

☐ HULL ONLY

☐ COMPLETION ONLY (HULL BUILT BY ANOTHER)

YEAR PHASE OF CONSTRUCTION _____

YEAR COMPLETED  2004

## II. VESSEL DATA

A. HULL IDENTIFICATION NUMBER OR HULL NUMBER _____

D. PLACE OF BUILD (CITY, STATE, COUNTRY) _____
Auckland, New Zealand

B. VESSEL NAME (IF KNOWN)
NOBLE HOUSE

C. EQUIPPED WITH ENGINE?
☒ YES  ☐ NO    OUTBOARD  ☐ YES  ☒ NO

E. HULL MATERIAL:

☐ WOOD  ☒ STEEL  ☐ FIBROUS REINFORCED PLASTIC
☐ ALUMINUM  ☐ CONCRETE  ☐ OTHER

## III. DIMENSIONS
### (COMPLETE APPROPRIATE DIAGRAM)

☒ SHIP-SHAPE HULL

L= 174'    B= 32'2"    D=19'

☐ SAILBOAT

D1 only if actual hull depth (D) cannot be determined

L= _____  B= _____  D= _____  D1= _____

☐ CATAMARAN

L= _____  B= _____  B1= _____  D= _____

☐ TRIMARAN

L= _____  L1= _____  L2= _____
B= _____  B1= _____  B2 _____
D= _____  D1= _____

☐ BARGE-SHAPED HULLS

L= _____  B= _____  D= _____

☐ DECKHOUSES    Houseboats only
(AVERAGE DECKHOUSE DIMENSIONS MUST BE FURNISHED IN ADDITION TO HULL DIMENSIONS)

L= _____  B= _____  D= _____

## IV. UNITED STATES BUILD STATEMENT

☐ ALL MAJOR COMPONENTS USED IN THE PHASE OF CONSTRUCTION COVERED BY THIS CERTIFICATE WERE FABRICATED IN THE UNITED STATES.

☐ ALL CONSTRUCTION AND ALL ASSEMBLY FOR THIS PHASE OF CONSTRUCTION WERE DONE IN THE UNITED STATES.

REVERSE OF CG–1261 (REV. 9-92)

## V. NAME(S) AND ADDRESS(ES) OF PARTY(IES) FOR WHOM BUILT

DARBY MARITIME LTD.
Cayman Business Park, A7
P.O. Box 10300 APO
Grand Cayman, Cayman Islands

IF BUILT FOR MORE THAN ONE PERSON, THE PERSONS NAMES ABOVE ARE TENANTS IN COMMON, EACH OWNING AN EQUAL UNDIVIDED INTEREST, UNLESS OTHERWISE INDICATED HEREIN. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP   ☐ TENANCY BY THE ENTIRETIES   ☐ COMMUNITY PROPERTY

## VI. CERTIFICATION

I, _Ivan Erceg_ DO HEREBY CERTIFY THAT THE FACTS RECITED HEREIN ARE TRUE AND THAT I HAVE PERSONAL KNOWLEDGE OF THESE FACTS BECAUSE I:

OR

☐ PERSONALLY PERFORMED THE CONSTRUCTION

☒ SUPERVISED THE CONSTRUCTION AT AND ON BEHALF OF: SENSATION YACHTS LIMITED
(NAME OF COMPANY)

FIONA JANE MATHIESON
SOLICITOR/NOTARY PUBLIC
AUCKLAND

☒ ACTING IN MY CAPACITY AS _Managing Director_   SENSATION YACHTS LIMITED
(TITLE)   (NAME OF COMPANY)

NOTE: THIS CERTIFICATE MUST NOT BE COMPLETED BY AN IMPORTER OR AN IMPORTER'S AGENT.

SIGNATURE   DATE _16/9/04_

## VII. FIRST SALE OR TRANSFER OF VESSEL

100% OF THE VESSEL IDENTIFIED HEREIN IS SOLD (TRANSFERRED) BY THE PARTY(IES) NAMED IN SECTION V TO THE FOLLOWING PERSON(S) (NAMES AND ADDRESSES)

IF SOLD (TRANSFERRED) TO MORE THAN ONE PERSON, THE PURCHASER(S) (TRANSFEREE(S)) ARE TENANTS IN COMMON, EACH OWNING AN EQUAL UNDIVIDED INTEREST, UNLESS OTHERWISE INDICATED HEREIN. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP   ☐ TENANCY BY THE ENTIRETIES   ☐ COMMUNITY PROPERTY

☐ OTHER (DESCRIBE)

## VIII. SIGNATURE OF SELLER(S) (TRANSFEROR(S)) OR PERSONS SIGNING ON BEHALF OF SELLER(S) (TRANSFEROR(S)):

DATE SIGNED:

NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED (E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)

## X. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATHS.)

ON _____ THE PERSON(S) NAMED IN
(DATE)
SECTION IX ABOVE ACKNOWLEDGED EXECUTION OF THE
FOREGOING INSTRUMENT IN THEIR STATED CAPACITY(IES)
FOR THE PURPOSES THEREIN CONTAINED.

STATE:

COUNTY:

NOTARY PUBLIC
MY COMMISSION EXPIRES:

## PRIVACY ACT STATEMENT

IN ACCORDANCE WITH 5 USC 552(A), THE FOLLOWING INFORMATION IS PROVIDED TO YOU WHEN SUPPLYING PERSONAL INFORMATION TO THE U.S. COAST GUARD.

1. AUTHORITY. SOLICITATION OF THIS INFORMATION IS AUTHORIZED BY 46 USC, CHAPTER 313 AND 46 CFR, PART 67.

2. THE PRINCIPAL PURPOSES FOR WHICH THIS INSTRUMENT IS TO BE USED ARE:

(A) TO PROVIDE A RECORD, AVAILABLE FOR PUBLIC INSPECTION AND COPYING, OF THE SALE OR OTHER CHANGE IN OWNERSHIP OF A VESSEL WHICH IS DOCUMENTED, WILL BE DOCUMENTED, OR HAS BEEN DOCUMENTED PURSUANT TO 46 USC, CHAPTER 121.
(B) PLACEMENT OF THIS INSTRUMENT IN A BOOK FOR EXAMINATION BY GOVERNMENTAL AUTHORITIES AND MEMBERS OF THE GENERAL PUBLIC.

3. THE ROUTINE USE WHICH MAY BE MADE OF THIS INFORMATION INCLUDES DEVELOPMENT OF STATISTICAL DATA CONCERNING DOCUMENTED VESSELS.

4. DISCLOSURE OF THE INFORMATION REQUESTED ON THIS FORM IS VOLUNTARY. HOWEVER, FAILURE TO PROVIDE THE INFORMATION COULD PRECLUDE FILING OF A BILL OF SALE AND DOCUMENTATION OF THE VESSEL NAMED HEREIN PURSUANT TO 46 USC, CHAPTER 121. MOREOVER, BILLS OF SALE WHICH ARE NOT FILED ARE NOT DEEMED TO BE VALID AGAINST ANY PERSON EXCEPT THE GRANTOR OR A PERSON HAVING ACTUAL KNOWLEDGE OF THE SALE. (46 USC 31321(A)).

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN FOR THIS FORM IS 20 MINUTES. YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGESTIONS FOR REDUCING THE BURDEN TO: COMMANDANT (G-MVI), U.S. COAST GUARD, WASHINGTON, DC 20593-0001 OR OFFICE OF MANAGEMENT AND BUDGET, OFFICE OF INFORMATION AND REGULATORY AFFAIRS, ATTENTION DESK OFFICER FOR DOT/USCG, OLD EXECUTIVE OFFICE BUILDING, WASHINGTON, DC 20503.

| DEPARTMENT OF TRANSPORTATION U.S. COAST GUARD CG-1340 (REV. 9-92) | **BILL OF SALE** | |
|---|---|---|

**1. VESSEL NAME**

NOBLE HOUSE

**2. OFFICIAL NUMBER**

737283

**3. NAME(S) AND ADDRESS(ES) OF SELLER(S):**

SENSATION YACHTS LIMITED
11 Selwood Road
Henderson, Auckland
New Zealand

RECORDED:

BOOK:                    PAGE:

PORT (IF NOT FILING PORT)

DOCUMENTATION OFFICER

**3A. TOTAL INTEREST OWNED (IF LESS THAN 100%)** _____ %

**4. NAME(S) AND ADDRESS(ES) OF BUYER(S) AND INTEREST TRANSFERRED TO EACH:**

DARBY MARITIME LTD.
Cayman Business Park, A-7
P.O. Box 10300 APO
Grand Cayman, Cayman Islands

**4A. TOTAL INTEREST TRANSFERRED (100% UNLESS OTHERWISE SPECIFIED)** _____ %

**4B. MANNER OF OWNERSHIP.** UNLESS OTHERWISE STATED HEREIN, THIS BILL OF SALE CREATES A TENANCY IN COMMON, WITH EACH TENANT OWNING AN EQUAL UNDIVIDED INTEREST. CHECK ONLY ONE OF THE FOLLOWING BLOCKS TO SHOW ANOTHER FORM OF OWNERSHIP.

☐ JOINT TENANCY WITH RIGHT OF SURVIVORSHIP     ☐ TENANCY BY THE ENTIRETIES     ☐ COMMUNITY PROPERTY

☐ OTHER (DESCRIBE)

**5. CONSIDERATION RECEIVED:**

(ONE DOLLAR AND OTHER VALUABLE CONSIDERATION UNLESS OTHERWISE STATED)

**6.** I (WE) DO HEREBY SELL TO THE BUYER(S) NAMED ABOVE, THE RIGHT, TITLE AND INTEREST IDENTIFIED IN BLOCK 4 OF THIS BILL OF SALE, IN THE PROPORTION SPECIFIED HEREIN.

SELLER WARRANTS THAT BUYER SHALL RECEIVE FROM SELLER GOOD AND MARKETABLE TITLE TO THE VESSEL, FREE AND CLEAR OF ALL LIENS, MORTGAGES, AND OTHER ENCUMBRANCES OF ANY KIND AND NATURE. VESSEL IS SOLD TOGETHER WITH AN EQUAL INTEREST IN THE MASTS, BOWSPRIT, SAILS, BOATS, ANCHORS, CABLES, TACKLE, FURNITURE, AND ALL OTHER NECESSARIES THERETO APPERTAINING AND BELONGING.

**7. SIGNATURE(S) OF SELLER(S) OR PERSON(S) SIGNING ON BEHALF OF SELLER(S).**

**8. DATE SIGNED**

16/9/04

**9.** NAME(S) OF PERSON(S) SIGNING ABOVE, AND LEGAL CAPACITY IN WHICH SIGNED (E.G., OWNER, AGENT, TRUSTEE, EXECUTOR)

IVAN ERCEG     MANAGING DIRECTOR

**10. ACKNOWLEDGMENT (TO BE COMPLETED BY NOTARY PUBLIC OR OTHER OFFICIAL AUTHORIZED BY A LAW OF A STATE OR THE UNITED STATES TO TAKE OATHS.)**

ON 16/9/04     THE PERSON(S) NAMED IN SECTION 9     STATE: AUCKLAND
(DATE)

ABOVE ACKNOWLEDGED EXECUTION OF THE FOREGOING INSTRUMENT     COUNTY: NEW ZEALAND
IN THEIR STATED CAPACITY(IES) FOR THE PURPOSE THEREIN
CONTAINED.

NOTARY PUBLIC

MY COMMISSION EXPIRES DOES NOT EXPIRE

FIONA JANE MATHIESON
SOLICITOR/NOTARY PUBLIC
AUCKLAND

E⁻ SE OF CG-1340 (REV. 9-92)

**(COMPLETE THIS SECTION ONLY IF VESSEL HAS NEVER BEEN DOCUMENTED AND DOES NOT HAVE A HULL IDENTIFICATION NUMBER.)**

VESSEL DATA

A. BUILDER  _Sensation Yachts Ltd_

B. BUILDER'S HULL NUMBER  _SY18_

C. FORMER NAME(S)

D. FORMER MOTORBOAT NUMBERS

E. FORMER ALIEN REGISTRATIONS

F. DIMENSIONS: L= _174'_      B= _32' 2"_      D= _19'_

G. PERSON FROM WHOM SELLER OBTAINED VESSEL

SIGNATURE OF SELLER

---

WARRANTIES/APPURTENANCES/LIMITATIONS/EXCEPTIONS

_As per construction Contract and ammendments_

---

INSTRUCTIONS

1. INDICATE CURRENT DOCUMENTED NAME. (IF VESSEL HAS NEVER BEEN DOCUMENTED SELLER MUST COMPLETE AND SIGN DATA SECTION ABOVE.)
2. INDICATE OFFICIAL NUMBER AWARDED TO VESSEL OR HULL IDENTIFICATION NUMBER ASSIGNED BY MANUFACTURER. (IF THE VESSEL HAS NO HULL IDENTIFICATION NUMBER AND HAS NEVER BEEN DOCUMENTED, SELLER MUST COMPLETE AND SIGN THE VESSEL DATA SECTION ABOVE.)
3. INSERT NAMES AND ADDRESSES OF ALL PERSONS SELLING VESSEL, ALONG WITH TOTAL INTEREST OWNED BY THOSE PERSON.S IF MORE ROOM IS NEEDED, AN ATTACHMENT MAY BE MADE SHOWING THE ADDRESSES OF THE SELLERS.
3A. SELF-EXPLANATORY.
4. INSERT NAMES AND ADDRESSES OF ALL BUYERS, ALONG WITH THE INTEREST TRANSFERRED TO EACH. IF THERE IS MORE THAN ONE BUYER AND NO DIVISION OF INTEREST IS SHOWN, THIS BILL OF SALE WILL RESULT IN EACH BUYER HOLDING AN EQUAL INTEREST. (IF MORE ROOM IS NEEDED, AN ATTACHMENT MAY BE MADE SHOWING THE ADDRESSES OF THE BUYERS.)
4A. SELF-EXPLANATORY.
4B. CHECK ONE OF THE BLOCKS TO CREATE A FORM OF OWNERSHIP OTHER THAN A TENANCY IN COMMON. IF "OTHER" IS CHECKED, THE FORM OF OWNERSHIP MUST BE DESCRIBED.
5. OPTIONAL. IF THE AMOUNT PAID FOR THE VESSEL IS INSERTED, IT WILL BE NOTED ON THE VESSEL'S GENERAL INDEX.
6. SELF-EXPLANATORY. USE "REMARKS" SECTION ABOVE IF VESSEL IS NOT SOLD FREE AND CLEAR, OR TO LIST VESSEL APPURTENANCES WHICH ARE NOT SOLD WITH THE VESSEL.
7. SELF-EXPLANATORY.
8. SHOW THE DATE ON WHICH THE INSTRUMENT IS SIGNED.
9. IN ADDITION TO THE PRINTED OR TYPED NAME OF THE SIGNER, SHOW WHETHER THAT PERSON WAS ACTING AS AN OWNER, AS AN AGENT FOR AN OWNER, AS TRUSTEE, AS THE PERSONAL REPRESENTATIVE OR EXECUTOR OF AN ESTATE, OR OTHER CAPACITY WHICH ENTITLED THAT PERSON TO SIGN THE BILL OF SALE.
10. ANY ACKNOWLEDGMENT IN SUBSTANTIAL COMPLIANCE WITH THE LAW OF THE STATE WHERE TAKEN MAY BE ATTACHED TO THIS INSTRUMENT IN LIEU OF THE PREPRINTED ACKNOWLEDGMENT.

---

PRIVACY ACT STATEMENT

IN ACCORDANCE WITH 5 USC 552(A), THE FOLLOWING INFORMATION IS PROVIDED TO YOU WHEN SUPPLYING PERSONAL INFORMATION TO THE U.S. COAST GUARD.

1. AUTHORITY. SOLICITATION OF THIS INFORMATION IS AUTHORIZED BY 46 USC, CHAPTER 313 AND 46 CFR, PART 67.

2. THE PRINCIPAL PURPOSES FOR WHICH THIS INSTRUMENT IS TO BE USED ARE:

    (A) TO PROVIDE A RECORD, AVAILABLE FOR PUBLIC INSPECTION AND COPYING, OF THE SALE OR OTHER CHANGE IN OWNERSHIP OF A VESSEL WHICH IS DOCUMENTED, WILL BE DOCUMENTED, OR HAS BEEN DOCUMENTED PURSUANT TO 46 USC, CHAPTER 121.
    (B) PLACEMENT OF THIS INSTRUMENT IN A BOOK FOR EXAMINATION BY GOVERNMENTAL AUTHORITIES AND MEMBERS OF THE GENERAL PUBLIC.

3. THE ROUTINE USE WHICH MAY BE MADE OF THIS INFORMATION INCLUDES DEVELOPMENT OF STATISTICAL DATA CONCERNING DOCUMENTED VESSELS.

4. DISCLOSURE OF THE INFORMATION REQUESTED ON THIS FORM IS VOLUNTARY. HOWEVER, FAILURE TO PROVIDE THE INFORMATION COULD PRECLUDE FILING OF A BILL OF SALE AND DOCUMENTATION OF THE VESSEL NAMED HEREIN PURSUANT TO 46 USC, CHAPTER 121. MOREOVER, BILLS OF SALE WHICH ARE NOT FILED ARE NOT DEEMED TO BE VALID AGAINST ANY PERSON EXCEPT THE GRANTOR OR A PERSON HAVING ACTUAL KNOWLEDGE OF THE SALE. (46 USC 31321(A)).

---

THE COAST GUARD ESTIMATES THAT THE AVERAGE BURDEN ~~~~~~~ IS 20 MINUTES. YOU MAY SUBMIT ANY COMMENTS CONCERNING THE ACCURACY OF THIS BURDEN ESTIMATE OR MAKE SUGGE~~~~~~~~~ THE BURDEN TO: COMMANDANT (G-MVI), U.S. COAST GUARD, WASHINGTON, DC 20593-0001 OR OFFICE OF MANAGEMENT AND BUDG~~~~~~~~~~~AND REGULATORY AFFAIRS, ATTENTION: DESK OFFICER FOR DOT/USCG.

FIONA JANE MATHIESON
SOLICITOR/NOTARY PUBLIC
AUCKLAND

SENSATION YACHTS LIMITED

Builder

DARBY MARITIME LIMITED

Purchaser

RUSSELL MCVEAGH

Escrow Agent

---

ESCROW AGREEMENT

US$1,740,649

---

RUSSELL MCVEAGH

AGREEMENT dated   *16 September*    2004

## PARTIES

**SENSATION YACHTS LIMITED ("Builder")**

**DARBY MARITIME LIMITED ("Purchaser")**

**RUSSELL MCVEAGH ("Escrow Agent")**

## INTRODUCTION

A.    The Builder and the Purchaser have entered into an amendment agreement ("**Amendment Agreement**") on or about the date of this agreement, amending the Vessel Construction Agreement between the Builder and the Purchaser dated on or about 29 March 2002.

B.    The Amendment Agreement provides, *inter alia*, for the payment of the Escrow Funds by the Purchaser into an escrow account to be maintained by the Escrow Agent.

C.    The Escrow Agent shall hold and disburse the Escrow Funds in accordance with the terms and conditions set out in this agreement.

## AGREEMENT

**1.**    **DEFINITIONS**

1.1    Unless otherwise defined in this agreement, words and phrases defined in the Amendment Agreement shall have the same meaning in this agreement.

1.2    In this agreement "**tax**" includes any present or future tax, levy, impost, duty, rate, charge, fee, deduction or withholding of any nature and whatever called, imposed or levied by any governmental authority, together with any interest, penalty, charge, fee or other amount imposed or made on or in respect of any of the foregoing, and "**taxes**" are to be construed accordingly.

**2.**    **DEPOSIT OF ESCROW FUNDS**

2.1    **Deposit**:  The Purchaser shall, within five Business Days following execution of the Amendment Agreement deposit the Escrow Funds with the Escrow Agent.

2.2    **Retention of Escrow Funds**:  Upon receipt of the Escrow Funds by the Escrow Agent, the Escrow Agent shall hold the Escrow Funds on trust for the Purchaser in an interest bearing account on immediate call with Westpac Banking Corporation in the name of the Purchaser, to be disbursed pursuant to the terms of this agreement. The Escrow Agent shall not be liable to either the Purchaser or the Builder for any loss of or diminution in any investment so made.

2.3    **Interest**:  Interest earned on the Escrow Funds while in the Escrow Account shall be paid (less any withholding taxes which are required by law to be deducted) to the Purchaser by the Escrow Agent at the same time as the Escrow Funds are released.

2.4    **Payment**: The Escrow Funds shall be released on receipt by the Escrow Agent of, and in accordance with the directions contained in, an irrevocable payment instruction,

generally in the form set out in the schedule to this agreement, signed by both the Purchaser and the Builder. The Purchaser and the Builder shall give directions to the Escrow Agent in accordance with the Amendment Agreement.

2.5     **Backstop rule:** If no such notice is given, the Escrow Agent shall retain the Escrow Funds in its possession until directed by a final, non-appealable order of a court or arbitral body, whereupon the Escrow Agent may make such disposition in accordance with such joint instructions, court order or arbitration order.

3.      **DUTIES OF THE ESCROW AGENT**

3.1     **Authorisation:** The Escrow Agent is hereby authorised and directed to hold the Escrow Funds in trust for the Purchaser in accordance with this agreement.

3.2     **Liability of Escrow Agent:** Except for its own negligence or wilful misconduct, the Escrow Agent shall not be liable in any circumstance whatsoever in relation to the matters contained in this agreement.

3.3     **Reliance by Escrow Agent:** The Escrow Agent shall be entitled to rely upon the notice given under clause 2.4 without being required to determine the authenticity or the correctness of any fact stated therein or the propriety, validity or execution of or the service thereof. The Escrow Agent may rely, and shall be protected in acting or refraining from acting, upon any such notice, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein.

3.4     **Authority irrevocable:** This agreement, and the authority of the Escrow Agent, shall be irrevocable and shall not be subject to termination or modification by the Purchaser or the Builder except where all of the parties consent to the termination or modification.

3.5     **Warranty:** Each of the Purchaser and the Builder represents and warrants that this agreement has been duly and validly authorised, executed and delivered by such party and constitutes a valid and binding obligation of such party, enforceable against such party in accordance with its terms.

3.6     **Conflict:** If at any time the Escrow Agent receives conflicting notices, claims, demands or instructions with respect to the Escrow Funds, the Escrow Agent shall rely on the notice given under clause 2.4 and shall make payment in accordance with such notice.

3.7     **Resignation:** The Escrow Agent may resign at any time by giving the Purchaser and the Builder 10 Business Days' prior written notice to that effect, provided that a successor escrow agent shall first have been appointed, shall have signed an agreement in the same or similar terms to this agreement, and shall have received payment of the Escrow Funds in cleared and immediately available funds from the Escrow Agent. In such event, the successor escrow agent shall be such person, firm or corporation as is mutually selected by the Purchaser and the Builder who shall sign an agreement in the same or similar terms to this agreement. In the event that the parties are unable to agree on a successor escrow agent in terms of this clause, the successor escrow agent shall be such person nominated by the president for the time being of the Auckland District Law Society.

4.      **INDEMNITY**

4.1     The Purchaser and the Builder, jointly and severally, agree to pay on demand, as well as to indemnify, defend and hold the Escrow Agent harmless from and against, all costs, damages, assignments, solicitors' fees, expenses, obligations, liabilities and claims of

any kind which the Escrow Agent may sustain, incur or pay in connection with or arising out of this agreement, including, without limitation, any fees and expenses which it may incur or sustain in any legal action arising from this agreement or involving the subject matter hereof, whether or not commenced by the Escrow Agent provided, however, that the foregoing indemnification shall not apply to the Escrow Agent in the event of its negligence or wilful misconduct in connection with the performance of its services hereunder.

## 5.      ACKNOWLEDGMENT

5.1      The Escrow Agent shall within two Business Days following receipt of the Escrow Funds in accordance with clause 2.1 of this agreement, acknowledge in writing to each of the Purchaser and the Builder that it holds the Escrow Funds on the terms set out in  this agreement.

## 6.      COSTS

6.1      All costs, losses and other liabilities (including legal expenses on a full indemnity basis and goods and services and similar taxes thereon) incurred or sustained in connection with:

(a)      the negotiation, preparation, signing, administration and release of this agreement; and

(b)      the granting of any waiver or consent under, or the giving of any variation or release of, this agreement,

shall be shared equally by the Purchaser and the Builder.

## 7.      NO ASSIGNMENT

7.1      This agreement shall not be assignable by any party without the prior written consent of the other parties.

## 8.      AMENDMENTS

8.1      All amendments or variations to this agreement must be in writing and must be signed by all of the parties to this agreement.

## 9.      TERMINATION OF OBLIGATIONS

9.1      Upon payment of the Escrow Funds and interest on the Escrow Funds under and in accordance with this agreement, this agreement shall be deemed to be terminated and the Escrow Agent shall be released and discharged from all further obligations hereunder.

## 10.      GOVERNING LAW

10.1      This agreement shall be governed by and construed in accordance with the laws of New Zealand and the parties irrevocably agree to submit to the non-exclusive

jurisdiction of the Courts of New Zealand in relation to any question or issue relating to the interpretation or application of this agreement.

**11.      COUNTERPARTS**

11.1    This agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Executed counterparts transmitted by facsimile shall be effective as originals.

**12.      BUILDER'S ACKNOWLEDGMENT**

12.1    The Builder acknowledges that the Escrow Agent is the firm of solicitors which acts for the Purchaser and the Builder agrees that the Escrow Agent may continue to act as solicitors for the Purchaser notwithstanding the appointment of the Escrow Agent to hold the Escrow Funds and perform its other obligations under this agreement.

**SIGNATURES**

SENSATION YACHTS LIMITED by:

and witnessed by:



Signature of witness

Occupation

City/town of residence

Signature of director

IVAN ERCEG
Name of director

DARBY MARITIME LIMITED by:

and witnessed by:

Signature of witness

Occupation

DALLAS, TEXAS
City/town of residence

Signature of director

GREG BRADY
Name of director

**RUSSELL MCVEAGH** by:

_____
Signature of authorised signatory

_____
*GERARD M BROWN*
Name of authorised signatory

# SCHEDULE

**Date:** [ ]

**To:** Russell McVeagh
Vero Centre
48 Shortland Street
**AUCKLAND**

**Attention:** Gerard Brown

## ESCROW FUNDS - PAYMENT DIRECTION

1. Terms defined in the escrow agreement dated [ ] ("**Escrow Agreement**") between Darby Maritime Limited, Sensation Yachts Limited and Russell McVeagh shall have the same meaning in this notice.

2. The Builder and the Purchaser hereby irrevocably instruct you pursuant to the provisions of clause 2.4 of the Escrow Agreement that the specified amount of the Escrow Funds is to be released to the Builder[, and the balance of the Escrow Funds is to be released to the Purchaser], in accordance with the details attached.

3. The Builder and the Purchaser further hereby irrevocably instruct you pursuant to the provisions of clause 2.3 of the Escrow Agreement that the interest on the Escrow Funds so released is to be released to the Purchaser in accordance with the details attached.


**DARBY MARITIME LIMITED by:**

_____
Signature of authorised signatory

_____
Name of authorised signatory


**SENSATION YACHTS LIMITED by:**

_____
Signature of authorised signatory

_____
Name of authorised signatory


**[attach specified amount of Escrow Funds and relevant account information]**

## RELEASE DEED POLL

**DEED POLL** dated ~~17~~ ~~August~~ September 2004 given by Michael Anthony Erceg (**"Secured Party"**) in favour, and for the benefit, of Sensation Yachts Limited (**"Debtor"**) and Darby Maritime Limited.

## INTRODUCTION

1.     The Debtor has:

   (a)     granted a security interest in all of the Debtor's present and after-acquired personal property, including the Vessel as described under the heading "Released Property" below (**"Personal Property"**); and

   (b)     charged all of the Debtor's present and future interests in, and all of the Debtor's present and future rights in relation to, any land and any other property, other than any personal property to which the Personal Property Securities Act 1999 applies, (**"Other Property"**),

   to the Secured Party, which is detailed in the security agreement between the Secured Party and the Debtor dated on or about 18 October 1999 (**"Agreement"**).

2.     A financing statement (numbered FV92T5RWPU84576H) has been registered by the Secured Party in the Personal Property Securities Register in respect of the Personal Property.

## OPERATIVE PROVISIONS

A.     The Secured Party releases and discharges the property detailed under the heading "Released Property" below (**"Released Property"**) from all security interests granted to the Secured Party under the Agreement or otherwise from the date of this deed poll but without prejudice to any remaining rights, powers and remedies of the Secured Party in the Agreement and in respect of any other property remaining subject to any security interest and without releasing or discharging the Debtor or any other person or any body corporate or any other security or securities for the time being held by the Secured Party for the payment of any monies owing to the Secured Party under the Agreement, any collateral instrument or otherwise.

B.     The Secured Party will forthwith (and in any event not later than one week following the date of this deed poll) register a financing change statement amending financing statement number FV92T5RWPU84576H so that the collateral description in that financing statement clearly no longer includes the Released Property.

### Released Property

The Vessel, being the 174 foot Sensation Motor Yacht having builder's number SY18, as described in the Construction Agreement between Darby Maritime Limited and the Debtor, dated on or about 29 March 2002 (as amended) (**"Construction Agreement"**) (including any interest in it and its engines, machinery, boats, tackle, outfit, tools, pumps, gears, furnishings, appliances, fittings, spare and replacement parts, other belongings and appurtenances and any Equipment (as defined in Article 2 of the Construction Agreement)).

Erceg ~~in the presence of~~ by his attorney

Darryl Edward Gregory in the presence of:

_____
**Signature**

_____
**Signature of witness**

Solicitor
_____
**Occupation**

C- Jackson Russell, Solicitor PO Box 345)
_____
**City/town of residence** Auckland

## CERTIFICATE OF NON-REVOCATION
## OF POWER OF ATTORNEY

**I, DARRYL EDWARD GREGORY** of Auckland, Solicitor, **HEREBY CERTIFY:**

1.      That by Deed dated 31 August 1999 **MICHAEL ANTHONY ERCEG** of Auckland, Company Director appointed me his attorney on the terms and subject to the conditions set out in the said Deed.

2.      That at the date hereof I have not received any notice or information of the revocation of that appointment by the death of the said **MICHAEL ANTHONY ERCEG** or otherwise.

SIGNED at Auckland this      17th  day of      September      2004



........................................................................

X0408002_DEG.r1:lc

-0  190804

(... details prepared purchases)

| WBS | Item | Supplier | Contracted to | Order Date Number | Contract | Revised Delivery Date | SVL Cost US$ (E 1.15) (NZ$ 1.59) |
|---|---|---|---|---|---|---|---|
| | Design Assistance to Danby | Francoise Zureti | | | | Zureti Subtotal | $47,200.00 |
| | Overall Costs | | | | | | |
| | Carpet | Interiors by Sensation | Safari | 10251 | | | $15,294.00 |
| | Carpet | Interiors by Sensation | Source Mondial | 10248 | | | $37,590.00 |
| | Wall fabric | Interiors by Sensation | Icon Textiles | 10246 | | | $13,534.00 |
| | Helm for helm seats | Interiors by Sensation | Tasman Tanning | 10249 | | | $770.00 |
| | Helm Seats | Interiors by Sensation | Offshore Marine | 10250 | | | $540.00 |
| | Steamer Chairs | Interiors by Sensation | Teak Traders | 10230 | | | $3,190.00 |
| | Wall fabric (guest 5) | Interiors by Sensation | Viking Fabrics | 10221 | | | $1,696.00 |
| | Wall fabric (Guest 1) | Interiors by Sensation | Aniket Textiles | 10222 | | | $1,721.00 |
| | Shrima Accessories | Interiors by Sensation | Patterson Trading | 10324 | | | $2,214.00 |
| | Shrima shower accessories | Interiors by Sensation | Macce | 10306 | | | $1,209.00 |
| | Leather sofa & 4 chair | Interiors by Sensation | Casa Sport | 10404 | | | $12,189.00 |
| | Neptune bath spool | Interiors by Sensation | THS | 10405 | | | $1,590.00 |
| | Leather | Interiors by Sensation | Tasman Tanning | 10407 | | | $6,663.00 |
| | Bathroom Hardware | Interiors by Sensation | Jado | 10408 | | | $17,221.00 |
| | Flooring for Gym | Interiors by Sensation | Bosco | 10485 | | | $1,800.00 |
| | Guest bathroom hardware | Interiors by Sensation | Macce | 10410 | | | $29,255.00 |
| | Ceiling fabric | Interiors by Sensation | Mailler | 10334 | | | $51,615.00 |
| | Leather fabric (Cherry) | Interiors by Sensation | Unique | 10403 | | | $226.00 |
| | Angela-side-or-Gym | Interiors by Sensation | Sealuxe | 10402 | | | $4,000.00 |
| | Bathware | Interiors by Sensation | Jado | 10502 | | | $1,360.50 |
| | Furniture | Interiors by Sensation | | | | | |
| | Guest 4 Headboard | Interiors by Sensation | Decorte | | | | |
| | Guest 3 Headboard | Interiors by Sensation | Rubelli | | | | |
| | Guest 2 Headboard | Interiors by Sensation | J Roberts | | | | |
| | Guest 1 Headboard | Interiors by Sensation | Jim Thomson | | | | |
| | Wall Upholstery | Interiors by Sensation | | | | | |
| | Carpet, Engineers Flooring | Interiors by Sensation | Armtec | | | | |
| | Bathware | Interiors by Sensation | | | | | $3,199.00 |
| | Fire Retardant | Interiors by Sensation | | | | | |
| 411M | Sideboard desk with hanger door 1.1.1 | LIST | | | | | $4,855.63 |
| 411M | Night table 1.1.2 | LIST | | | | | $3,677.30 |
| 411M | Writing desk with drawers 1.2.1 | LIST | | | | | $3,719.48 |
| 411M | Sideboard with drawers 1.2.2 | LIST | | | | | $4,199.05 |
| 411M | Night table 1.2.2 | LIST | | | | | $3,190.37 |
| 411M | Writing desk with drawers 1.3.1 | LIST | | | | | $3,719.48 |
| 411M | Cabinet between beds with hinged doors 1.3.2 | LIST | | | | | $3,771.60 |
| 411M | Writing desk with drawers 1.4.1 | LIST | | | | | $5,951.17 |
| 411M | Night table 1.4.2 | LIST | | | | | $4,043.76 |

| Code | Description | Vendor | Price |
|---|---|---|---|
| 411M | Writing desk with drawers 1.5.1 | List | $5,961.17 |
| 411M | Night table 1.5.2 | List | $5,190.37 |
| 411M | Night table 2.1.2a | List | $8,612.41 |
| 411M | Table/Desk table 2.1.3 | List | $6,094.78 |
| 411M | Cabinet with drawers 2.1.6 | List | $11,490.05 |
| 411M | Sideboard for entertainment 3.1.6 | List | $11,331.89 |
| | Additional List charges, Lower deck general engineering | List | $2,300.00 |
| | Additional List charges | List | $2,300.00 |
| | Additional List charges, Nightstands engineering | List | $3,690.00 |
| | Additional List charges, Main deck Masonry changes | List | $2,242.50 |
| | Additional List Charges, Knobs and Handles change | List | $596.00 |
| | Additional List charges, Design and programming changes | List | $18,065.00 |
| | Vanity and mirror frame 113 | Modal Cantu | $9,422.30 |
| | Vanity and mirror frame 116 | Modal Cantu | $9,422.30 |
| | Vanity top 116 | Modal Cantu | $3,422.30 |
| | Vanity and mirror frame 118 | Modal Cantu | $9,422.30 |
| | Vanity and mirror frame 121 | Modal Cantu | $9,422.30 |
| | Vanity and mirror frame 123 | Modal Cantu | $9,422.30 |
| | Marble executive drawings | Modal Cantu | $11,900.00 |
| | Marble Shower tray 116 | Paolo | $802.20 |
| | Marble Floor 116 | Paolo | $2,655.54 |
| | Marble Top 116 | Paolo | $1,614.24 |
| | Marble Floor 118 | Paolo | $6,290.58 |
| | Marble Bath Surround 118 | Paolo | $837.00 |
| | Marble Floor 116 | Paolo | $1,868.60 |
| | Marble Vanity Top 116 | Paolo | $1,292.10 |
| | Marble Wall to rail 116 | Paolo | $6,266.98 |
| | Marble Floor 121 | Paolo | $1,621.68 |
| | Marble Bath Surround 121 | Paolo | $2,745.54 |
| | Marble Top 121 | Paolo | $1,464.38 |
| | Marble Wall to rail 121 | Paolo | $6,330.12 |
| | Marble Floor 123 | Paolo | $1,021.68 |
| | Marble Bath Surround 123 | Paolo | $2,745.54 |
| | Marble Floor 125 | Paolo | $6,530.12 |
| | Marble Wall to rail 125 | Paolo | $1,032.56 |
| | Marble Bath Surround 113 | Paolo | $1,932.56 |
| | Marble Floor 113 | Paolo | $1,955.96 |
| | Marble Vanity top 113 | Paolo | $1,974.14 |
| | Marble Wall to rail 113 | Paolo | $5,526.30 |
| | Marble Floor in front Dining 119 | Paolo | $5,648.86 |
| | Marble Floor Foyer 119 | Paolo | $13,758.90 |
| | Marble Floor Fwd Corridor 119 | Paolo | $6,321.28 |
| | Marble Sideboard Top 119 | Paolo | $377.80 |
| | Marble Sideboard Top Dining | Paolo | $300.40 |
| | Marble Bar Tops Main Salon | Paolo | $1,734.60 |

| | | | | | Running Balance US$ |
|---|---|---|---|---|---|
| Marble Bar Floor Main Salon | Paoli | | | | $1,000.14 |
| Marble Subboard Top Study | Paoli | | | | $306.90 |
| Marble Shower Tray 2~ | Paoli | | | | $1,434.88 |
| Marble Shower Walls 2~ | Paoli | | | | $5,197.90 |
| Marble Shower Walls 2~ | Paoli | | | | $4,191.94 |
| Marble Frame 2~ | Paoli | | | | $1,668.52 |
| Marble Frame 2~ | Paoli | | | | $152.90 |
| Marble Floor 2~ | Paoli | | | | $4,494.00 |
| Marble Vanity Tops 2~ | Paoli | | | | $5,121.20 |
| Marble Walls 2~ | Paoli | | | | $2,905.50 |
| Marble Walls 2~ | Paoli | | | | $1,424.88 |
| Marble Floor Toilet 2~ | Paoli | | | | $3,522.88 |
| Marble Walls Toilet 2~ | Paoli | | | | $822.20 |
| Marble Vanity Top PR 2~ | Paoli | | | | $1,883.30 |
| Marble Floor PR 2~ | Paoli | | | | $3,139.80 |
| Marble Walls to Rail PR 2~ | Paoli | | | | $1,905.40 |
| Marble Vanity Top UPR 3~ | Paoli | | | | $1,985.94 |
| Marble Floor UPR 3~ | Paoli | | | | $1,366.50 |
| Marble Walls to Rail UPR 3~ | Paoli | | | | $143.40 |
| Marble Bar Top BD 3~ | Paoli | | | | $1,541.08 |
| Marble Bar Floor BD ??? | Paoli | | | | $561.08 |
| Additional half cabinet top | Paoli | | | | $663.76 |
| Additional Nightstand tops x 2 | Paoli | | | | $8,879.40 |
| Additional Galley upper and lower | Paoli | | | | $9,903.04 |
| Additional Galley Pantry | Paoli | | | | $0.00 |
| Additional BD pantry | Paoli | | | | $1,028.96 |
| Additional Captain's vanity | Paoli | | | | $132.18 |
| Additional Captain's ensuite floor | Paoli | | | | $11,425.88 |
| Additional Fireplace, type BBQ counter | Paoli | | | | $719.80 |
| Additional Gym vanity | Paoli | | | | $3,500.00 |
| Additional Bay deck bar surrounds | Paoli | | | | $201,208.00 |
| | | | | | |
| List excess charge | | | | | |
| | | | | | |
| Freight (US$) | | | | | $15,120.00 |
| Freight (Marble order #1) | | | | | $27,080.00 |
| Freight (Carugati) | | | | | $7,680.00 |
| Freight | | | | | |

Running Balance US$

Less PC Sum
allowance ($455,000.00)

Total ~~$849,560.06~~

$847,150.06

$392,150.06



# EXHIBIT C

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-20658-CIV-JORDAN/BROWN

DARBY MARITIME LIMITED, and
GREGORY A. BRADY

       Plaintiffs,

vs.

HOLLAND & KNIGHT, LLP,
MICHAEL T. MOORE, DANIELLE
GRUCCI BUTLER, KOCH,
NEWTON & PARTNERS, L.C., and
JOHN ROBERT NEWTON III, a/k/a
ROB NEWTON,

       Defendants.

_____/

## ORDER STAYING ALL PROCEEDINGS AND
## DIRECTING THE PARTIES TO FILE APRIL 1, 2005 STATUS REPORT

**THIS CAUSE** is before the Court on the January 30, 2005 Joint Motion of Plaintiffs

Darby Maritime and Gregory A. Brady, Defendants Holland & Knight LLP, Michael T.

Moore and Danielle J. Butler, and Koch, Newton & Partners, L.C. and John Robert Newton,

III to Stay Proceedings for Sixty Days, With Supporting Memorandum.  The Court has

considered the motion and the entire record.  Consequently, it is hereby

**Page 1 of  3**

Case No. 04-20658-Civ-Jordan/Brown

**ORDERED** that the motion is **granted** and this case is stayed for sixty days and/or

pending further Order of the Court.

**IT IS FURTHER ORDERED** that the parties are instructed to file a status report on

or before April 1, 2005 to apprise the Court of the status of this case and the scheduled

mediation proceedings, or any other activity that could or should cause the stay to be lifted.

**DONE AND ORDERED** in Chambers, at Miami, Miami-Dade County, Florida on

this _____ day of _____, 2005.

_____

**ADALBERTO JORDAN**
**UNITED STATES DISTRICT COURT JUDGE**

Copies furnished to
all counsel on the
attached Service List.

**Page 2 of 3**

## SERVICE LIST
### Darby Maritime, etc., et al.
### vs. Holland & Knight, etc., et al.
### Case No. 04-20658-Civ-Jordan/Brown

George A. LaMarca, Esq.
LAMARCA & LANDRY, P.C.
1820 119th Street, Suite 200
Des Moines, Iowa 50325
Telephone:   (515) 225-2600
Facsimile:   (515) 225-8581
**Attorneys for Plaintiffs Darby**
**Maritime Limited and Gregory A.**
**Brady**

Richard H. Critchlow, Esq.
Brian F. Spector, Esq.
Pamela I. Perry, Esq.
KENNY NACHWALTER, P.A.
201 South Biscayne Boulevard
1100 Miami Center
Miami, Florida  33131-4327
Telephone:   (305) 373-1000
Facsimile:   (305) 372-1861
**Attorneys for Defendants Holland &**
**Knight LLP, Michael T. Moore and**
**Danielle J. Butler**

Gregory G. Olsen, Esq.
MORGAN, OLSEN & OLSEN, LLP
315 Northeast 3rd Avenue, Suite 200
Fort Lauderdale, Florida 33301-1149
Telephone:   (954) 524-3111
Facsimile:   (954) 463-3570
**Attorneys for Defendants Koch,**
**Newton & Partners, L.C. and**
**John Robert Newton III**

**Page 3 of  3**