# EXHIBIT 1

**33**

1 with the court.
2    Q   You did not?
3    A   Did not? Okay. And then a lawsuit
4 against the company by a former VP of sales, Rayben
5 Lancaster.
6    Q   Was your deposition ever taken in
7 connection with the class action filed against you
8 in the company?
9    A   That's what I said. I'm not sure that
10 actually occurred. There were meetings. I'm not
11 sure if there was any formal deposition. I'm not --
12 I'm not sure.
13   Q   If your depositions were taken in the
14 class action what counsel would have copies of
15 those?
16   A   If I knew there was a deposition, I would
17 remember who the attorneys were. Which class action
18 are you talking about?
19   Q   The class action dealing with the revenue
20 recognition problems that were raised by the SEC
21 that resulted in a class action.
22   A   I don't believe the SEC raised the issue
23 before the class action occurred actually.
24   Q   Okay. Than the class action that was
25 filed relative to the restatement of the financials

**34**

1 that resulted in the class action.
2    A   I believe I haven't done a deposition on
3 that yet. If I did, it would have been Ed Koppman.
4    Q   Ed Kaplan?
5    A   Koppman Eak & Gumman.
6    Q   In Dallas?
7    A   Yes.
8    Q   How do you spell his last name?
9    A   K-O-P-P-M-A-N.
10   Q   Is that class action still pending?
11   A   No. There is a civil suit but not the
12 class action.
13   Q   What's the civil suit?
14   A   By the SEC.
15   Q   Is the SEC action still pending as far as
16 you know?
17   A   Yes.
18   Q   Have you provided any interviews or
19 statements to the SEC in connection with their
20 investigation of i2?
21   A   No.
22   Q   Have you been deposed in connection with
23 the formal investigation by the SEC?
24   A   No.
25   Q   When was Darby formed?

**35**

1    A   Don't remember exactly. I would guess
2 maybe five, six years ago.
3    Q   Who were the principals of Darby when it
4 was formed?
5        MR. KELLOGG: Objection, instruct you not
6    to answer.
7        MR. CRITCHLOW: Why?
8        MR. KELLOGG: It's not reasonably
9    calculated to lead to the discovery of
10   admissible evidence in this case as to who owns
11   Darby.
12       MR. CRITCHLOW: Sure it is.
13       MR. KELLOGG: And when it was formed.
14       MR. CRITCHLOW: Sure it is.
15       MR. KELLOGG: We'll see.
16 BY MR. CRITCHLOW:
17   Q   Who owned Darby in 2001?
18       MR. KELLOGG: Same objection, same
19   instruction.
20 BY MR. CRITCHLOW:
21   Q   Who were the officers and direct -- Strike
22 that. What is the nature of the legal existence
23 corporation, partnership, LLC?
24       MR. KELLOGG: You can answer.
25       THE WITNESS: Darby is owned by a company

**36**

1 called --
2        MR. KELLOGG: No, no. He is asking you
3    what's the nature of the company. Is it a
4    corporation, partnership, LLC?
5        THE WITNESS: Actually, I don't really
6    know. I don't remember how it's --
7 BY MR. CRITCHLOW:
8    Q   The complaint says Darby Maritime,
9 Limited. Is that your recollection or understanding
10 of what Darby is, a limited?
11   A   I wasn't really involved in forming the
12 corporation or I don't know if it's a corporation
13 actually.
14   Q   Do you have --
15       MR. KELLOGG: So the answer is I don't
16   know.
17       THE WITNESS: I don't know.
18 BY MR. CRITCHLOW:
19   Q   Do you have a position -- Did you have a
20 position with Darby when it was created five or six
21 years ago?
22       MR. KELLOGG: Same objection, same
23   instruction.
24       MR. CRITCHLOW: What?
25       MR. KELLOGG: Does he have a position with

Page 37

1  it?
2      MR. CRITCHLOW: Yes.
3      MR. KELLOGG: You can answer the question.
4      THE WITNESS: I'm a sole director.
5  BY MR. CRITCHLOW:
6   Q   What do you mean by sole director?
7   A   I'm the sole director of the company.
8   Q   Is director synonymous with officer?
9   A   Don't know.
10  Q   Were there officers of the company?
11  A   Excuse me?
12  Q   Were there officers of the company in addition to directors?
14     MR. KELLOGG: Now?
15 BY MR. CRITCHLOW:
16  Q   Five or six years ago.
17  A   Don't recall.
18  Q   Are you still affiliated with Darby today?
19  A   Yes. I'm the sole director.
20  Q   Has your position as a sole director changed at any point as far as you can recall from its creation through today?
23  A   Not that I can recall.
24  Q   Is there anybody to whom you would report at Darby during its entire existence?

Page 38

1   A   No.
2   Q   What percentage of Darby do you currently own?
4      MR. KELLOGG: Object to the form of the question. Assumes that he owns any.
6  BY MR. CRITCHLOW:
7   Q   Good point. That's a good question. Do you own any of the interests of Darby, either the partnership interest, shareholder interest or whatever the nature its legal existence is?
11     MR. KELLOGG: You can answer that yes or no.
13     THE WITNESS: Yes.
14 BY MR. CRITCHLOW:
15  Q   And today how much --
16     MR. KELLOGG: I need to talk to him. I need a break.
18     (Thereupon, a recess was had.)
19     MR. CRITCHLOW: What was the last question?
21     MR. KELLOGG: The last question was do you own Darby?
23     MR. CRITCHLOW: No. Any interest in Darby.
25     MR. KELLOGG: He is going to correct his

Page 39

1  answer.
2      THE WITNESS: And my correct answer is no.
3  BY MR. CRITCHLOW:
4   Q   At any point during its existence did you have any ownership interest in Darby?
6   A   No.
7   Q   Who does currently?
8   A   Company called Coral.
9   Q   Is that the full name, Coral?
10  A   I don't remember. It's Coral, I think it's Coral something else, Coral Investments or Coral something.
13  Q   Do you have any ownership interest in Coral Investments?
15     MR. KELLOGG: Objection, instruct you not to answer.
17 BY MR. CRITCHLOW:
18  Q   What is the percentage of ownership that you have in Coral Investments?
20     MR. KELLOGG: Same objection, same instruction.
22 BY MR. CRITCHLOW:
23  Q   Does Coral own all of Darby?
24     MR. KELLOGG: You can answer that.
25     THE WITNESS: Yes.

Page 40

1  BY MR. CRITCHLOW:
2   Q   Has it owned the entirety of Darby's interest since its existence?
4   A   I believe so.
5   Q   Other than you are there any other individuals or entities that -- Strike that. Let me rephrase it.
8      Are there any owners of Coral Investments other than yourself, if you are an owner?
10     MR. KELLOGG: Objection, instruct you not to answer.
12 BY MR. CRITCHLOW:
13  Q   What did you do after you left i2?
14  A   Took some time off.
15  Q   Did you join any other entity following your association with i2?
17  A   Yes.
18  Q   What is the name of that?
19  A   Started a company called Noble Star Consulting. As part of that founded a company called One Network which I'm the consultant to through Darby - or through Noble Star.
23  Q   At the time of your joinder or your creation of One Network are you aware of any type of press releases or public statements that were made

### 137

1  what APP means?
2  A  Not that I can remember.
3  Q  Did you when you settled this case with
4  Sensation talk to your lawyers about asking them
5  whether there is an engineering technical
6  terminology that defines APP?
7  A  I would assume that they would define it
8  in the agreement, it wouldn't be necessary.
9  Q  Not my question, sir. Did you ask your
10 lawyers to research to determine whether in nautical
11 engineering terminology APP has a meaning?
12 A  Not that I recall.
13 Q  Would that have been important to you?
14 A  Would I -- Would it be remember important
15 for me to tell my lawyers to go do their job?
16 Q  No, sir.
17 A  What are you asking me?
18 Q  Would it have been important for you for
19 your lawyers to tell you that in nautical
20 terminology, nautical engineering terminology, APP
21 has a meaning?
22 A  It would have been important for them to
23 tell me what APP meant and then the definition of
24 APP as far as relevance to the original draft
25 number. So it was APP 2 percent more or less,

### 138

1  90 percent more or less.
2  Q  Is Mr. Mccreery still working for you,
3  sir?
4      MR. KELLOGG: Darby.
5      THE WITNESS: For Darby as of today, yes.
6  BY MR. CRITCHLOW:
7  Q  Is that going to end soon?
8  A  Yeah. He is on temporary loan to us.
9  Q  Okay. From whom?
10 A  Just temporary contract from his --
11 Q  As an independent contractor?
12 A  He is living in Perth not working on boats
13 anymore.
14 Q  Okay. If the term APP has a definition in
15 nautical engineering, would you have believed it was
16 important for Mr. McCreery to tell you that?
17     MR. KELLOGG: Object to the form. Calls
18 for speculation. But answer if you can.
19     THE WITNESS: I think approximate is a
20 term that everybody knows regardless of what it
21 is. I would have expected somebody to define
22 what's the, what's the range of approximate
23 around this issue.
24 BY MR. CRITCHLOW:
25 Q  So was it your understanding that Holland

### 139

1  & Knight as an attorney was supposed to review every
2  aspect of the technical specifications to determine
3  what they meant?
4  A  Absolutely.
5  Q  And was it your understanding that Holland
6  & Knight was required in its legal capacity to
7  review every technical aspect of the general
8  arrangements and profiles?
9  A  Yes. They should read all documents.
10 Q  And are you aware, sir, that, indeed,
11 Holland & Knight advised you that that was not their
12 responsibility?
13 A  No. I'm not aware of that.
14 Q  Other than the draft issue in the Exhibit
15 A that was attached to the contract, are you aware
16 of any other issue that resulted in injury to you or
17 Darby because the wrong Exhibit A was attached?
18 A  I guess in a broader sense, yes.
19 Q  What?
20 A  Because the specifications and the
21 elevations should go hand in hand. Because the
22 elevations didn't get attached there was no, there
23 was no clarity around the specifications.
24 Q  And which elevations, the Zuretti
25 elevations?

### 140

1  A  Those, yes.
2  Q  The Exhibit E?
3  A  Well, Exhibit E never actually got the
4  correct attachment.
5  Q  That's what you said because they weren't
6  attached and I'm talking about you're referring to
7  what Exhibit E should have been?
8  A  Exhibit E takes the interior part of the
9  specifications and clarifies them.
10 Q  Okay. Was the issue raised in the
11 arbitration of what the -- Let me ask you this. Let
12 me strike that, start this question all over again.
13     At the time of the arbitration in December
14 of 2002 were you aware of what the Zuretti drawings
15 should have looked like?
16     MR. KELLOGG: At the commencement of the
17 arbitration?
18 BY MR. CRITCHLOW:
19 Q  Yes. By December of 2002.
20 A  There was a release -- Oh, by December or
21 by the arbitration or by the contract?
22 Q  By the arbitration. We are going nine
23 months ahead now.
24 A  Zuretti never finished the drawings.
25 Q  Not my question, sir. Based upon all the

Page 141

```
 1  information that you had in your possession, by the
 2  time of the arbitration in December of 2002 did you
 3  feel you knew what should have been included in
 4  Zuretti that was not to be - that had been excluded
 5  from Exhibit A?
 6       MR. KELLOGG: Exhibit A or --
 7       MR. CRITCHLOW: A, yes.
 8       MR. KELLOGG: Object to the form. Answer
 9  if you can.
10       THE WITNESS: Exhibit A was the high level
11  specifications. Exhibit E was supposed to be
12  the detailed interior drawings from the yard
13  which was prepared by Zuretti. So there were
14  drawings produced up until the contract that
15  were supposed to be applied to the contract.
16  They were never handed over to us in totality
17  for reasons the yard claimed were competitive
18  reasons.
19 BY MR. CRITCHLOW:
20   Q   By the time that the arbitration commenced
21  and was finished --
22   A   Yeah. We never received them then.
23  Because once they were never attached they saw an
24  opportunity never to have to give them to us.
25   Q   During the arbitration isn't it true, sir,
```

Page 142

```
 1  that part of what the claim was was what the failure
 2  to have the Zuretti drawings deprived you of in the
 3  contract?
 4   A   Yes.
 5   Q   Okay. And that was specifically
 6  arbitrated, correct?
 7   A   Yes.
 8   Q   And the arbitrator made a decision about
 9  what your claim of what Zuretti's drawings should
10  have included and what it shouldn't and denied you
11  relief, correct?
12   A   Actually I think his claim was my lawyers
13  screwed up and, therefore, because they did the
14  contract inappropriately the attachments would not
15  be deemed --
16   Q   Not my question.
17   A   Okay.
18   Q   There was specific issues raised about
19  what the Zuretti drawings should have included in
20  the vessel, correct?
21   A   No. You're mixing up several issues into
22  one issue. There were the original specs as of
23  March. There was K which amended those.
24   Q   Right.
25   A   And there was a discussion in the spirit
```

Page 143

```
 1  of the agreement for some additional things that
 2  didn't get in the contract. The contract was
 3  supposed to read that that would be incorporated in
 4  thereafter as we heard yesterday. So you're
 5  intermingling different components. We never got
 6  any of the elevations attached. Forget about the
 7  few things we arbitrated. We got nothing. After
 8  the arbitration it actually got worse, not better.
 9   Q   Well, at the arbitration Exhibit K was
10  certainly part of the contract; correct?
11   A   Yes.
12   Q   And Exhibit K was to include certain
13  things that Mr. Zuretti was supposed to do, correct?
14   A   Correct.
15   Q   And Exhibit A also provided that you were
16  supposed to have a $455,000 allowance, correct?
17   A   Yes.
18   Q   Okay. No question in your mind that the
19  PC sum meant a $455,000 allowance for whatever you
20  meant it to include, correct?
21   A   The 455 was for owner's selected items.
22   Q   Which was part of the contract price?
23   A   Yeah. Unfortunately we found that the PC
24  sum wasn't defined anywhere in the contract either
25  and then it became ugly.
```

Page 144

```
 1   Q   Who installed PC sum in the contract?
 2   A   The yard.
 3       MR. KELLOGG: Who put it in there?
 4 BY MR. CRITCHLOW:
 5   Q   Yes, in Exhibit K.
 6   A   The yard and Michael.
 7   Q   So is it your testimony today that Michael
 8  participated in the use of the PC sum terminology?
 9   A   Yeah. When we were debating the details
10  of K we had Michael on the phone.
11   Q   And did Michael at any point prior to
12  signing say I think this is not a good idea to
13  include Exhibit K as part of the contract?
14   A   I don't recall.
15   Q   Did Michael tell you that these are not
16  change-orders because a contract hasn't even been
17  signed yet?
18   A   That doesn't make sense to me. You had a
19  boat that was already built. If you're going to
20  change something based on a specification that
21  should have been attached to the contract, then,
22  yes, it should have been a change-order.
23   Q   So that was what your interpretation of
24  the use of the term change-order in Exhibit K was,
25  it was a change-order to the existing specifications
```

40 (Pages 157 to 160)

Page 157

```
 1  Section 1.13 of Exhibit A, do you know how much
 2  damage you suffered because Exhibit A reflects
 3  9 feet 6 inches APP and the maximum draft criteria
 4  is left blank?
 5     A   Yeah. The draft issue is a major cost
 6  issue for me, major issue.
 7     Q   How much?
 8     A   I would -- This is a layman guessing just
 9  off of prior discussions with people, not a formal
10  estimate. But to fix the draft is going to cost in
11  excess of a million dollars we assume.
12     Q   Who have you discussed that with?
13     A   My captain and my engineer.
14     Q   And who is your current captain?
15     A   Steve McDonald.
16     Q   And your engineer, is that still
17  Mr. McCreery?
18     A   Yes, at this point.
19     Q   Is somebody else going to take a look at
20  that issue?
21     A   Yes, when it gets back in the U.S.
22     Q   And who is that going to be that's going
23  to look at the issue of how much it cost?
24     A   We haven't selected the engineering firm
25  yet.
```

Page 158

```
 1     Q   Did you know that the draft issue as set
 2  forth in Exhibit A was the proximate cause of an
 3  injury which you suffered when you settled with
 4  Sensation in September of 2004?
 5         MR. KELLOGG: Object to the form. Answer
 6     if you can.
 7         THE WITNESS: Ask the question again.
 8  BY MR. CRITCHLOW:
 9     Q   Sure. Did you know that you had suffered
10  a monetary injury in September of 2004 when you
11  settled with Sensation as a result of the use of the
12  terminology in Exhibit A that doesn't define APP?
13     A   Yes. We knew that in order to negotiate
14  the problem with the lien that we were giving up
15  something very expensive to us.
16     Q   Did you know that one of the things you
17  were giving up was a cure for the draft issue?
18     A   Oh, yes.
19     Q   And that was in September 2004 when you
20  settled?
21     A   Yes.
22     Q   And until this week you have not raised
23  that as one of your damages; isn't that true, sir?
24     A   Not that I'm aware of. Is that true?
25     Q   I'm asking you, sir.
```

Page 159

```
 1     A   No, I don't think that's true. In fact, I
 2  assume that's a big issue.
 3     Q   Did you review the damage interrogatory
 4  answers before you signed them, sir?
 5     A   I glanced at them.
 6     Q   Did you think it was important to review
 7  the damages which were being asserted by you as part
 8  of --
 9     A   The thing --
10     Q   Let me finish.
11         -- as part of this litigation, sir? Go
12  ahead.
13     A   Yes. But unfortunately some things lead
14  to other damages. The lien was the actual problem
15  area. Because we had to negotiate the lien away we
16  had to give up something else that's going to cost
17  me a lot to fix.
18     Q   So I mean the real causal issue was that
19  you didn't have a lien on the vessel in the summer,
20  early fall of 2004 which caused you to feel you had
21  to settle with Sensation; is that correct?
22         MR. KELLOGG: Object to the form.
23  Misstates testimony.
24  BY MR. CRITCHLOW:
25     Q   Go ahead, sir.
```

Page 160

```
 1         MR. KELLOGG: Answer it.
 2         THE WITNESS: Yes, that's correct.
 3  BY MR. CRITCHLOW:
 4     Q   Now, we are going to get back to that.
 5  But my question, when you settled in September of
 6  2004 with them, and I'll show you a copy of amended
 7  VCA if you want to see it -- Well, we are going to
 8  show it to you. You knew that one of the injuries
 9  that you had suffered because you were giving up
10  rights relate to the draft, correct?
11     A   Oh, yeah, yeah.
12     Q   In October of 2005 when you signed the
13  Answers to Interrogatories which itemized all of
14  your damages, is there any reason you didn't include
15  that?
16     A   Probably depends on how you define it. Is
17  the damage caused by the lien or is it caused by the
18  fact that you had to use something to negotiate away
19  the lien? I'm not a lawyer. You tell me.
20     Q   Sir, the question was tell me all the
21  damages that you suffered as a result of Holland &
22  Knight's negligence.
23     A   Holland & Knight's negligence --
24     Q   I'm not done yet.
25     A   Okay.
```

Veritext/Florida Reporting Co.
Serving the State of Florida (305) 376-8800

Case 1:04-cv-20658-EGT   Document 108-1   Entered on FLSD Docket 05/07/2007   Page 7 of 12
41 (Pages 161 to 164)

...

**Page 161**

1  Q   Was the damage associated with the draft a
2  result of Holland & Knight's negligence?
3  A   Yes.
4  Q   And in October of 2004 --
5  A   Caveated, yes.
6  Q   In October of 2005 when you signed under
7  oath the Answers to Interrogatories, you did not
8  list that as one of your damages?
9  A   Like I said, the damage of the draft was
10 because of the negotiation process. They required
11 us to give the yard something that they knew they
12 would probably loose on. The lien caused the draft
13 issue.
14 Q   Maybe my English is just awful. So I'm
15 going to try it again.
16 A   Or maybe you're not paying attention to my
17 response.
18 Q   Maybe my question is just too confusing.
19 Let me try it again.
20 A   All right.
21 Q   In September of 2004 when you signed the
22 amended VCA that was the settlement between Darby
23 and Sensation -- Correct?
24 A   Yes.
25 Q   -- you knew that one of the injuries that

**Page 162**

1  you were going - that you would suffer because of
2  this settlement was the damage associated with the
3  draft, correct?
4  A   Because we had to trade it to get the
5  lien.
6  Q   For whatever reason.
7  A   Okay. Yes.
8  Q   You knew that that was a damage that was
9  related to Holland & Knight's services to you as a
10 lawyer, as your lawyer, as Darby's lawyer; right?
11 A   Right.
12 Q   So you knew it in September of 2004. My
13 question to you, sir, is in October of 2005, a
14 little bit more than a year later, you did not swear
15 under oath that that was one of the injuries which
16 you had suffered. Why is that?
17 A   I guess not being a lawyer I assumed
18 anything that I had to negotiate to get the lien
19 back would have been understood that the lien caused
20 the issue.
21 Q   So if your lawyers improperly prepared the
22 interrogatory answers it's their fault not yours for
23 telling them about it?
24     MR. KELLOGG: Object to the form.
25     THE WITNESS: Object to the question. No.

**Page 163**

1  I'm not saying that. I'm saying that -- You
2  tell me. I'm a layman. I'm not a lawyer. The
3  lien caused me to negotiate away an issue that
4  could be construed, may or may not ended up
5  being a problem for Holland & Knight. But
6  because of the lien it became a major issue.
7  BY MR. CRITCHLOW:
8  Q   So if the lawyers in October of 2005
9  failed to provide as one of your damages the million
10 dollars plus for fixing the draft problem, they made
11 a mistake?
12 A   I don't know. You tell me. I'm not a
13 lawyer.
14 Q   Well, you read the interrogatories and you
15 swore under oath that they were truthful?
16 A   How many times you want me to answer the
17 same question? I'm assuming that if I was stating
18 the lien problem and it was clear that we had to
19 negotiate away something that may or may not be
20 their problem but because we had to negotiate it
21 away, yes, it's caused me severe damages.
22 Q   And you don't know why that was not
23 included in your damages a year later, correct?
24     MR. KELLOGG: You want to show him the
25 interrogatory?

**Page 164**

1      THE WITNESS: I don't know. Show me the
2  interrogatory.
3      MR. CRITCHLOW: Let me have a copy of the
4  interrogatory. Let me have this marked as
5  Exhibit 34.
6      (Thereupon, Defendant's Exhibit 34 was
7  marked for identification.)
8      THE WITNESS: I guess my response is still
9  basically the same. It does not appear to
10 address the lien issue and what it caused in
11 dollars. So, yeah, maybe the attorneys
12 mishandled this.
13 BY MR. CRITCHLOW:
14 Q   Take a look at page 6, please. Is that
15 your signature?
16 A   Yes.
17 Q   And was that notarized on October 7, 2005,
18 by Shellee Mussey?
19 A   Yes.
20 Q   Does that mean that in October 7 or
21 thereabouts you read these and signed them?
22 A   Yes.
23 Q   Did you believe it was your responsibility
24 to review them for accuracy or is that the lawyers
25 job?

Page 169

1  A  Okay. And let me rephrase my issue on the
2 million dollars. When I'm referring to a million
3 dollars, I'm talking about the swim platform. There
4 is a lot of additional costs that we are incurring
5 and will continue to incur for the draft outside of
6 the million dollars. I'll get to that.
7  Q  In looking at Exhibit 8 if you say that
8 did you have to pay for the fix to the swim platform
9 under Exhibit 35?
10  A  Not on this part.
11  Q  That was Sensation's responsibility,
12 right?
13  A  Let me give you some clarity.
14  Q  That was Sensation's responsibility,
15 correct?
16  A  Yes.
17  Q  Go ahead.
18  A  The draft sits so low that the swim
19 platform was literally under water. Unfortunately
20 you have a garage that has a garage door that opens.
21 The swim platform can only be raised so far. They
22 agreed to raise it so far. It's still under water.
23 Makes the boat almost unusable and very expensive
24 from a resale opportunity. In order to fix that you
25 have to completely reconfigure the garage, the back

Page 170

1 of the boat, the crane system, the all the back end
2 of the interior. It's a major issue. That's the
3 first problem with with the draft. But that's just
4 the problem related to the swim platform.
5       You also have a problem with the foot
6 draft creates a back pressure problem with the
7 engines. What that means is that the exhaust flows
8 down in the water, it's too deep, there is too much
9 pressure. We actually experienced that. The boat
10 got 300 miles offshore and almost sunk because it
11 burned up the exhaust area and caused a leak and the
12 engines to shut down. Because of that we also had
13 to pay to ship the boat to the United States.
14 That's also due to the draft which was another
15 $225,000 worth of damages we have incurred. Since
16 then we have had to completely redo the back draft,
17 back - or whatever I just called it, the back
18 pressure problem. Had to reconfigure some of the
19 exhaust systems in the boat, had to pay to ship it
20 over here. The remaining thing that we have not
21 paid for yet is the reconfiguring of the back of the
22 boat which we don't have a detailed estimate yet.
23  Q  Is that more than a million dollars?
24  A  No. Like I said, it's a high level, we
25 can get a detailed estimate. But the estimate is

Page 171

1 going to be, it's a lot of money to redo the back of
2 the boat.
3  Q  How much?
4  A  We don't have a detailed estimate. Off
5 the cuff answer I gave you is a million dollars.
6  Q  So that's a million dollars separate and
7 apart from the swim platform?
8  A  That is to create a fix for the swim
9 platform. You can't fix the draft. It's -- You
10 can't fix that.
11  Q  So all of the problems associated with the
12 draft issue are about a million dollars in excess of
13 what you have paid for under the contract?
14  A  No. What I said is the million is just
15 for the reconfigure of the back of the boat. It may
16 be half a million, it may be a million and a half.
17 We won't know until we get a detailed estimate.
18 It's going to be done in the Bahamas when it gets
19 over here. We have already consumed probably
20 $250,000 $300,000 more of doing the fix for the back
21 pressure problems. We can get detailed estimates on
22 that.
23  Q  When did you incur those expenses?
24  A  Just recently.
25  Q  When did the boat burn?

Page 172

1  A  That first experience was right after it
2 left. We tried to float it back. Back pressures
3 stopped it. We had to go back to shore. We were
4 under legal liability to get out of - not a legal, a
5 tax liability to get out of New Zealand by a certain
6 timeframe or we would have to pay taxes on it. The
7 yard wasn't willing to do the work. We had to get
8 out of town so we also incurred the cost of shipping
9 it over to the U.S. We had to put it on a ship and
10 ship it over here which was another 200 something.
11  Q  When was the boat shipped over here?
12  A  Right after we took delivery. Probably
13 two weeks after that, whatever the delivery date is.
14  Q  So sometime January, February of 2005?
15  A  Yeah. We put it in the yard, worked on it
16 for six, seven weeks and get it over to the
17 timeframe January so sometime around there.
18  Q  So sometime in early 2005, January,
19 February, March 2005?
20  A  Well, let's say it's 2006. No. This was
21 the first season. So -- Yeah, I guess we spent a
22 lot more time working on it. It was here at
23 Lauderdale for nine or ten months, Lauderdale
24 surrounding area.
25  Q  But the boat or the vessel was delivered

177

1 BY MR. CRITCHLOW:
2   Q   Let me rephrase it. Did he provide to you
3 any type of either in either hard copy or electronic
4 form, an explanation of why you should settle and
5 give up so many things?
6   A   I don't know if we have a hard copy of it.
7 I'm sure there is one somewhere. But there was a
8 lot of discussion around you really don't have a
9 choice because of the lien. If you don't do this,
10 if you don't settle, you could loose the boat
11 altogether.
12   Q   And that was the primary reason that you
13 settled?
14   A   Primarily, yes.
15   Q   And is my understanding correct that Erceg
16 threatened to go into bankruptcy?
17   A   Yes. There were a lot of verbal comments
18 made.
19   Q   What were those?
20   A   The yard is having financial difficulties,
21 we don't have the wherewithal, da da da. His
22 brother told me on the phone that he had no
23 intention of putting more money in the yard.
24   Q   And was that the reason that you decided
25 to settle, was because the yard could go into a

178

1 bankruptcy type proceeding and you would loose the
2 vessel?
3   A   Yes. That was a big part of it.
4   Q   Anything else?
5   A   It was primarily the lien I guess. The
6 secondary issue would be just getting the boat out
7 of New Zealand and finishing it somewhere else. The
8 draft, once we settled I had to have it done
9 somewhere else.
10   Q   Now, did anybody provide you with a legal
11 analysis of your rights in New Zealand relative to
12 the ownership of that vessel?
13   A   I know there was a research done by
14 Russell McVeagh on behalf of - you say early on - on
15 behalf of Michael, later by Rob. And they got an
16 opinion.
17   Q   And what was that opinion?
18   A   That if it went to court on the lien we
19 would loose.
20   Q   All right. And was that in writing?
21   A   I believe so.
22   Q   Did you see it?
23   A   I think I glanced at it. I don't know if
24 I kept it or not. I'm sure Rob has got it.
25   Q   And did Rob do any independent research

179

1 himself? Rob Moss that is.
2   A   You would have to ask Rob.
3   Q   And did Rob advise you that you should
4 give up your rights because of the lien issue?
5   A   He said we need to come to closure
6 primarily because of the lien issue.
7   Q   And did you ask Rob to do any research
8 himself?
9   A   Well, I asked Rob to manage the process.
10   Q   So it would be fair to say that Rob was in
11 charge of making sure that whatever research needed
12 to be done relative to your rights, the ownership or
13 liens on the vessel, that it was his job to make
14 sure all the research was properly done?
15   A   Post the contract. It was Michael's
16 before that.
17   Q   I mean after the contract.
18   A   Yes, yes.
19   Q   When did you first hire Mr. Moss?
20   A   I don't know. After the arbitration and
21 after it was clear that Holland & Knight was a
22 problem.
23   Q   Just out of curiosity was Sensation a
24 boatyard that was in the business of selling boats
25 and vessels?

180

1   A   Selling or building?
2   Q   Both. Building and selling?
3   A   Yes.
4   Q   And did you consider that you were dealing
5 with them in that business to have a boat built and
6 sold to you?
7   A   I'm sorry. I don't understand.
8   Q   Did you consider that in your agreement
9 with Sensation that you were buying from them a
10 vessel which they would build and you would take
11 possession of?
12   A   Yes.
13   Q   Was that your intention in the contract
14 itself?
15   A   To buy the boat?
16   Q   To buy the boat from a boatyard that was
17 in the business of building and selling boats.
18   A   Yes.
19   Q   Were you told by any of your lawyers prior
20 to giving up your rights because of this lien issue
21 that, in fact, New Zealand law favored you that you
22 owned it?
23   A   Not that I recall.
24   Q   Would that have been important to you if
25 that is or was the law in 2004?

Page 181

```
1    A    If the --
2         MR. KELLOGG: Object to the form. Calls
3    for speculation. Lack of foundation. But go
4    ahead and answer if you can.
5         THE WITNESS: Yeah. I mean, if I found
6    out that I would not have lost, there was no way
7    for me to loose on the lien, sure, it would have
8    been important.
9  BY MR. CRITCHLOW:
10   Q    And would you have still settled?
11   A    If I did, nowhere near like it is.
12 Because there was nothing to settle. He would have
13 nothing on his side to settle against.
14   Q    If we go back to your Answers to
15 Interrogatories, sir, which I believe we had marked
16 as Exhibit 34. I'm going to ask you, sir, if these
17 are an accurate computation and compilation of your
18 damages as you sit here today, the draft issue
19 aside?
20   A    No. I would expect that there would be
21 additional damages that we have yet to figure out.
22   Q    And what do those relate to, sir?
23   A    Most of them will be due to the draft
24 challenges.
25   Q    The draft aside. And those haven't been
```

Page 182

```
1  computed yet, correct?
2    A    Yeah. But just remember that the draft
3  causes problems. And so we don't know all the
4  things it's caused yet.
5    Q    Other than damages relating to the draft
6  issue do your Answers to Interrogatories accurately
7  reflect all of the damages which you are claiming
8  against Holland & Knight in this lawsuit?
9    A    No. There will probably be some other
10 things that are still yet to be in here that I have
11 noticed.
12   Q    Well, this is my day. This is your day.
13 So tell me every other item of damage as well as its
14 computation that is not included in your Answers to
15 Interrogatories.
16   A    There is a lot of things I didn't get on
17 the boat that were actually agreed to that because
18 the elevations were not attached. I just chose not
19 to have them done because I was going to have to pay
20 for a change-order.
21   Q    You knew that in September of 2004,
22 correct?
23   A    Yes. I knew there were things that I did
24 not get.
25   Q    And you knew what the approximate values
```

Page 183

```
1  of those were, too; didn't you, sir?
2    A    No, I didn't know the approximate values.
3    Q    You knew that that was at least an item of
4  damage --
5    A    Right.
6    Q    -- that you gave up as a result of the
7  settlement with Sensation, correct?
8         MR. KELLOGG: Object to the form. Gave it
9    up because of the arbitration ruling.
10        THE WITNESS: Right. Right. I gave up
11   because of the arbitration ruling.
12 BY MR. CRITCHLOW:
13   Q    You gave up in connection with the
14 settlement with Sensation?
15        MR. KELLOGG: Object to the form.
16        THE WITNESS: I gave up, yes.
17 BY MR. CRITCHLOW:
18   Q    Okay.
19   A    Well, as far as a ruling, not a
20 settlement. What are you talking about?
21   Q    Well, as a result of the conclusion of the
22 arbitration which happened -- I think the award came
23 in March of 2003; is that right?
24   A    Yes. Something like that.
25   Q    I can get it if you want. But that's the
```

Page 184

```
1  approximate date. So you knew as of March of 2003
2  that there were injuries that you had suffered
3  because you weren't going to get what you wanted,
4  correct?
5    A    Right.
6    Q    And did you know in March of 2003 you
7  weren't going to put them into the boat at that
8  point?
9    A    Not all of them, no.
10   Q    By September of 2004 you knew what you
11 weren't going to put into the boat, correct, when
12 you settled with Sensation?
13   A    No. We are still adding some of the
14 things that we didn't get in ourselves.
15   Q    What is it that you did not get?
16   A    Effective paint job. We didn't get some
17 of the outside furniture definitions done. A lot of
18 stuff like handrails that were inappropriately done
19 and we had to redo. A whole laundry list of those
20 types of issues.
21   Q    Well, the effective paint job, wasn't that
22 the obligation of Sensation to do regardless of what
23 the contract said?
24   A    Well, because we had to settle for taking
25 delivery on the boat, the paint job never got done.
```

### 197

1 Sensation in excess of?
2    A    Yeah. It's payment in excess of. It
3 still doesn't include the things that we didn't get.
4    Q    Okay.
5    A    That's what we agreed to pay for anyway.
6    Q    This is what you actually paid Sensation,
7 however, over and above the 455?
8    A    It's my understanding.
9    Q    And you paid Nigel Burgess an additional
10 $1,200 for something?
11    A    Yes. Come in and help clean up this mess.
12 We hired him as consultants.
13    Q    Okay. And what is the bathroom fixture
14 amount?
15    A    $53,000.
16    Q    I add that and I see that down there. Why
17 is this a damage? What does it mean? I don't
18 understand that either.
19    A    When you look at the specifications that
20 were agreed to in the attachment didn't get attached
21 versus what was put in the document, it's a
22 difference of $53,000.
23    Q    So these are items that you should have
24 received that you didn't and you had to pay
25 Sensation for?

### 198

1    A    To get what I need.
2    Q    To get what you wanted?
3    A    Yes.
4    Q    And these should have been included where?
5    A    In the specification documents.
6    Q    Exhibit A?
7    A    No. Exhibit E.
8    Q    Exhibit E.
9    A    Or A. So that's the problem with the
10 exhibits. They all kind of interrelate.
11    Q    So long as I know the document from which
12 it flows. Either Exhibit A - or E, excuse me, or
13 both. The next one is, because it looks like it's
14 highlighted I assume that says change-orders.
15    A    Right.
16    Q    What does this next element of damage
17 relate to?
18    A    Appears to be once again something that
19 wasn't in the attached specs that were in the ones
20 that should have been attached.
21    Q    And which specific spec does this relate
22 to, A or B or E?
23    A    It would be a combination of A, E. A, E.
24    Q    Okay. So the change-orders relate to
25 Exhibits A and E. The bathroom fixtures relate to A

### 199

1 and E and the furniture construction cost relates to
2 the PC sum of $455,000 allowance. Correct?
3    A    Yes. I think specifically it's the
4 drop-in difference, yes.
5    Q    Okay. Going to what is referred to as B6,
6 I have got no idea why it's called that but B6 is an
7 additional navel architect fees due to dispute
8 delays. What does this relate to, sir?
9    A    This must have been for the arbitration.
10    Q    It says service date seventh inspection,
11 eighth inspection, ninth inspection, ten, eleventh
12 inspection, that's actually after the arbitration
13 and twelfth inspection. Does this mean additional
14 inspections which they had to perform because the
15 boat was delayed in getting built?
16    A    I would assume.
17    Q    So this is a direct consequence of a delay
18 in the construction of the boat, correct?
19    A    When was the arbitration finished?
20    Q    Finished in December. The award was
21 December -- Excuse me. It was finished in December
22 of '02. The award came in March of '03.
23    A    No. What I think this is was to prepare
24 the -- We used him as an expert witness for the
25 arbitration.

### 200

1    Q    Well, that would perhaps be -- Well, it
2 even wouldn't be that because the arbitration was
3 over before December 20. And it's an inspection.
4 And all the other inspections occurred in '03 after
5 the arbitration.
6    A    Um-hum.
7    Q    And it's called due to dispute delays.
8    A    Right. Like I said, I didn't prepare this
9 so I assume that --
10    Q    It relates to the additional inspections
11 that had to be made because the boat was delayed and
12 had to continue to inspect; correct?
13    A    Yes, I would assume.
14    Q    Okay. Cost difference. Does this mean
15 that had you been able to purchase these items in
16 2002 instead of 2003 and 2004 that the items would
17 have cost less?
18    A    Yeah. Now I know what that is. This is
19 saying because of the delays we had a lot more
20 inspections than we originally anticipated. Because
21 of the delays we had a lot of costs incurred from
22 the difference and price of things.
23    Q    So this is also a delay damage?
24    A    Yes.
25    Q    Next, the loss of fees -- This is the

**205**

1    MR. KELLOGG: Why don't you ask him the
2    question. Ask whatever questions you need to
3    ask.
4   BY MR. CRITCHLOW:
5    Q   Okay. Has your claim for loss of Noble
6   House revenues been withdrawn?
7    A   My expection for loss of Noble House
8   revenue would have been only after the late payments
9   were expired. So anything from that point until we
10  could actually charter the boat is what we will
11  still claim.
12   Q   Well, you voluntarily gave up the $3,000 a
13  day late penalty, correct, in connection with the
14  settlement with Sensation in September of '04?
15   A   We actually raised it, didn't we?
16   Q   Pardon?
17   A   I think we actually added a new one.
18   Q   You did indeed?
19   A   Yes.
20   Q   So that whatever late charges would have
21  occurred by reason of the inappropriate delivery
22  should be Sensation's problems after 60 days
23  following September 17, '04; correct?
24   A   No, not necessarily.
25   MR. KELLOGG: You mean up until delivery?

**206**

1    MR. CRITCHLOW: Yes.
2    MR. KELLOGG: Answer the question if you
3    can.
4   BY MR. CRITCHLOW:
5    Q   In the amended VCA you provided for a
6   delivery of the vessel within 60 days of the
7   execution; correct?
8    A   Right.
9    Q   And if they failed to deliver the vessel
10  within 60 days they were responsible for late fees;
11  correct?
12   A   Up until they handed it off to us.
13   Q   And that late fee was $4,500 a day?
14   A   Yes.
15   Q   So in connection with the amendment you
16  negotiated a penalty that Sensation was responsible
17  for for the late delivery of the vessel; correct?
18   A   Up until delivery.
19   Q   And even though the delivery was made to
20  you sometime in January of 2005 they did not deliver
21  a seaworthy vessel; correct?
22   A   Correct.
23   Q   So do you --
24   A   Well, they met their obligations.
25   Q   Well, they did not deliver to you a

**207**

1   usable, seaworthy vessel; correct?
2    A   Correct.
3    Q   And that violated the terms of the amended
4   VCA; did it not, sir?
5    A   No, it did not.
6    Q   Did you read the VCA, the amendment to the
7   VCA carefully?
8    A   Maybe I didn't. My understanding is it
9   did not. I would love that advice if you can show
10  me where it does.
11   Q   And if it does violate what they warranted
12  to you or represented to you they did that would be
13  Sensation's problems 60 days after September of 2000
14  --
15   A   It solely depends on the issue.
16   Q   The condition of the vessel?
17   A   Another good example is the draft. They
18  walked from the draft issue and most of the problems
19  we have had and why we couldn't use the boat was
20  draft-related issues.
21   Q   When you settled the draft issue in
22  September of 2004 did you anticipate that the agreed
23  upon fix, that is with the swimming deck, was going
24  to fix the problem?
25   A   Absolutely not.

**208**

1    Q   Did you know that in September of 2004
2   that you were going to have a multiple million
3   dollar expense before it would be seaworthy?
4    A   We knew the swim platform would have to be
5   dealt with differently than what they were
6   committing to do.
7    Q   Did you know that there were other
8   problems associated with it?
9    A   No. Nobody can. There is no way you can
10  know until you experience what that draft was going
11  to cause.
12   Q   So did you have your engineer look at it
13  and try to decipher or try to determine all of the
14  problems that can arise from that?
15   A   Sure. But until you get it out and use it
16  you don't know.
17   Q   Was the Burness Group part of that group
18  that you dealt with?
19   A   Yes.
20   Q   And Mr. McCreery was as well, correct?
21   A   Yes. But no engineer can understand the
22  causes of the draft until you start using it.
23   Q   So this delay damage that you are seeking
24  for loss of Noble House revenues emanates from the
25  contract; correct?